

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

BARBARA DELUCA and DREW R.
NAYLOR, on behalf of themselves and
other similarly situated limited partners,

          Plaintiffs,

          v.

GPB AUTOMOTIVE PORTFOLIO, LP,
GPB HOLDINGS II, LP,
GPB CAPITAL HOLDINGS, LLC,
ASCENDANCY ALTERNATIVE
STRATEGIES, LLC, ASCENDANT
CAPITAL, LLC, AXIOM CAPITAL
MANAGEMENT, INC., DAVID
GENTILE, MARK MARTINO,
JEFFREY LASH, and JEFFREY
SCHNEIDER,

          Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**19 CV 10498**

Civil Action No. _____

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

121213333_1

**TABLE OF CONTENTS**

Page

I. INTRODUCTION...................................................................................................................2

II. PARTIES.............................................................................................................................6

    A. PLAINTIFFS .................................................................................................................6

    B. DEFENDANTS..............................................................................................................7

        1. Fund Defendants ..........................................................................................7

        2. Selling Defendants .......................................................................................9

III. JURISDICTION, VENUE, AND DEMAND FOR TRIAL BY JURY .........................................11

IV. FACTUAL ALLEGATIONS.................................................................................................12

    A. THE GENERAL PARTNER CREATES THE GPB INVESTMENTS TO INVEST IN AUTOMOTIVE DEALERSHIPS AND OFFERS LIMITED PARTNERSHIP UNITS TO INVESTORS .....................12

    B. THE FUND DEFENDANTS OFFER THE GPB INVESTMENTS TO INVESTORS THROUGH THE SELLING DEFENDANTS, WHO HAVE DEEP TIES TO THE GENERAL PARTNER AND RECEIVED LUCRATIVE FEES..................................................................................................14

    C. DEFENDANTS FRAUDULENTLY INDUCE INVESTORS INTO PURCHASING LP UNITS IN THE GPB INVESTMENTS AND CONCEAL AN ILLEGAL SCHEME TO DEFRAUD INVESTORS .....17

        1. The Automotive Dealership Approval Process Is Rigorous And Subject To Strict Requirements.................................................................................................17

        2. The Fund Defendants Circumvented The Manufacturer Approval Process Using The Convertible Loan Scheme............................................................................18

        3. The Private Placement Memoranda Made Material False Statements And Omissions Concerning ███████████████████████████████.........................21

        4. Lawsuits Involving The General Partner Reveal An Illegal Ponzi Scheme And Undisclosed Self-Dealing Payments And Transactions.......................................24

    D. DEFENDANTS' HOUSE OF CARDS BEGINS TO CRUMBLE................................................36

        1. The General Partner's CFO Resigns ................................................................36

        2. The General Partner's Auditor Resigns And The GPB Investments' Financials Need To Be Restated.....................................................................................37

        3. GPB Capital And The GPB Investments Become The Target Of Government Investigations ..............................................................................................40

        4. Defendants Admit To Paying Distributions Using Investor Capital Contributions Instead Of Operating Income, As Previously Represented, And Then Promptly Cease Making Investor Distributions...................................................................41

        5. The General Partner's Chief Compliance Office Is Indicted For Obstruction of Justice........................................................................................................43

V. CLASS ALLEGATIONS......................................................................................................43

VI. COUNTS.........................................................................................................................46

i

COUNT I ................................................................................................................46
Fraud IN THE INDUCEMENT Against the .......................................................46
Fund Defendants and the Selling Defendants.....................................................46
COUNT II................................................................................................................47
Fraudulent Misrepresentation Against the Fund Defendants and the Selling Defendants ......47
COUNT III ..............................................................................................................49
Breach of Contract Against the General Partner .................................................49
COUNT IV ..............................................................................................................50
Breach of Duty to Make Lawful Distributions Against the General Partner .........................50
COUNT V ................................................................................................................51
Aiding and Abetting Fraud Against the Selling Defendants .................................51
COUNT VI................................................................................................................52
Unjust Enrichment Against All Defendants ........................................................52
VII.     PRAYER FOR RELIEF........................................................................................................53

ii

Plaintiffs Barbara DeLuca and Drew R. Naylor (together, "Plaintiffs"), file this class action on behalf of themselves and other similarly-situated limited partners ("Limited Partners") against Defendants GPB Automotive Portfolio, LP ("Automotive"), GPB Holdings II, LP ("Holdings II"), GPB Capital Holdings, LLC ("GPB Capital" or "General Partner") (together with Gentile, Lash, Schneider, Automotive and Holdings II, the "Fund Defendants"), Mark Martino ("Martino"), Ascendant Alternative Strategies, LLC ("AAS"), Ascendant Capital, LLC ("Ascendant"), Axiom Capital Management, Inc. ("Axiom") (together with Martino, AAS and Ascendant, the "Selling Defendants"), David Gentile ("Gentile"), Jeffrey Lash ("Lash"), and Jeffrey Schneider ("Schneider") (collectively with Gentile and Lash, the "GPB Individual Defendants") (together with the Fund Defendants and the Selling Defendants, the "Defendants"). Plaintiffs allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation, their review of: (a) over ▆▆▆▆ pages of documents produced by Defendants pursuant to Plaintiffs' demands to inspect books and records pursuant to 6 *Del. C.* § 17-305 sent to Holdings II ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆; (b) the parties' relevant limited partnership agreements ("LPAs") and private placement memoranda ("PPMs") and other GPB Capital correspondence; (c) regulatory filings made with the United States Securities and Exchange Commission ("SEC"); (d) press releases and media reports issued by or concerning Defendants; (e) public court filings by Defendants and others; and (f) other publicly-available information concerning Defendants.

Plaintiffs bring this class action on behalf of all persons or entities who purchased or otherwise acquired limited partnership units ("LP Units") in Automotive and Holdings II (the

"Class"). Plaintiffs seek rescission, disgorgement, and monetary relief for themselves and the Class, and any other such relief as the Court may deem just and appropriate.

## I.    INTRODUCTION

1.    This action arises out of a fraudulent scheme whereby Defendants raised money and/or assisted in raising money from investors for Automotive and Holdings II (the "GPB Investments") by marketing investments in car dealerships and other investment opportunities with a promise of steady, long-term returns. In reality, it was a short-term fraud by which Defendants lied to and withheld material information from investors in order to induce investment, siphoned off lucrative fees for themselves, and paid their investors "distributions" with subsequent investor capital, which Defendants misrepresented to be the product of dealership operational cash flow and profit. As of May 2018, over 14,000 Limited Partners were fraudulently induced into investing *more than $1.27 billion* of capital into Defendants' fraudulent scheme, which Defendants knew was virtually impossible to sustain. Defendants, nonetheless, managed to pay themselves over $100 million in fees from the funds that Plaintiffs and the Class unknowingly invested into the fraud. Moreover, Defendants failed to inform investors that the exorbitant fees, expenses, and compensation on sales, acquisitions, management, and operations were being paid to related party entities and individuals.

2.    Formed in 2013, GPB Capital is the General Partner of Automotive, Holdings II, and at least eight other private partnerships that have raised capital primarily through the sale of LP Units to investors through broker-dealer firms. Beginning in 2013 for Automotive, and 2015 for Holdings II, the General Partner and its owner and officers solicited Limited Partners to invest in the GPB Investments, whose primary aim was to purchase retail car dealerships for the purpose of generating operating revenue that would be distributed to Limited Partners in the form of dividends.

2

3.     For example, in 2014, Plaintiff DeLuca and other Automotive Limited Partners were told that the investment program's primary focus would be ███████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████.

Instead, the General Partner's aim was to deduct fees, expenses, and advances on profits from investor capital and pay itself and interrelated outside entities these monies, all of which were grossly disproportionate to the value and risk associated with the investment plan or the services that they provided.

4.     To achieve their true goal of siphoning off and absconding with money directly from the investment to profits themselves and related third parties, the Fund Defendants needed to raise ever-increasing amounts of investor capital.

5.     To do so, the Fund Defendants made aggressive distribution projections in their PPMs to entice investors, who were told in the PPMs that they could expect to begin receiving distributions based on dealership cash flows within three months from when they purchased LP Units in the GPB Investments.  Plaintiffs and the other Class members were promised ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

3

6.      Meanwhile, the Fund Defendants and the Selling Defendants knew that these distribution expectations could not be met relying exclusively on cash flows from dealership operations, as Automotive, Holdings II, and other related ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████.

7.      To remedy this issue, the General Partner paid Automotive and Holdings II distributions to Limited Partners, including Plaintiffs, from the subsequent investment capital raised for Automotive, Holdings II, and the other GPB Capital entities that the General Partner operated.  Each time it did so, the General Partner increased the need to raise more capital to fulfill more distribution expectations.

8.      This need became perpetual as Defendants repeatedly expanded their offerings. Put succinctly, the Fund Defendants and the Selling Defendants engaged in a distribution plan commonly referred to as a "Ponzi scheme" (the "Ponzi Scheme").

9.      To conceal this Ponzi Scheme and their true motives, the Fund Defendants and the Selling Defendants consummated a scheme that made Automotive, Holdings II, and other related GPB Capital entities appear to be acquiring dealership assets and dealership cash flows. However, this plan too was a fraud.

10.     To obtain ownership of a car dealership, a person must obtain manufacturer approval, which has strict requirements and is a lengthy process.  Knowing that they could not obtain approval on the timetable needed to meet distribution expectations, the Fund Defendants and the Selling Defendants employed a deceptive, convertible loan scheme that would circumvent manufacturer-franchising requirements (the "Convertible Loan Scheme").

4

11.    Specifically, Defendants paid dealership owners a purchase price that they characterized as a forgivable loan that could be converted into equity. In exchange, they purported to obtain access to dealership operations and cash flows so that the Fund Defendants could appear to be carrying out the investments promised in the PPMs.

12.    But in making these so-called "loans," the Fund Defendants flouted manufacturer approval requirements, and Defendants knew that it was virtually impossible that this loan device would result in actual manufacturer-approved ownership of a dealership that could be presented as a going concern because neither the General Partner, nor the GPB Investments, possessed the requisite expertise or track record to obtain manufacturer approval for the dealership. None of this was disclosed to Plaintiffs or the Class prior to their investments in the GPB Investments.

13.    

Neither the Fund Defendants, nor the General Partner, had any significant expertise or experience in the automotive retail sector.

14.    

Fund Defendants purchase portfolios of dealerships and employed their former owners, including individuals dealership group owners Jeffrey Lash, Patrick DiBre and David Rosenberg. All three of these individuals eventually sued Fund

Defendants for nonpayment and breach of contract, and nearly all have accused Fund Defendants of defrauding the Limited Partners.

15.    Moreover, from 2013 to 2017, Defendants relied on their accountants to present a picture of a stable going concern and produced audited financial reports that contained misleading and falsified information. ███████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████

16.    By employing these fraudulent schemes, Defendants induced the Limited Partners to purchase LP Units in Automotive and Holdings II to their detriment, and as a result, they are responsible for Plaintiffs' losses. Plaintiffs are entitled to the return of their capital investment and punitive damages.

## II.    PARTIES

### A.    PLAINTIFFS

17.    Plaintiff Barbara DeLuca ("DeLuca") is a natural person who resides in Boynton Beach, Florida. DeLuca purchased two units in Automotive for $100,000 on June 1, 2015, and has continuously held such units at all relevant times.

18.    Plaintiff Drew R. Naylor ("Naylor") is a natural person who resides in North Carolina. Naylor's spouse, Dr. Lee Ann Naylor, purchased one unit in Holdings II for $50,000 in March 2018 and has continuously held such unit at all relevant times. Naylor is the assignee of his wife's interests in Holdings II.

121213212_1

**B.   DEFENDANTS**

**1.   Fund Defendants**

19.     Defendant Automotive is a Delaware limited partnership with its principal place of business located at 159 Northern Boulevard, Great Neck, NY 11021; 1581 Franklin Ave., Garden City, NY 11530; and 535 West 24th Street, Floor 6, New York, NY 10011.

20.     During the relevant times hereto, Automotive offered and sold LP Units to investors, including Plaintiffs. GPB Capital is the General Partner of Automotive. ■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

21.     Defendant Holdings II is a Delaware limited partnership with its principal place of business located at 535 West 24th Street, Floor 6, New York, NY 10011.  During the relevant times hereto, Holdings II offered and sold LP Units to investors, including Plaintiffs.

22.     Defendant GPB Capital is a Delaware limited liability company that holds itself out as having its principal place of business located at 535 West 24th Street, Floor 6, New York City, NY 10011. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ and was at all relevant times the General Partner, control person, manager, and majority owner of the GPB Investments. GPB Capital orchestrated the offerings of the GPB Investments and offered and sold the LP Units issued by the GPB Investments to Plaintiffs and other investors. ■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■

23.     Defendant David Gentile is a natural person that resides in New York.  Together with Defendants Lash and Schneider, Gentile co-founded GPB Capital in 2013.  At all relevant times, Gentile was the sole owner and Chief Executive Officer ("CEO") of the General Partner. He was integrally involved in the preparation of the PPMs for the GPB Investments and managed the day-to-day operations of the GPB Investments.  Gentile is also an indirect owner in AAS.

7

24.     Defendant Jeffrey Lash is a natural person that resides in New York. Lash masterminded the automotive dealership investment strategy that culminated in the GPB Investments and brought the original idea to Defendant Gentile in 2012.  Gentile brought in Defendant Schneider, who was the president of a private equity firm, and together they co-founded GPB Capital in 2013, whereby Lash became Managing Partner of Automotive.  Lash is also a former officer of the General Partner and a former Co-Director of Automotive Retail for the General Partner.  Lash oversaw the various operating partners at the dealership level.  He was integrally involved in seeking investors for the GPB Investments, the preparation of the PPMs for the GPB Investments, and managed the day-to-day operations of the GPB Investments.  On February 10, 2018, Lash resigned and entered into a Resignation Agreement with GPB Holdings, which subsequently was amended by a Restated Agreement. In October 2018, Lash filed a lawsuit against GPB Capital, Automotive, Gentile, and others for breach of contract in the Eastern District of New York, which he later voluntarily withdrew in November 2018—the same month that the GPB Investments' auditor resigned.

25.     Defendant Jeffrey Schneider is a natural person who resides in Austin, TX.  He is the co-founder of GPB Capital with Defendants Gentile and Lash and serves as GPB Capital's Strategic Advisor.  Schneider is also founder and CEO of Ascendant Capital and the Founding Principal of Ascendant Alternative Strategies. Schneider is also the former Senior Vice President of Axiom Capital Management. Schneider was integrally involved in the preparation of the PPMs of the GPB Investments and offering the LP Units to investors.

26.     Defendants Gentile, Lash, and Schneider are collectively referred to as the "GPB Individual Defendants" and collectively with the General Partner, Automotive, and Holdings II, the "Fund Defendants".

121213212_1

27.     The GPB Individual Defendants, as a result of their senior positions within the Fund Defendants and/or their affiliates, had access to material non-public information of GPB Capital and/or the GPB Investments, possessed the power and authority to control the content and form of the GPB Investments' solicitation materials to prospective investors, knew that the solicitation materials contained false and/or misleading statements, permitted investors, including Plaintiffs, to rely on those false and/or misleading statements in making their investment in the GPB Investments, and took no steps to remediate the false and/or misleading statements made to investors, including Plaintiffs.

### 2.     Selling Defendants

28.     Defendant Axiom Capital Management, Inc. ("Axiom") is a Delaware corporation with its principal place of business located at 780 Third Avenue, New York, NY 10017. Axiom is a financial services business and licensed broker-dealer firm. Axiom served as the underwriter (or managing broker-dealer) of the GPB Investments' LP Unit offerings. As underwriter of the GPB Investments' LP Unit offerings, Axiom played a key role in structuring and overseeing those offerings, preparing the offering materials distributed to investors, overseeing the distribution of such offering materials to investors, and/or offering or selling the GPB Investments' LP Units to investors. Defendant Schneider is a former Senior Vice President at Axiom. Defendant Martino was the former-CEO and President of Axiom prior to founding AAS. Ascendant Capital is a registered representative of Axiom.

29.     Defendant Ascendant Alternative Strategies, LLC ("AAS") is a Delaware limited liability company with its principal place of business located at 535 West 24th Street, Floor 4, New York City, NY 10011. AAS is a managing broker-dealer, providing investment banking and securities servicing to investment advisors and broker dealers. ███████████████

████████████████████████████████████████████

121213212_1

[REDACTED]

30.     Defendant Ascendant Capital, LLC ("Ascendant Capital") is a Delaware limited liability company with its principal place of business located at 14412 Galleria Circle, Building H, Suite 100, Austin, TX 78738.  According to Ascendant Capital's website, securities products and services of Ascendant Capital are offered through AAS, and all Ascendant Capital members are Registered Representatives of AAS. [REDACTED]

[REDACTED]

31.     Defendant Mark Martino is a natural person who resides and does business in New York. [REDACTED]

10

121213212_1

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

32.     Defendants Axiom, AAS, Ascendant Capital and Martino collectively are referred to as the "Selling Defendants."

## III.   JURISDICTION, VENUE, AND DEMAND FOR TRIAL BY JURY

33.     This Court has jurisdiction over this dispute pursuant to the Class Action Fairness Act of 2005, codified at 28 U.S.C. § 1332(d)(2)(B). The amount in controversy exceeds $5 million. The class includes more than 100 individuals; at least one Plaintiff is a citizen of a foreign state, and the Fund Defendants and some of the Selling Defendants are all citizens of New York.

34.     Venue is proper in this Court under 28 U.S.C. § 1391(a)(3), as one or more of the Defendants reside in the district encompassed by this Court and the principal place of business of one or more Defendants is in the district encompassed by this Court. Furthermore, a substantial part of the events and omissions giving rise to the claim occurred in the district encompassed by this Court.

35.     ████████████████████████████████████████████████████

████████████████████████████████.

36.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all matters triable thereby, ██████████████████████████

████████████████████████████████████

11

## IV.   FACTUAL ALLEGATIONS

### A.   THE GENERAL PARTNER CREATES THE GPB INVESTMENTS TO INVEST IN AUTOMOTIVE DEALERSHIPS AND OFFERS LIMITED PARTNERSHIP UNITS TO INVESTORS

37.    On or about 2012, Defendants Gentile and Lash discussed starting an investment fund, whereby Gentile would serve as the general partner of the fund that would invest in, among other things, automotive dealerships, and Lash would serve as the manager of the fund's automotive segment. Lash and Gentile met with Defendant Schneider, Gentile's friend and president of Ascendant Capital, and agreed that Schneider would raise funds from outside investors to make investments in businesses that would generate a predictable and sustainable cash flow, with a focus on the automotive industry.

38.    In 2013, Gentile, Schneider, and Lash formed GPB Capital, Automotive, GPB Holdings, LP ("GPB Holdings I"), GPB Holdings Qualified, LP, GPB Holdings Automotive, LLC, and GPB Portfolio Automotive, LLC to implement this plan.[1]

39.    The General Partner formed Automotive on May 27, 2013 for the purpose of acquiring and operating automotive dealerships.  The LPA for Automotive gives the General Partner exclusive authority to manage and operate the Automotive investment fund.

40.    Holdings II was formed on April 17, 2015 to acquire and operate companies in the automotive retail, information technology, and healthcare sectors.  The LPA for Holdings II gives the General Partner exclusive authority to manage and operate the Holdings II investment fund.

---

[1] The General Partner also operates and manages several other funds that are formed through LPAs.  For example, it manages and operates GPB Holdings III, LP, GPB Holdings Qualified LP, GPB Cold Storage, LP, GPB Eurobond Finance PLC, GPB NYC Development, GPB Scientific, and GPB Waste Management, LP, for whom the General Partner made private-placement offerings similar to the offerings that the GPB Investments made.

12

41.    Between June 2013 through 2018 for Automotive and April 2015 through 2018 for Holdings II, the Fund Defendants and the Selling Defendants began raising capital from investors under Regulation D for unregistered securities and started marketing the GPB Investments to investors through a series of PPMs.  The PPMs explained that capital funds would be used to acquire car dealerships that would produce long-term and steady returns for the Limited Partners.

42.    All investors in the GPB Investments (or their nominees) were provided copies of the PPMs for the investment fund in which they invested, and all investors were required to acknowledge that they received a copy of the PPMs as a condition to purchasing LP Units. ██

██████████████████████████████████████████████████████.

43.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████.

44.    ████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████.

45.    The GPB Investments' offerings to investors increased substantially over time. For example, Automotive's initial offering was $50 million in 2013. By March 2015, Automotive had increased its offering to $150 million.  Less than a year later, it reportedly increased its offering to $250 million even though it had sold only $32 million in LP Units. By 2016, Automotive reported an indefinite offering and had sold more than $176 million in LP Units, and its PPM for Class A LP Units disclosed an offering of $500 million. In 2017, Automotive reported an indefinite offering and that it had sold more than $369 million in LP

Units. In 2018, it reported an indefinite offering and that it had sold more than $622 million in LP Units, and the PPM disclosed an offering of $750 million for Class B LP Units. On June 30, 2018, Automotive stopped selling LP Units after having raised approximately $673 million.

46.     Holdings II's offerings likewise increased exponentially. In April 2015, Holdings II initiated an offering of up to $350 million. In a December 2015 supplement to the Holdings II PPM, the $350 million offering was maintained, but it was noted that the offering "may be increased at the sole discretion of" the General Partner "up to an anticipated maximum of $500 million." By March 2016, Holdings II had increased the Class A LP Unit offering to $500 million. The 2016 PPM disclosed that it had reached that maximum, despite Holdings II's audited financial statements for the year ending 2016 indicating that it had only sold $110 million in Class A capital contributions that year. In its January 2018 PPM, Holdings II disclosed that it had exceeded its "anticipated maximum" and increased the offering to $750 million.

**B.      THE FUND DEFENDANTS OFFER THE GPB INVESTMENTS TO INVESTORS THROUGH THE SELLING DEFENDANTS, WHO HAVE DEEP TIES TO THE GENERAL PARTNER AND RECEIVED LUCRATIVE FEES**

47.     From 2013 until June 30, 2018, the General Partner worked primarily with two registered broker dealers to manage the sale of LP Units: Axiom and AAS. ███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████

48.     In exchange for serving as the broker-dealer for the LP Units, the Selling Defendants received excessive fees and expenses well above industry rate for a comparable investment. ████████████████████████████████████

14

[REDACTED]

49.     Axiom sold LP Units in the GPB Investments beginning in 2013 for Automotive and in 2015 for Holdings II. According to public filings, by May 19, 2016, Axiom had sold Automotive LP Units to 1,869 investors, raised $176,110,533 in capital, and received $19,372,158 in sales commissions. By May 19, 2016, Axiom had sold Holdings II LP Units to 899 investors, raised $76,017,028 in capital, and was paid $8,361,873 in commissions.

50.     In 2017, the General Partner also began selling LP Units in the GPB Investments through AAS. By May 2017, the General Partner, through AAS and Axiom, had more than doubled the number of investors in Automotive to 3,851 and increased the total capital raised to $369,234,443, while Holdings II investors climbed to 3,505 and increased the total capital raised to $364,072,884. The Selling Defendants received sales commissions and fees deducted from these investments in an aggregate amount of $86,163,610 ($43,385,047 for Automotive and $42,778,563 for Holdings II).

51.     Between 2017 and 2018, AAS continued to aggressively expand the sale of LP Units in GPB Investments by retaining dozens of brokers and investment advisors from across the country, referred to as "Soliciting Brokers," who took instruction from AAS on the sale of LP Units to investors. In a Form D/A filed on May 14, 2018, Automotive reported that that it had increased the number of investors to 6,353, increased the capital raised to $622,143,273, and reported that the amount of sales commissions paid from these investments had increased to

121213212_1

more than $52 million. Similarly, Holdings II reported that the number of investors had increased to 6,095, the capital raised increased to $645,813,889, and the amount of sales commissions paid from these investments had increased to nearly $50 million, totaling more than $100 million in commissions to the Selling Defendants for Automotive and Holdings II combined.

52.



53.

54.    Defendant Schneider,

55.    Ascendant Capital and Gentile also are members of

56.    The General Partner and AAS are also next-door neighbors, listing offices in the same building in the Chelsea district on the west side of Manhattan, and even sharing basic business expenses.

57.    The Fund Defendants and the Selling Defendants were all                    and acted in concert with the same motive of generating fees from the Limited Partners' capital

contributions and taking advances on profits before they were due. ██████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████.

C.   **DEFENDANTS FRAUDULENTLY INDUCE INVESTORS INTO PURCHASING LP UNITS IN THE GPB INVESTMENTS AND CONCEAL AN ILLEGAL SCHEME TO DEFRAUD INVESTORS**

1.   **The Automotive Dealership Approval Process Is Rigorous And Subject To Strict Requirements**

58.   The investment thesis for the GPB Investments centralized around the acquisition and ownership of automotive dealerships. However, purchasing an automotive dealership requires a rigorous approval process subject to strict requirements and due diligence by automobile manufacturers.

59.   Every automotive dealership applicant must enter into a franchise agreement with the automobile manufacturer, which specifies the location within a designated market area in which the dealership may sell vehicles and related products and perform approved services.

60.   Manufacturers, however, are reluctant to trust their brand name to unknown investors. Therefore, automobile manufacturers require that franchise applicants have sufficient experience and working capital to operate the dealership before it will approve a franchise application. Manufacturers also require that the dealership owners have a specified dealer principal and an executive or general manager approved by the manufacturer as having the requisite experience and expertise in the automobile dealership industry. A manufacturer is

17

unlikely to approve a franchise owner unless an applicant has developed a sufficient track record in the automobile dealership industry.

61.     Dealerships sold from one owner to another also must go through the same rigorous manufacturer approval process. In the context of a dealership sale, the first step in the approval process requires the seller to deliver a copy of the proposed purchase agreement to the manufacturer. Once the proposed purchase agreement is provided to the manufacturer, the buyer must submit a completed application and any requested diligence directly to the manufacturer. The manufacturer will not approve the sale of the dealership until it is satisfied that it has all requested information and that the information provided satisfies its criteria for franchise ownership. At the end of the manufacturer approval process, the manufacturer provides notification of the approval or denial of the application directly to both the dealer/seller and its proposed purchaser. This dealership approval process typically takes six months or longer.

The Fund Defendants and the Selling Defendants did not disclose to investors the cumbersome process or lengthy timetable required to obtain manufacturer approvals. Further,

**2.      The Fund Defendants Circumvented The Manufacturer Approval Process Using The Convertible Loan Scheme**

63.     The manufacturer approval process also presented a timing problem for the Fund Defendants, as the

██████████████████████████████████████████████

████████

64.     The Fund Defendants knew about this problem and failed to disclose it when it made its offerings to investors in the GPB Investments.  Rather than disclosing this material risk, the Fund Defendants and the Selling Defendants developed the Convertible Loan Scheme to end-run the manufacturer approval process and allow the General Partner and the GPB Investments to get access to the dealerships cash flows prior to obtaining actual ownership of the dealerships – which in many instances never happened.

65.     Under the Convertible Loan Scheme, the General Partner or an entity it controlled would enter into a purchase agreement with the dealership owner, whereby the GPB Investments would pay the seller the purchase price in the form of a forgivable "loan" with a very low interest rate. In exchange, the GPB Investments would obtain control of the dealership and its cash flows, but it would not receive an equity interest. Instead, upon manufacturer approval of the sale of the dealership, the GPB Investments had the right to convert the "loan" into equity in the dealership and the seller's debt on paper would be released. The GPB Investments' management teams would also be paid a management fee and other royalties in exchange for operating the dealership while the manufacturer approval process was still pending.

66.     For  example,  ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

19

██████████████████████████████████████████████████
███████████████████████████████.

67.      ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████.

68.      In 2014, the General Partner began doing business with Patrick Dibre ("Dibre"), who owned several car dealerships in New York. Dibre claims he agreed to sell six dealerships to GPB Capital for $80 million. On information and belief, the General Partner began to fund the purchase price using the Convertible Loan Scheme to be paid over time. Between 2013 and 2015, the General Partner advanced $42 million to Dibre for the purchase of certain of his Nissan and Volkswagen dealerships.

69.      As part of the transaction between the General Partner and Dibre, the General Partner received the net cash flows from the dealerships even though it did not yet own any of the dealerships. ████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████. The General Partner ultimately was unable to complete the transaction to acquire several dealerships from Dibre because it lacked the funds to do so.

70.      On information and belief, the dealerships, typically did not generate the necessary cash flow to make the promised distributions to investors. ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

20

███████████████████████████████████████████████████

████████████████████████████████

71.     Effectively, the "Convertible Loan" was a sham that allowed the General Partner to bypass normal manufacturer approval requirements, surreptitiously gain access to dealerships net cash flows, and falsely represent to investors that the GPB Investments had acquired car dealerships. Indeed, in some instances, like Dibre's Nissan dealership, the General Partner and the GPB Investments never actually received manufacturer approval for the dealerships in which it had employed the Convertible Loan Scheme, falsely representing ownership to investors and falsely reporting and using cash flows that did not actually belong to the GPB Investments.

**3.      The Private Placement Memoranda Made Material False Statements And Omissions Concerning** ███████████████████

███████████████████████

72.     From 2013 through 2018 for Automotive and from 2015 through 2018 for Holdings II, the Fund Defendants and the Selling Defendants marketed the GPB Investments using false and misleading representations and omissions made in the PPMs presented to potential investors prior to purchasing LP Units.

73.     ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████ "

74.     The GPB Investments' strategy was to ████████████████

███████████████████████████████████████████████████

75. The General Partner also stated [REDACTED] could:

• [REDACTED].

76. The Fund Defendants also acknowledged in their PPMs the [REDACTED]

121213212_1

███████████████████████████████████████████████████

███████████████████████████████

77.     In fact, the General Partner "partnered" with Defendant Lash and Dibre—two dealership owners and co-directors of auto-retail for the General Partner—who knew that the GPB Investments were at a distinct *disadvantage* from other market participants because *manufacturers were unlikely to approve an equity fund as owner of an automobile dealership absent a well-established reputation for operating funds*.  In fact, the franchising manufacturers refused to approve the General Partner as owner for several of Dibre's dealerships.  For example,

███████████████████████████████████████████████████

██████████████████████████████████████

78.     Based on the experience of Defendant Lash and Dibre, the Fund Defendants and the Selling Defendants knew that the equity fund model was viewed in the industry as a far riskier model than traditional ownership by a member of the community. The Fund Defendants and the Selling Defendants, therefore, knew that it was all but certain that manufacturers would not grant a franchise or approve an unknown equity fund as an owner on the timetables set forth in their PPM distribution projections. In fact, according to the complaint in a lawsuit filed by Dibre in the New Jersey Superior Court ("DiBre NJ Action"), GPB Capital had pressured him to enter what he dubbed "illegal stock sales" of numerous dealerships "in as much as none of the sales had received manufacturer approval." ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████.

79.     To give its investment plan credibility, the General Partner referred investors to news stories in its marketing materials, which reported that George Soros and Warren Buffett were embarking on similar ventures using equity funds to acquire automotive dealerships. By juxtaposing these news stories with its investment proposal, the General Partner intended to create the belief that it shared the credentials of the likes of Soros and Buffett. But according to Lash and Dibre, the General Partner knew that it could not garner the level of credibility needed to convince a manufacturer to approve it as a dealership owner, let alone garner the level of credibility that the likes of Soros and Buffett could.

### 4.     Lawsuits Involving The General Partner Reveal An Illegal Ponzi Scheme And Undisclosed Self-Dealing Payments And Transactions

80.     On July 10, 2017, the General Partner—on behalf of Automotive, GPB Holdings I, and Holdings II—filed a lawsuit against Patrick Dibre in the Supreme Court of New York in Nassau County alleging breach of his contractual obligations to the General Partner and its funds.[2]

81.     Among many allegations, GPB Capital alleged that Dibre had implemented improper and manipulative tactics that inflated the historic earnings of the dealerships he sold to GPB Capital.   In response, Dibre asserted detailed counterclaims alleging that the General Partner was operating a Ponzi scheme and defrauding the Limited Partners invested in the funds that the General Partner managed (the "Dibre Counterclaims").[3]

---

[2] *GPB Capital Holdings, LLC et al. v. Dibre*, Index No. 606417/2017 (N.Y. Sup. Nassau July 20, 2017).

[3] *Id.* at Docket No. 51.

121213212_1

82.     Dibre alleged that, after GPB Capital took control over Dibre's dealerships (but without having actual ownership), it began implementing policies that negatively impacted the dealerships' financial performance but personally benefitted GPB Capital or its managers, and that GPB Capital began manipulating the financial statements of the dealerships and the GPB Investments to hide their activities.  For example, while GPB Capital was only entitled to receive the net cash flows from dealerships under the Convertible Loan Scheme, it overfunded itself from the dealerships by drawing out more than the net cash flows from dealerships in order to entice new investors, and then used that overfunded cash to distribute to investors as a "special distribution," while touting the exceptional performance of the dealerships.  At the end of the year, GPB Capital would "invest" the amount of the overfunded money into the dealership for "capital improvements" to cover the deficiency.

83.     Defendants Gentile and Schneider recorded the purchase price of dealerships they purchased at several million dollars more than the actual purchase price, including closing expenses and working capital investment, and then directed those additional monies back to themselves, or entities in which they held an interest, as acquisition fees.

84.     Gentile and Schneider also created an entity called LSG, to which they directed in excess of $4 million from reinsurance funds and manufacturer rebates that should have been paid to the dealerships, and, ultimately, to Limited Partners.  GPB Capital also manipulated financials by taking factory incentives that were earned, but not yet received, and distributed those funds to investors.

85.     ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

25

██████████████████████████████████████████████. For

example, in 2016, Dibre alleged that on several occasions GPB Capital transferred funds from GPB Holdings I to Automotive and *vice versa* in order to bolster returns if one fund was lagging behind. Gentile would also have potential sellers of dealerships increase the purchase price by a certain dollar amount needed to pay back investors, and then take the additional funds as a rebate at closing of the dealership.

86.    In 2015, GPB Capital obtained personal guarantees, backdated to 2014, in the amounts of $810,462 and $325,739 so that financial records did not reveal the actual losses. ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██

87.    GPB Capital also manipulated financials by inflating the value of dealerships to further cover for actual losses. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████.

88.    GPB Capital, Gentile, and Schneider also sought to personally benefit from the reinsurance business at Dibre's dealerships. For example, warranty products are typically offered to customers through dealerships, whereby the warranty products are reinsured by the owners to an outside reinsurance company and administered by a third-party administrator. The

third-party administrator charges a fee to administer the warranty and the balance of the price paid for the reinsurance product is deposited with the reinsurance company.

89.     Dibre engaged in the reinsurance business prior to doing business with the Fund Defendants. Upon entering into the business relationship with the Fund Defendants, Dibre alleged that Gentile and Schneider wanted to become involved in the reinsurance business but did not want to disclose to investors that they were personally benefitting from it, which would represent a conflict of interest requiring disclosure. Therefore, GBP Capital entered into an arrangement with Dibre whereby new warranties sold by the dealerships were funded into Dibre's reinsurance company, but the funds released after the expiration of the warranty were to be paid for the benefit of GPB Capital.

90.     At times, in order to assist with cash flow, Dibre agreed to advance GPB Capital a portion of the warranty funds that had not yet been paid. Occasionally, Gentile and Schneider would request Dibre to make warranty fund payments to LSG, a Gentile/Schneider-related company.

91.     In July 2019, David Rosenberg ("Rosenberg") filed a breach of contract lawsuit in Massachusetts state court against GPB Prime Holdings, LLC and Automile Parent Holdings, LLC, entities both controlled by the General Partner (the "Rosenberg Complaint").

92.     Prior to 2017, Rosenberg owned and operated Prime Motor Group ("Prime"), which was at that time one of the largest automotive dealership groups in New England. In 2017, GPB Capital purchased a controlling interest in Prime and asked Rosenberg to oversee all of their automotive dealerships. The combined portfolio of dealerships began doing business as the Prime Automotive Group ("PAG"), and Rosenberg became CEO of PAG. PAG was one of GPB Capital's largest investments.

121213212_1

93.     The Rosenberg Complaint alleged that the defendants breached its contract to pay Rosenberg $5.9 million pursuant to the terms of their purchase agreement. Rosenberg, however, also claimed that the General Partner-owned entities breached their contract in retaliation against Rosenberg after he made efforts to address fraudulent and wrongful conduct by the General Partner and its affiliates.

94.     Specifically, as CEO of PAG, Rosenberg became aware of information and documents evidencing serious financial misconduct by the General Partner with respect to GPB Capital's management of the dealership portfolios it operated, including the GPB Investments, before it acquired an interest in Prime, beginning at least as far back as 2014.

95.     According to Rosenberg, the financial misconduct that he observed included, *inter alia*, (i) the fabrication of revenue through the use of fictitious contracts; (ii) self-dealing transactions on the part of GPB Capital principals, including Defendant Gentile; and (iii) undisclosed related-party transactions that benefitted Defendant Lash. Rosenberg alleged that this financial misconduct took place in order to make it appear to investors that profits from the automotive investments were higher than they actually were, to conceal the fact that investors were receiving distributions directly from investor contributions instead of operating profits, and to misappropriate investor funds for the Fund Defendants' own personal use and/or benefit.

96.     For example, Rosenberg alleged to have seen two contracts titled "Performance Guaranty," which showed that Lash had personally guaranteed the 2014 performance of two Volkswagen dealerships acquired by GPB Capital and that he had personally agreed to pay any deficiency if the dealerships' net profits were below $450,000 and $150,000, respectively. On March 18, 2015, GPB Capital issued letters addressed to Lash indicating a deficiency and seeking payments totaling $1,136,201. The 2014 year-end financial statements for GPB Holdings

28

I, issued on April 30, 2015, reported that, for the year ending December 31, 2014, approximately $1,100,000 was paid into the dealerships based on the Performance Guaranties with Lash and similar agreements with a different dealer-operator. The Performance Guaranties with Lash, however, were actually a sham, as Lash never actually guaranteed the performance of the dealerships and GPB Capital never expected him to pay the deficiency amounts. Indeed, most of the purported debt was waived as part of a settlement agreement between GPB Capital and Lash nearly 4 years later.

97.     Rosenberg also saw documents showing that, in April 2016, GPB Capital had used a similar strategy to fabricate over $1 million of net profit for 2015 in order to boost the profits that GPB Capital could report.  Rosenberg claims to have seen documents showing that, as GPB Capital was preparing documents for the 2015 year-end audit, it was, in fact, over $1 million short in revenue. To conceal the shortfall and manufacture profits to cover it, Gentile and other GPB Capital executives fabricated another Performance Guaranty in April 2016, whereby Lash "guaranteed" a certain amount of profit from a certain dealership for 2015, but backdated the agreement to January 1, 2015 to make it appear that it had been in place for the entirety of 2015.  Rosenberg alleged that there was no evidence that Lash had paid the guarantee or that he had any intent or ability to pay the guarantee. Lash also told a member of Rosenberg's executive team that the contract was "fictitious" and "was never supposed to be paid back."

98.     In April 2016, GPB Capital had one of its subsidiaries wire $700,000 into an account associated with Lash.  The same day that money was deposited, the same Lash account deposited $1,050,000 into an account for one of the GPB Investments. According to the Rosenberg Complaint, the purpose of the money transfer was to provide Lash with most of the funds to pay the fictitious Performance Guaranty.

121213212_1

99. Rosenberg also witnessed documents evidencing improper "round tripping" by GPB Capital in an effort to inflate revenues. In 2016, the head of a dealership group owned by GPB Holdings I sent a payment of $3.2 million to certain other GPB Investments, but on the very same day, those same GPB Investments sent $2.1 million to the head of that same dealership as "working capital." According to Rosenberg, the purpose of that transaction was to conceal the fact that the dealership group was not truly generating $3.2 million in operating revenue for distribution.

100. Rosenberg also claims that Defendants Gentile and Lash had funneled nearly $2 million in revenue to entities controlled by them under the guise of, *inter alia*, "management fees." For example, in 2015, $201,706 was transferred to an entity called Emdykycol, Inc., which is alleged to be owned by Defendants Gentile and Lash, and $201,706 was transferred to Jarhirijo, Inc., an entity owned by Gentile. The Rosenberg Complaint further alleged that dealership funds were siphoned off to LSG Auto Wholesale, an entity named for Defendants Lash, Schneider, and Gentile, and that those payments served no legitimate business purpose, nor were they disclosed to investors.

101. The Rosenberg Complaint further detailed allegations of GPB Capital providing dealership-owned vehicles to third parties, including professional athletes and an investor in the GPB Investments, which served no legitimate business purpose, were not properly accounted for, and attributed costs directly to the dealerships that owned the vehicles. The Rosenberg Complaint further detailed GPB Capital's illegitimate purchase of a Ferrari for $355,000 through one of the GPB Investments' dealerships in December 2014 and alleged that the vehicle was transferred to another GPB Investment dealership and later sold for a loss of $183,000 three years later with only 1,700 miles on the vehicle.

30

102.    Rosenberg also revealed a number of benefits specifically enjoyed by Defendant Lash at the expense of investors, including Plaintiffs. For example, in one instance Lash drew, on a dealership's behalf, an advance of $750,000 that he labelled as a "retention bonus," which was then distributed to himself and several others. In another instance, following the close of a new dealership purchase, Lash and others working on the dealership portfolio in question received approximately $100,000 worth of sporting vehicles and equipment in an alleged kickback arrangement. In addition, Lash and others tied to certain GPB Investment dealerships orchestrated a kickback of $100 per vehicle for every Canadian used car purchase, which Rosenberg alleged to have resulted in thousands of dollars being diverted from investor distributions.

103.    Rosenberg also detailed a number of misrepresentations made by GPB Capital to investors and the efforts made by the Fund Defendants to cover up the financial improprieties. For example, in September 2018, following Crowe's resignation as auditor (discussed below), GPB Capital and Ascendant representatives falsely reported the circumstances of Crowe's withdrawal, as well as falsely stated that another firm, Stoneturn Group LLC, had completed a full forensic audit of GPB Capital and gave it a clean bill of health. Rosenberg claimed to have demanded that the misstatements be corrected, but no correction had been made.

104.    Rosenberg also revealed that GPB Capital consistently inflated the value of the dealerships in the GPB Investments' quarterly valuations and financial reports by carrying the dealerships at their purchase prices, which, in later years, did not accurately reflect their values. Rosenberg claimed to have consistently reported the information to GPB Capital about the dealerships' true valuation, but GPB Capital refused to adjust the valuations. According to Rosenberg, it was not until June 21, 2019 that GPB Capital was informed by Fidelity

31

Investments that it would no longer carry its investments on its platform, and GPB Capital announced that it was dramatically cutting the valuation of the automotive dealership investments.

105.    In May 2019, Rosenberg was questioned by GPB Capital's auditors, and Rosenberg provided information about the General Partner's financial misconduct. Rosenberg then received a threatening letter from GPB Capital's outside counsel in an effort to silence him, and GPB Capital began efforts to fire Rosenberg as CEO of PAG.

106.    According to the Rosenberg Complaint, Rosenberg provided GPB Capital with information about the financial misconduct on June 5, 2019 and requested that they take steps to preserve the value of the dealerships, which GPB Capital refused to do.

107.    None of these transactions and improper activities were disclosed to investors, including Plaintiffs, prior to making their investments in the GPB Investments.

108.    Moreover, in exchange for its so-called "management" of the GPB Investments and the "day to day operations" of the dealerships, the General Partner paid itself a "managerial assistance fee" consisting of 2% per annum on the capital contributions made by Automotive and Holdings II investors in Class A and B units and 1.75% per annum on capital contributions made by Automotive and Holdings II investors in Class A-1 and Class B-1 units. The General Partner's principals also used the relationships that they made with dealerships to extract management fees for themselves directly from the dealerships. Meanwhile, because the General Partner did not meet the necessary dealership approval requirements to do so, the General Partner did not have control over nor could they manage the day-to-day operations of dealerships. Therefore, they took management fees to which they were not legally entitled.

121213212_1

109.    Under the guise of legitimate fees and expenses, from 2015 through 2017, Defendants siphoned off a significant percentage of investor capital funds in Automotive and Holdings II, reportedly paying themselves and affiliates ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████.

110.    Specifically, in 2015, 2016 and 2017, the General Partner extracted ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████.

111.    Moreover, the amounts and types of expenses were ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ and consisted of the following:

| | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|
| **Holdings II** | ██████ | ██████ | ██████ | ██████ |
| **Automotive** | ██████ | ██████ | ██████ | ██████ |

112.    ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████.

113. 

114.

115.

116.

121213212_1

██████████████████████. Instead, the Fund Defendants and the Selling Defendants knew that the distributions promised in the PPMs would need to be made, and in fact, were made, at least in part, from ████████████████

117.   Automotive's representation that it had made a ████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

118.   Indeed, it was impossible for the GPB Investments to distribute dividends to investors from operations, as promised in the PPMs, because neither Automotive nor Holdings II had ████████████████████████████████████████████████

████████████████████████

119.   For example, by 2015, the General Partner had used ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

**Distributions paid from Holdings II Investor Capital**

| YEAR | Total | Class A | Class B |
|------|-------|---------|---------|
| 2015 | ████ | ████ | ████ |
| 2016 | ████ | ████ | ████ |
| 1/1/2017 - 9/30/2017 | ████ | ████ | █ |

120.   Similarly, in 2015, the General Partner used ███████████████



**Distributions paid from Automotive Investor Capital**

| YEAR | Total | | | Class A | | Class A-1 | Class B | | Class B-1 |
|------|-------|--|--|---------|--|-----------|---------|--|-----------|
| 2015 | ██████ | | | ██████ | | █ | █ | | |
| 2016 | ████████ | | | ████████ | | █ | ███ | | █ |
| 2017 | ████████ | | | ████████ | | | █████ | | ████ |

121.   By affirmatively misrepresenting and omitting the actual source of the distributions, the Fund Defendants and the Selling Defendants concealed the fraudulent Ponzi Scheme and Convertible Loan Scheme.

**D.   DEFENDANTS' HOUSE OF CARDS BEGINS TO CRUMBLE**

**1.   The General Partner's CFO Resigns**

122.   In 2018, the General Partner's CFO, Macrina Kgil, resigned due to concerns about fraud related to the funds the General Partner managed, including the GPB Investments. Notably, Kgil deleted all references to GPB Capital on her LinkedIn profile.

123.   ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████.

36

124.    According to LinkedIn, GPB Capital has stopped searching for a CFO and currently lists no CFO on its general website.

### 2.    The General Partner's Auditor Resigns And The GPB Investments' Financials Need To Be Restated

125.    Both Automotive and Holdings II claimed to investors that



This representation was made in the PPMs and various marketing materials and brochures from the inception of each entity.

126.    Holdings II has been and continues to be audited by

127.    For Automotive,                                               conducted the 2014 and 2015 audits but was replaced by Crowe in 2016, who conducted the 2016 audit. On May 1, 2017, Crowe provided Automotive with a clean audit opinion for the 2016 calendar year and noted no exceptions.

128.    Section 12(g) of the Exchange Act requires an issuer with total assets of more than $10 million and a class of securities held of record by either 2,000 persons, or 500 persons who are not accredited investors, to register that class of securities with the SEC. GPB Capital met these thresholds for both Automotive and Holdings II, its two largest funds, by May 18, 2017.

129.    As a result, by May 18, 2017, both Holdings II and Automotive needed to file registration forms and audited financials with the SEC, even though the funds were private and

not listed or traded on an exchange. While conducting its 2017 annual audit, █████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████ of the financial statements for the year ended December 31, 2016.   Crowe further

noted that ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████

130.   ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

131.   █████████████████████████████████████████████████████

████████████████████████████████████████.

132.   █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

    133.   ███████████████████████████████████████

████████████

    134.   On November 9, 2018, the General Partner distributed a letter to the Limited Partners stating that it still does not have a final draft of its 2017 audited financial statements, including supplementary information. The November 9th letter was also the first time that the General Partner had made any disclosure to Limited Partners that Crowe had resigned as the auditor for the Company over "perceived risks they determined fell outside of their internal risk tolerance parameters." ██████████████████████████████████████ ███████████████████████████████████████████ GPB Capital retained EisnerAmper LLP ("EisnerAmper") as its auditor to replace Crowe.

    135.   On March 20, 2019, the General Partner sent a letter to the Limited Partners stating that their new tax preparation firm would not have Schedule K-1 tax documents prepared prior to the April 15, 2019 tax filing deadline and that Limited Partners should consult their own tax professionals for guidance.

    136.   On April 4, 2019, the General Partner sent a letter to the Limited Partners stating that there were delays in completing the audits for Automotive and Holdings II due to internal

deficiencies and that it intended on completing the 2017 audits by June 30, 2019 and the 2018 audits by September 30, 2019.

137.    On June 21, 2019, the General Partner sent a letter to the Limited Partners stating that the delivery of outstanding audits for 2016, 2017, and 2018 would all be released on September 30, 2019.

138.    In September 2019, the General Partner informed Limited Partners that, due to investigations by the SEC and Federal Bureau of Investigation ("FBI"), it would no longer be able to meet the September 30 deadline and, instead, expected to complete the audits by the end of the year.

139.    ███████████████████████████████████████████

███████████████████████████████████████████████████

### 3.    GPB Capital And The GPB Investments Become The Target Of Government Investigations

140.    As their scheme began to unravel, Automotive failed to file a registration statement and audited financial statements with the SEC by April 30, 2018, as required. By August 2018, GPB Capital announced that it was suspending Automotive's offering, as well as investor redemptions.

141.    In September 2018, the Commonwealth of Massachusetts secretary announced that it had opened an investigation into the Selling Defendants and other broker-dealer firms that sold LP Units in the funds controlled by the General Partner, including the GPB Investments.

142.    The SEC and the Financial Industry Regulatory Authority ("FINRA") also reportedly made inquiries of broker-dealer firms that sold private placement securities in partnerships controlled by the General Partner.

121213212_1

143.    On March 4, 2019, the General Partner sent a letter to the Limited Partners

stating:

> On February 28, 2019 representatives of both the FBI and the New York
> City Business Integrity Commission ("BIC") arrived at GPB offices to
> collect materials pursuant to a search warrant obtained by the U.S.
> Attorney's Office – Eastern District of New York ("U.S. Attorney"). As
> previously indicated we believe this visit was a continuation of previous
> ongoing inquiries and GPB has and will continue to cooperate with any
> inquiries.

144.    In that same letter, the General Partner further confessed that:

> During the summer of 2018, GPB received a subpoena from the US
> Attorney's Office – Eastern District of New York requesting documents
> concerning GPB's Waste Management fund in connection with an
> investigation done with the BIC. Since that time GPB has received
> additional requests for information from the BIC and U.S. Attorney.

> [. . . ]

> In September 2018 GPB received a subpoena requesting information from
> the Securities and Exchange Commission ("SEC").

> Additionally, in October 2018 GPB received subpoenas from the New
> Jersey Bureau of Securities for information . . . .

> [. . . ]

> Much of the requested information does concern issues raised by former
> operating partner, Patrick Dibre, in his response to our complaint filed
> against him in the Nassau County Supreme Court.

145.    Specifically, according to reports of an executive insider's account, the focus of

the SEC's questions "is the accuracy of disclosures made to investors, the performance of

various funds and the distribution of capital to investors."

146.    On July 15, 2019, GPB Capital sent a letter to the Limited Partners indicating that

the governmental investigations are still ongoing.

### 4.    Defendants Admit To Paying Distributions Using Investor Capital Contributions Instead Of Operating Income, As Previously

41

**Represented, And Then Promptly Cease Making Investor Distributions**

147.    After raising more than $622 million through the fraudulent scheme discussed herein, the 2018 Automotive PPM admits the Ponzi Scheme that it had been perpetrating on investors for years. Indeed, after proffering to investors that it would make distributions to investors based solely on operational profits in an effort to lure them into an investment with the GPB Investments, ███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ (emphasis added). Following this attempt to come clean, the Fund Defendants began the short descent to revocation of investors' distributions altogether.

148.    In April 2018, GPB Capital reduced the rate of its distributions to limited partners from 8% per annum to 4% per annum.

149.    On December 20, 2018, the General Partner announced that the GPB Investments would be transitioning to a quarterly distribution plan and told Limited Partners that distributions were not guaranteed.

150.    On April 4, 2019, the General Partner sent letters to Limited Partners stating that first quarter 2019 distributions, if any, would be declared at the end of April 2019, with distributions to be paid on May 15, 2019. The letter further stated that it believed that most of the GPB Investments would not be issuing first quarter 2019 distributions.

151.    On April 30, 2019, the General Partner sent letters to the Limited Partners stating that the GPB Investments would not be issuing a distribution to Limited Partners for the first quarter of 2019.

121213212_1

152.    As of June 21, 2019, Automotive is no longer making distributions to its investors at all, and the value of the LP Units for Automotive and Holdings II have dropped by 39% and 25.4%, respectively.

### 5.    The General Partner's Chief Compliance Office Is Indicted For Obstruction of Justice

153.    While employed as a Securities Compliance Examiner and Industry Specialist in the SEC's Enforcement Division, the General Partner's Managing Director and Chief Compliance Officer, Michael S. Cohen, accessed and disclosed confidential information to the General Partner – the target of the SEC's investigation – to land a job with the General Partner.

154.    On October 23, 2019, a superseding indictment was unsealed revealing that on October 17, 2019, Mr. Cohen was charged with obstruction of justice, unauthorized computer access, and unauthorized disclosure of confidential information.

155.    In approximately October 2018, prior to leaving the SEC, Mr. Cohen accessed highly sensitive information on SEC servers relating to an Enforcement Division investigation into the General Partner, which included "confidential information, privileged attorney-client work product and contacts with law enforcement and other regulatory agencies."  According to the U.S. Attorney's Office for the Eastern District of New York's press release, "[d]uring discussions with [the General Partner's] personnel about obtaining a job there, Cohn advised them that he had inside information about the SEC's investigation, and on several occasions he disclosed information to members of [the General Partner's] senior management about that investigation."

## V.    CLASS ALLEGATIONS

156.    Plaintiffs assert this action under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and seeks to represent the following class of persons: all Limited

Partners in the GPB Investments who, between January 1, 2013 and December 31, 2018, executed the subscription documents included with the PPMs for Automotive and Holdings II ("the Class"). The following persons are excluded from the Class: Defendants and any entity in which any Defendant has a controlling interest, and the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries, and/or assigns of any such entity.

157.    The Class meets the prerequisites for certification under Rules 23(a) and 23(b)(3):

158.    **Numerosity:** During the Class period, more than 14,000 Limited Partners executed subscription documents included with PPMs for Automotive and Holdings II.

159.    **Common Questions of Law and Fact:**

(a)    Did the Fund Defendants and/or the Selling Defendants know that the PPMs contained material misrepresentations or omissions of fact?

(b)    Did the Fund Defendants and/or the Selling Defendants intend to defraud Limited Partners?

(c)    Did the Fund Defendants and/or the Selling Defendants owe investors fiduciary duties and did they breach those duties by providing the PPMs and selling LP Units in investments that were fraudulently induced, and, in the case of the Selling Defendants, without performing proper due diligence?

(d)    Did the General Partner breach the LPA when it failed to provide accurate and truthful, annual financial reports as required?

(e)    Did the General Partner breach the LPA when it failed to form and authorize an Advisory Committee to review related party transactions as required?

44

(f)     Did the General Partner breach the LPA when it made distributions to Limited Partners with investment capital and when the GPB Investments' liabilities exceeded its assets under DRULPA?

(g)     Alternatively, did the Selling Defendants aid and abet the Fund Defendants' fraud when they, with willful blindness or recklessness indifference to this fraud, provided PPMs to Limited Partners and sold LP Units in the GPB Investments?

(h)     Were Defendants unjustly enriched by receiving fees that they did not earn and/or were not entitled to?

160.    **Typicality:** Plaintiffs are members of the Class, and their claims are based on the same or similar facts affecting all Class members, including but not limited to misrepresentations in, and omissions from, the PPMs on which Limited Partners indicated reliance in their subscription documents.  Plaintiffs' legal theories are co-extensive with the Limited Partners they seek to represent.  Plaintiffs' losses arose from the events, patterns of practice, and courses of conduct alleged herein, which uniformly affected all members of the Class.

161.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of the Class because Plaintiffs are sincere in their interest to pursue this action, and they are represented by competent counsel.

162.    **Predominance:** Common issues predominate over any individual ones.  Plaintiffs rely on common class proof in the form of the LPAs, PPMs, and the subscription documents to prove their claims, which were substantially similar across all investments, and Defendants' conduct is uniform to all Class members.

163.    **Superiority:** A class action is superior to individual actions for the fair and efficient adjudication of a controversy involving more than 14,000 investors.

121213212_1

## VI.    COUNTS

### COUNT I

#### FRAUD IN THE INDUCEMENT AGAINST THE
#### FUND DEFENDANTS AND THE SELLING DEFENDANTS

164.    The foregoing paragraphs are re-alleged herein.

165.    This Count is asserted against the Fund Defendants and the Selling Defendants. Through statements made in the PPMs, the Fund Defendants falsely represented to the Limited Partners in connection with the purchase of LP Units in the GPB Investments that: (i) the GPB Investments would invest their monies into a legitimate automobile dealership acquisition strategy that could feasibly be achieved rather than an illegitimate Ponzi Scheme; (ii) they would be paid distributions from actual cash flows and profits arising from the acquisition of dealerships rather than from capital funds invested by subsequent investors; (iii) the equity fund model provided market advantages in the automobile dealership industry; (iv)  the General Partner had expertise in the automotive retail industry; and (v) that their financial statements complied with GAAP and FASB accounting standards when in fact they did not. The Selling Defendants had knowledge of these misrepresentations and failed to alert investors to them when they provided the PPMs and other marketing materials for the GPB Investments.

166.    The Fund Defendants failed to disclose the following material information, which among other statements, they knew would render the statements in the PPMs false and/or misleading, including that: (i) the Fund Defendants would employ the Convertible Loan Scheme to end-run manufacturer approval requirements; (ii) they had not acquired manufacturer approval for dealerships that they claimed to have acquired; and (iii) the fees deducted from Limited Partners' capital investment were being paid to affiliates to and/or related parties of the Fund Defendants with whom they collaborated to defraud investors. The Selling Defendants had

46

knowledge of these omissions and failed to alert investors to them when they provided the PPMs and other marketing materials for the GPB Investments.

167.     The Fund Defendants and the Selling Defendants made these false and misleading misrepresentations and omissions knowingly, recklessly, and without regard to their truth or falsity, and with the intent to induce Plaintiffs and the Class to rely upon them and invest their money in the GPB Investments.

168.     The Fund Defendants' and the Selling Defendants' intent is demonstrated by the fees they paid themselves and the knowledge that the General Partner would not be able to obtain manufacturer approval as owner on the timetable provided for distributions in the PPMs.  It also is demonstrated by the fact that the Fund Defendants and the Selling Defendants knew that the GPB Investments made distributions from capital investment funds, which revealed the Fund Defendants' knowledge that the investment they proposed was illegitimate and phony.

169.     Plaintiffs justifiably relied on these false representations and omissions to their detriment by investing money in the Fund Defendants' and Selling Defendants' Ponzi Scheme.

170.     As a direct and proximate result of their reliance on the false representations and omissions of the Fund Defendants and Selling Defendants, Plaintiffs suffered damages, including the loss of their investment and the improper and unearned fees paid to the Fund Defendants, Selling Defendants, and other soliciting brokers.

## COUNT II

## FRAUDULENT MISREPRESENTATION AGAINST THE FUND DEFENDANTS AND THE SELLING DEFENDANTS

171.     The foregoing paragraphs are re-alleged herein.

172.     Based on their unique or special expertise with respect to investments generally, the Fund Defendants and the Selling Defendants had a special relationship of trust or confidence

121213212_1

with Plaintiffs and claim to have earned the status of trusted advisor. Based on this position, they owed Plaintiffs a duty to provide full and correct information to them.

173.    Through statements made in the PPMs, the Fund Defendants and Selling Defendants falsely represented to the Limited Partners that: (i) the GPB Investments would invest their monies into a legitimate automobile dealership acquisition strategy that could feasibly be achieved rather than an illegitimate Ponzi Scheme; (ii) they would be paid distributions from actual cash flows and profits arising from the acquisition of dealerships rather than from capital funds invested by subsequent investors; (iii) the equity fund model provided market advantages in the automobile dealership industry; (iv)  the General Partner had expertise in the automotive retail industry; and (v) that their financial statements complied with GAAP and FASB accounting standards when in fact they did not.

174.    The Fund Defendants failed to disclose the following material information, which among other statements, they knew would render the statements in the PPMs misleading that: (i) the Fund Defendants would employ the Convertible Loan Scheme to end-run manufacturer approval requirements; (ii) they had acquired manufacturer approval for dealerships that they claimed to have acquired; and (iii) the fees deducted from Limited Partners' capital investment were being paid to affiliates of the Fund Defendants with whom they collaborated to defraud Defendants.

175.    The Fund Defendants and the Selling Defendants made the false representations and material omissions knowing that Plaintiffs would use and rely upon the representations and omissions for the particular purpose of determining where and how to invest their assets and, in particular, to decide to invest their assets in the GPB Investments and whether and for how long to retain the LP Units.

48

176.   Plaintiffs justifiably relied upon the false representations and material omissions made by the Fund Defendants and the Selling Defendants to invest their money in the GPB Investments.

177.   As a result of Plaintiffs' reliance on the false representations and material omissions, they suffered damages in the loss of their investments, and the Fund Defendants and the Selling Defendants derived substantial profits.   The Fund Defendants' and the Selling Defendants' misconduct was the direct and proximate cause of Plaintiffs' losses.

## COUNT III

### BREACH OF CONTRACT AGAINST THE GENERAL PARTNER

178.   The foregoing paragraphs are re-alleged herein.

179.   This Count is against the General Partner.   Under the LPA, the General Partner had the following duties:



180.   The General Partner breached these duties when it failed to timely produce the financial reports and when it produced inaccurate financial statements from 2013 to 2017.

181.   The LPAs further █████████████████████████████████

████████████████████████████████████████████████████████

████



182.   ██████████████████████████████████████████████████

████████████████████ .

183.   Plaintiffs and the Class were harmed as a result of these material contractual

breaches.

## COUNT IV

### BREACH OF DUTY TO MAKE LAWFUL DISTRIBUTIONS
### AGAINST THE GENERAL PARTNER

184.   The foregoing paragraphs are re-alleged herein.

185.   The LPA grants the General Partner ████████████████████████

████████████  However, the Delaware Revised Uniform Partnership Act ("DRULPA") limits its

discretion: ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

186.   DRULPA imposes the following limit on distributions:

> A limited partnership shall not make a distribution to a partner to the extent
> that at the time of the distribution, after giving effect to the distribution, all
> liabilities of the limited partnership, other than liabilities to partners on
> account of their partnership interests and liabilities for which the recourse of
> creditors is limited to specified property of the limited partnership, exceed
> the fair value of the assets of the limited partnership, except that the fair
> value of property that is subject to a liability for which the recourse of

creditors is limited shall be included in the assets of the limited partnership only to the extent that the fair value of that property exceeds that liability.

6 *Del. C.* § 17-607.

187.    The General Partner breached the LPA when ███████████████████████

███████████████████████████████████████████    The distributions violated Section 17-607 of DRULPA because, after giving effect to the distributions, the GPB Investments' liabilities exceeded the fair value of its assets.

188.    As a result, the GPB Investments could not provide financial statements under the LPA and required disclosures under SEC regulations. It has essentially ceased its operations because of the improper distributions. The General Partner's breach was the direct and proximate cause of Plaintiffs' loss of their investments.

## COUNT V

### AIDING AND ABETTING FRAUD AGAINST THE SELLING DEFENDANTS

189.    The foregoing paragraphs are re-alleged herein.

190.    This Count is alleged against the Selling Defendants in the alternative.  As alleged above, the Fund Defendants fraudulently induced Plaintiffs and other Limited Partners into investing in the GPB Investments based on false or misleading statements in the PPMs and related documents.

191.    The Selling Defendants acted with willful blindness or recklessness in offering the LP Units to investors, and as a result, is charged with constructive knowledge that:

(a)        The Fund Defendants falsely represented to the Limited Partners in connection with the purchase of LP Units in the GPB Investments: (i) that the GPB Investments would invest their monies into a legitimate automobile dealership acquisition strategy that could feasibly be achieved rather than an illegitimate Ponzi Scheme and (ii)

51

that they would be paid distributions from actual cash flows and profits arising from the acquisition of dealerships rather than from capital funds invested by subsequent investors; and

(b)     The Fund Defendants failed to disclose the following material information, which among other statements, they knew would render the statements in the PPMs false and/or misleading: (i) that the Fund Defendants would employ the Convertible Loan Scheme to end-run manufacturer approval requirements; (ii) that they had acquired manufacturer approval for dealerships that had not yet been approved by manufacturers; and (iii) that the fees deducted from Limited Partners' capital investment were being paid to affiliates of and/or related parties to the Fund Defendants with whom they collaborated to defraud Defendants.

192.   The Selling Defendants substantially assisted the Fund Defendants by giving credibility to the GPB Investments when they marketed it to other brokers and other investors under their name and promoting their reputation.

193.   As a direct and foreseeable result of the Fund Defendants' fraudulent inducement and the aiding and abetting of that fraud, Plaintiffs and other Limited Partners have suffered substantial damages.

## COUNT VI

### UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

194.   The foregoing paragraphs are re-alleged herein.

195.   This Count is asserted against all Defendants in the alternative.   Defendants benefited from their unlawful acts and omissions and defrauded Plaintiffs and the other Limited Partners.   These unlawful acts and omissions caused Plaintiffs and the Limited Partners to suffer injury and monetary loss.

52

121213212_1

196.   As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves through their collection of unearned fees for their services.

197.   Equity requires that Defendants disgorge all such unjust enrichment and that Defendants pay the amounts by which they were unjustly enriched to Plaintiffs in an amount to be determined at trial.

198.   Plaintiffs seek restitution from Defendants, and seek an order disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

199.   Plaintiffs are entitled to establishment of a constructive trust impressed upon the benefits derived by Defendants from their unjust enrichment and inequitable conduct.

## VII.   PRAYER FOR RELIEF

**WHEREFORE,** on behalf of themselves individually and similarly situated Limited Partners, Plaintiffs requests the following:

(a)   Certification of this action as a class action proper and maintainable pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and declaration of the proposed named Plaintiffs as proper Class representatives;

(b)   Preliminary and permanent equitable relief, including the imposition of a constructive trust to preserve the assets wrongfully taken from Plaintiffs;

(c)   Compensatory, consequential, and general damages in an amount to be determined at trial;

(d)   Disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts and practices;

(e)   Punitive damages for each claim based on the outrageous nature of Defendants' willful and wanton disregard of Plaintiffs' rights;

121213212_1

       (f)      Costs, pre-judgment and post-judgment interest at the highest rate allowable by state law, and reasonable attorneys' fees and reimbursement of expenses; and

       (g)     Other such relief as this Court may deem just and proper.

Dated: November 8, 2019

**DILWORTH PAXSON LLP**

_____

Ira N. Glauber (ING – 8383)
99 Park Avenue
New York, NY 10016
Tel: (917)675-4252
iglauber@dilworthlaw.com

**OF COUNSEL**

Catherine Pratsinakis (*pro hac to be filed*)
Jessica L. Titler-Lingle (*pro hac to be filed*)
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Tel: (215) 575-7013
cpratsinakis@dilwothlaw.com
jtitler-lingle@dilworthlaw.com

Michael J. Barry (*pro hac to be filed*)
Kimberly A. Evans (*pro hac to be filed*)
Laina M. Herbert (*pro hac to be filed*)
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com
kevans@gelaw.com
lherbert@gelaw.com

*Counsel for Plaintiffs*

54

121213212_1