UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
BARBARA DELUCA and DREW R.
NAYLOR, on behalf of themselves and
other similarly situated limited partners,

                              Plaintiff,

              -against-                                          19-cv-10498 (LAK)


GPB AUTOMOTIVE PORTFOLIO, LP, et al.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

> Ira N. Glauber
> Catherine Pratsinakis
> Jessica L. Titler-Lingle
> DILWORTH PAXSON LLP
>
> Daniel Lawrence Berger
> Michael J. Barry
> Kimberly Evans
> Laina Herbert
> GRANT & EISENHOFFER P.A.
>
> *Attorneys for Plaintiffs*
>
> Tab Keith Rosenfeld
> Steven Michael Kaplan
> Nicole E. Meyer
> ROSENFELD & KAPLAN, LLP
> *Attorneys for Defendants GPB Automotive Portfolio, LP, GPB Holdings II, LP, and GPB Capital Holdings, LLC*
>
> Jeffrey Schreiber
> Richard Joseph Jancasz
> MEISTER SEELIG & FEIN LLP
> *Attorneys for Defendants Jeffry Schneider and Ascendant Capital, LLC*

Jessica Erin Levine
Alexander Asher Truitt
WINGET, SPADAFORA & SCHWARTZBERG, LLP
*Attorneys for Defendant Axiom Capital Management, Inc.*

Michael Howard Smith
ROSENBERG FELDMAN SMITH, LLP
*Attorneys for Defendants Mark Martino and Ascendant Alternative Strategies, LLC*

William F. McGovern
Leif Thorsten Simonson
KOBRE & KIM LLP
*Attorneys for Defendant David Gentile*

LEWIS A. KAPLAN, *District Judge.*

This putative class action relates to two private equity funds that invested in auto dealerships. Plaintiffs, who purport to represent a class of limited partners invested in the funds, claim that the funds and affiliates actually were parts of a Ponzi scheme by which defendants fraudulently "siphoned off" investments "under the guise" of management and sales fees.[1] Defendants include the funds, the general partner of the funds, the broker-dealers that sold and marketed the funds, and certain co-founders and officers.

The complaint alleges six causes of action for common law fraud, aiding and abetting fraud, breach of contract, and unjust enrichment. Defendants move to dismiss under the doctrine of *forum non conveniens* and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). They move also to stay the case due to pending state litigation. For the following reasons, defendants' motions to stay and to dismiss under *forum non conveniens* are denied. Their motions to dismiss for failure to state a claim are granted in part and denied in part.

---

[1] Compl. ¶¶ 1, 109.

3

*Background*

The following facts are taken from the complaint, documents incorporated by reference in the complaint,[2] and matters of which judicial notice appropriately may be taken.[3]  All facts are assumed to be true and all reasonable inferences are drawn in favor of the plaintiffs.[4]

I.     *The Parties*

The plaintiffs are Barbara DeLuca and Drew R. Naylor, who are accredited investors with limited partnership interests in GPB Automotive Portfolio, LP ("Automotive") and GPB Holdings II, LP ("Holdings II") (together, the "GPB Investments").[5]  Deluca purchased two limited partnership units in Automotive for $100,000 in June 2015.[6]  Naylor's one unit in Holdings II was

---

[2]
  This includes the Private Placement Memorandums ("PPMs"), limited partnership agreements, and subscription agreements relating to the funds.  *See, e.g.*, *Lakonia Mgmt. Ltd. v. Meriwether*, 106 F. Supp. 2d 540 (S.D.N.Y. 2000) (looking to offering memorandum, subscription agreement, and partnership agreement on motion to dismiss).

[3]
  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

[4]
  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam).

[5]
  Compl. at 1, ¶ 17, 18.  Limited partners in the GPB Investments invested by purchasing "limited partnership units" sold privately as unregistered securities under Securities and Exchange Commission ("SEC") Regulation D.  *Id.* ¶¶ 41-42.  In connection with their purchases, plaintiffs certified that they were "sophisticated investor[s] with . . . knowledge and experience in financial and investment matters" who are "accredited" within the meaning of Rule 501(a) of the Securities Act of 1933.  Truitt Decl., Exhibit 2 [DI 62-5] at ¶¶ 10-11 [hereinafter Automotive Subscription Agreement]; Truitt Decl., Exhibit 3 [DI 62-6] at ¶¶ 10-11 [hereinafter Holdings II Subscription Agreement].

[6]
  Compl. ¶ 17.

4

purchased for $50,000 in March 2018.[7]  Plaintiffs bring this purported class action on behalf of themselves and "all persons or entities" who acquired limited partnership interests in the GPB Investments.[8]  As of May 2018, the GPB Investments had over 14,000 limited partners.[9]

The defendants are 10 entities and individuals, which plaintiffs have categorized into two groups:

1.    *The "Fund Defendants."*  The Fund Defendants are the GPB Investments, namely, Automotive and Holdings II; their general partner, GPB Capital Holdings LLC ("GPB Capital"); and GPB Capital's co-founders: David Gentile, Jeffrey Lash, and Jeffry Schneider.[10]

2.    *The "Selling Defendants."*  The Selling Defendants are the broker-dealer and marketing entities that plaintiffs claim sold and marketed the GPB Investments: Ascendant Alternative Strategies, LLC ("Ascendant Alternative"), Ascendant Capital, LLC ("Ascendant Capital"), and Axiom Capital Management, Inc. ("Axiom"), as well as Mark Martino, Ascendant Alternative's CEO.[11]

---

7

*Id.* ¶ 18.  Naylor's wife purchased his limited partnership unit.  Naylor is the assignee of his wife's interest.  *Id.*

8

*Id.* at 1.

9

*Id.* ¶ 1.

10

*Id.* ¶¶ 2, 19-23.  The Complaint misspells Jeffry Schneider's first name as "Jeffrey."  *See* Jeffry Schneider and Ascendant Capital's Mot. to Dismiss [DI 61] at 1 [hereinafter Schneider Defs.' Mot. to Dismiss]; Axiom Mot. to Dismiss [DI 62-1] at 5.

11

Compl. ¶¶ 28-31.

*II.      The GPB Investments*

In 2012, David Gentile and Jeffrey Lash had the idea of starting an investment fund that would invest in auto dealerships.[12]  Gentile was to be the general partner of the fund, and Lash was to be the manager of its "automotive segment."[13]  Gentile and Lash agreed that Jeffry Schneider, Gentile's friend, would raise capital for the fund.[14]  Schneider was the chief executive officer ("CEO") of Ascendant Capital, an entity that marketed private offerings to broker-dealers and registered investment advisers.[15]

Beginning in 2013, the idea came to life as two private funds structured as limited partnerships: Automotive and Holdings II.[16]  Automotive and Holdings II, the "GPB Investments," had the stated purpose of acquiring "retail car dealerships" to "generat[e] operating revenue" for the benefit of their limited partners.[17]  Lash owned 15 percent of Automotive and was its director,[18] while Schneider was to be manager of some of the auto dealerships Automotive claimed to acquire.[19]

---

[12]      *Id.* ¶ 37.

[13]      *Id.*

[14]      *Id.*

[15]      *Id.* ¶¶ 25, 30, 37; Axiom Mot. to Dismiss at 5.

[16]      Compl. ¶¶ 19-21, 38, 40.  Automotive was formed in 2013.  Holdings II was formed in 2015.  *Id.* ¶¶ 39, 40.

[17]      *Id.* ¶ 2.

[18]      *Id.* ¶ 20.

[19]      *Id.* ¶ 54.

To manage the GPB Investments, Gentile, Lash, and Schneider formed GPB Capital, the GPB Investments' general partner.[20]   As general partner, GPB Capital had exclusive authority over fund management and operation.[21]   Gentile was its sole owner and CEO.[22]   Lash was an officer and the "Co-Director of Automotive Retail."[23]   Schneider was "Strategic Advisor."[24]

Limited partnership units in the GPB Investments were marketed to investors via a series of private placement memoranda ("PPMs").[25]   The PPMs stated that limited partners should expect to receive distributions from cash generated by the auto dealerships acquired by the GPB Investments.[26] The annual target return rate for the distributions – which were to begin three months after the limited partner's subscription – was at least eight percent of the limited partners' capital contributions.[27]

From 2013 to 2017, GPB Capital sold limited partnership units to investors "primarily" through Axiom, a broker-dealer and the underwriter of the GPB Investments' unit

---

[20]
      *Id.* ¶¶ 2, 38.   GPB Capital is also the general partner of "at least eight other private partnerships" not at issue in this lawsuit. *Id.* ¶ 2.

[21]
      *Id.* ¶¶ 39, 40.

[22]
      *Id.* ¶¶ 23-25.

[23]
      *Id.*

[24]
      *Id.*

[25]
      *Id.* at 1, ¶ 72.

[26]
      Truitt Decl., Exhibit 4 [DI 62-7] at 12 [hereinafter Automotive PPM]; Truitt Decl., Exhibit 5 [DI 62-8] at 11 [hereinafter Holdings II PPM]; Compl. ¶ 116.

[27]
      Automotive PPM at 12; Holdings II PPM at 11; Compl. ¶ 116.

offerings.[28]   In 2017, Ascendant Alternative, a broker-dealer and an affiliate of GPB Capital, also

began selling limited partnership units.[29]   Ascendant Alternative's CEO was Mark Martino, who

co-founded the firm with Schneider.[30]   Ascendant Alternative passed 100 percent of the payments

it received for the GPB Investments to Ascendant Capital, an affiliate of Ascendant Alternative and

a "branch office" of Axiom that provided "marketing" services to GPB Capital.[31]   As mentioned,

Ascendant Capital's CEO was Schneider.[32]

The GPB Investments paid fees to GPB Capital and the broker-dealers that sold the

limited partnership units.   GPB Capital was paid an annual management fee of about two percent

of capital contributions.[33]   The broker-dealers were paid sales fees "as high as 11 percent" of capital

---

[28]   Compl. ¶¶ 28, 47, 49.   Axiom has denied that it was the underwriter for the GPB Investments' offerings.   Axiom Mot. to Dismiss at 5-6.

[29]   Id. ¶¶ 29, 50. An entity called DJ Partners, LLC., which is owned by Gentile and Schneider, owns 66.67 percent of Ascendant Alternative.  Id. ¶ 29.  The remaining 33.33 percent of Ascendant Alternative is owned by an entity called MR Ranger LLC, which is owned solely by Mark Martino.  Id. ¶ 29.

[30]   Id. ¶¶ 25, 29.  Prior to co-founding Ascendant Alternative, Schneider and Martino worked together at Axiom.  Id.

[31]   Id. ¶¶ 29, 30.

[32]   Id. ¶ 25.

[33]   Id. ¶ 108.  The "managerial assistance fee" paid to GPB Capital is provided for under paragraph 3.13 of the limited partnership agreements ("LPAs").  Bergenfeld Decl., Exhibit E [DI 60-6] ¶ 3.13 [hereinafter Automotive LPA]; Bergenfeld Decl., Exhibit F [DI 60-7] ¶ 3.13 [hereinafter Holdings II LPA].

contributions.[34]   And GPB Capital's "principals" purportedly were paid management fees of unknown amounts directly from dealerships.[35]

From 2015 to 2017, the GPB Investments paid over $20 million in management fees to GPB Capital and $5 million in acquisition fees to "[d]efendants."[36] Plaintiffs allege also that "the total amount of expenses reported by" the GPB Investments from 2015 to 2017 (over $103 million) "appeared to filter down to Defendants or their affiliates"– though the complaint does not explain what is covered by the broad term "expenses."[37] By 2018, the GPB Investments had paid over $100 million in sales fees to the broker-dealers that sold the limited partnership units.[38]

As the years passed, the GPB Investments' offerings to investors "increased substantially."[39] By 2017, they had surpassed the SEC's thresholds for private issuers and were

---

[34]   Compl. ¶ 48.  For the sale of Class A limited partnership units, the broker-dealers received fees as high as 11 percent.  For Class B units, the broker-dealers received a servicing fee of 0.4 percent of capital contributions upon an investor's subscription, which was payable annually so long as the investor held the interest.  *Id.*

[35]   *Id.* ¶ 108.

[36]   *Id.* ¶¶ 109-10.

[37]   *Id.* ¶ 111.

[38]   *Id.* ¶ 51.

[39]   *Id.* ¶ 45.  In 2013, Automotive's initial offering was $50 million.  *Id.* ¶ 45.  By 2018, Automotive reported an "indefinite offering."  *Id.*  Likewise, Holdings II, which had an initial offering of $350 million in 2015, increased its offering to $750 million in 2018.  *Id.* ¶ 46.

required to be registered with the SEC.[40]   In the following year, the funds raised by the GPB Investments from inception reached about $1.27 billion.[41]

A.     *The Automobile Manufacturer Approval Process and the "Convertible Loan Scheme"*

The GPB Investments purported to buy auto dealerships, which typically are operated as franchises granted by automobile manufacturers.[42]   In consequence, buyers of dealerships must apply to manufacturers for, and receive, manufacturer approval.[43]   This manufacturer approval process is "rigorous" and "subject to strict requirements and due diligence."[44]   As automobile manufacturers are wary of trusting their brand names to "unknown investors," they typically approve only those with "sufficient experience and working capital to operate the dealership."[45]   Among other things, a dealership buyer must have a "specified dealer principal" and a general manager with requisite expertise in the auto industry to be approved.[46]

----

[40]     *Id.* ¶ 128.

[41]     *Id.* ¶ 1.

[42]     *Id.* ¶¶ 59, 61.

[43]     *Id.*

[44]     *Id.* ¶ 58.

[45]     *Id.* ¶ 60.

[46]     *Id.* ¶¶ 60-61.

According to plaintiffs, the manufacturer approval process – which typically takes "six months or longer" – "presented a timing problem" for defendants because the limited partners were promised distributions starting three months after purchasing their units.[47]  To resolve that problem, GPB Capital purportedly engaged in what plaintiffs refer to as the "Convertible Loan Scheme."[48]  While manufacturer approval was pending, GPB Capital allegedly paid an amount equal to the purchase price of the dealership to the seller as a forgivable loan with a very low interest rate.[49]  Upon manufacturer approval of the sale, GPB Capital had the right to "convert" this loan into equity in the dealership, at which point the loan would be released.[50]  Through this means, the GPB Investments obtained control of dealerships and their cash flows before receiving manufacturer approval.[51]  Additionally, the GPB Investments' "management teams" were paid management fees and other royalties for operating the dealerships.[52]

For instance, in September 2013, GPB Capital gave Lash a $2 million loan to enable Automotive to purchase 50 percent of a Buick/GMC dealership.[53]  In July 2014, GPB Capital loaned

---

[47]      *Id.* ¶¶ 61, 63.

[48]      *Id.* ¶ 65.

[49]      *Id.*

[50]      *Id.*

[51]      *Id.*

[52]      *Id.*

[53]      *Id.* ¶ 66.

an additional $2 million to Lash to purchase the remaining 50 percent.[54]   These loans, equal in amount to the purchase price of the dealership, were listed as receivables on Automotive's financial statements.[55]

In another case, plaintiffs allege, on information and belief, GPB Capital gave dealership owner Patrick Dibre a convertible loan totaling $42 million to purchase six Nissan and Volkswagen dealerships between 2013 and 2015.[56]   Subsequently, according to plaintiffs, GPB Capital "withdrew amounts in excess of the cash flow generated by the dealerships and paid it as a special distribution based on the alleged performance of the dealerships, which was represented to investors as being higher than its [sic] actual performance."[57]   GPB Capital ultimately "was unable to complete the transaction . . . because it lacked the funds to do so."[58]

Plaintiffs allege, also on information and belief, that the auto dealerships the GPB Investments claimed to acquire "typically did not generate the necessary cash flow to make the promised distributions to investors."[59]   On "several occasions in 2016," GPB Capital transferred funds from GPB Holdings I, which is not a defendant in this action, to Automotive.[60]   Additionally,

---

[54]     *Id.*

[55]     *Id.*

[56]     *Id.* ¶ 68.

[57]     *Id.* ¶ 69.

[58]     *Id.*

[59]     *Id.* ¶ 70.

[60]     *Id.*

GPB Capital "falsified financial reports to make the dealerships look more profitable than they were."[61]

### B. The PPMs

The GPB Investments distributed PPMs to each of their prospective investors.[62]  The PPMs described the funds, the terms of their offerings, and their risks.

### 1. GPB Capital's Investment Strategy and Goals

The PPMs detailed GPB Capital's goal of using the GPB Investments to "purchase and transform" auto dealerships into "stable, long-term investments."[63]  According to the PPMs, GPB Capital's investment strategy "was to acquire income-producing, middle-market private companies with high barriers to entry [and] high sustainable current cash flow" that were "recession resilient" and had "proven management teams."[64]

### 2. The Automobile Manufacturer Approval Process and GPB's Expertise in the Auto Industry

The PPMs disclosed that automobile manufacturer requirements posed a risk with respect to the GPB Investments' ability to acquire and operate dealerships and to achieve financial

---

[61]     Id.

[62]     Id. ¶¶ 41, 72.

[63]     Id. ¶ 73.

[64]     Id. ¶ 74.

success.[65]  At the same time, the PPMs stated that GPB Capital would overcome this "high barrier to entry" by "seeking to partner with automotive industry specialists within their network of long-standing relationships, giving GPB a distinct advantage."[66]  The PPMs stated also that GPB Capital and its management had significant experience in the auto industry.[67]

### 3. Distributions

The PPMs stated that distributions were "expect[ed]" and "intend[ed]" to be made to limited partners from "cash, if any" beginning about three months after their subscription.[68]  In March 2015, Automotive's PPM disclosed small special distributions of gross capital made in December 2013, June 2014, December 2014, and April 2015.[69]  In December 2016, Holdings II's PPM disclosed that Holdings II "reserve[ed] the right to return Capital Contributions to [limited

---

[65]  Automotive PPM 17 ("High capital requirements and the franchisee approval process are significant barriers to entry in the automotive retail industry. All franchisees need to possess a certain level of industry experience in order to garner the manufacturers' approval to own and operate new stores."); *id.* at 36-37 ("Dealerships are significantly dependent on relationships with . . . manufacturers, which exercise a great degree of influence over their operations through the franchise agreements . . . . We cannot guarantee all of the franchise agreements that our Dealerships will be party to will be renewed . . . . Our future results of operations may be materially and adversely affected to the extent that franchise rights that our Dealerships enjoy become compromised.  If a franchise agreement were terminated or not renewed, we would be materially affected."); *see also* Holdings II PPM at 17, 37-38.

[66]  *Id.* ¶ 76.

[67]  *Id.* ¶ 62.

[68]  Automotive PPM at 12; Holdings II PPM at 11.

[69]  Automotive PPM at 12.  The special distributions disclosed were all under three percent of gross capital. *Id.*

partners] as part of our distributions, though we do not presently have plans to do so."[70]

In 2016, GPB Capital used over $14 million in new investor capital to pay distributions to Automotive investors and over $8 million in new investor capital to pay distributions to Holdings II investors.[71]  In 2017, GPB Capital used over $27 million in new investor capital to pay distributions to Automotive investors and over $11 million in new investor capital to pay distributions to Holdings II investors.[72]  In July 2018, the Automotive PPM was revised to state that "[p]eriodic distributions are currently and may in the future be paid out of available working capital, which include investor contributions."[73]

### 4.    Equity Fund Model

The PPMs stated that the "equity fund model" for acquiring auto dealerships,  *i.e.*, the model used by the GPB Investments, provided a competitive advantage for various reasons, including because it could:

1.    Aggregate and consolidate dealerships for reasons of cost-control, efficiency, and scaling;
2.    Implement standard accounting practices across the dealership portfolio;
3.    Consolidate back-office operations;
4.    Conduct portfolio-wide board meetings of dealership managers for purposes of strategic coordination;
5.    Improve the parts and services operations of each dealership with a focus on bringing margins "up to GPB standards;" and

---

[70]

Holdings II PPM at 12.  The special distributions disclosed were all under three percent of gross capital.  *Id.*

[71]

Compl. ¶¶ 119, 120.

[72]

*Id.*

[73]

*Id.* ¶ 147.

6.      Implement a strong internet sales operation.[74]

In support of these representations, GPB Capital pointed investors to news reports that George Soros and Warren Buffett were "embarking on similar ventures" and using equity funds to acquire auto dealerships.[75]

The complaint alleges that Nissan declined to approve the sale of "several of Dibre's dealerships" to GPB Capital, which it characterized as "an unknown equity fund."[76]

### 5.    Financial Statements

Finally, the PPMs stated that the GPB Investments' financial statements "ha[d] been prepared in accordance with accounting principles generally accepted in the United States of America ('GAAP') consistent with the presentation and disclosure requirements of Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 946, 'Financial Services – Investment Companies.'"[77]

### C.    GPB Capital's Chief Financial Officer and Automotive's Auditor Resign

In 2018, GPB Capital's chief financial officer ("CFO"), Macrina Kgil, resigned, allegedly "due to concerns about fraud related to the funds [GPB Capital] managed, including the

---

[74]
        Id. ¶ 75.

[75]
        Id. ¶ 79.

[76]
        Id. ¶ 77 (quotations omitted).

[77]
        Id. ¶ 125.

GPB Investments."[78] In April 2018, GPB Capital reduced the rate of its distributions to limited partners from eight percent to four percent per annum.[79]

In July 2018, the auditor of Automotive's 2016 financial statements, Crowe LLP ("Crowe"), resigned.[80]  Crowe cited concerns that Automotive's 2016 financial statements were "likely materially misstated."[81]  Additionally, plaintiffs allege that Crowe advised GPB Capital in a letter that Automotive's "internal controls" were not sufficient to develop reliable financial statements due to "significant related party activity."[82]

In August 2018, GPB Capital informed the limited partners and the broker-dealers that sold securities in the GPB Investments that its financial statements for 2015 and 2016 needed to be restated.[83]  It stated also that the GPB Investments had "certain material weaknesses in internal controls over financial reporting," including controls over related party transactions and

---

[78]

Id. ¶ 122.

[79]

Id. ¶ 148.

[80]

Id. ¶¶ 127, 130.  Holdings II "has been and continues to be audited by RSM US LLP (f/k/a McGladrey LLP).  Id. ¶ 126.

[81]

Id. ¶ 130.

[82]

Id. ¶ 129.

[83]

Id. ¶ 132.

disclosures.[84]   That same month, GPB Capital suspended Automotive's investor offering and redemptions.[85]

In December 2018, the GPB Investments transitioned to a quarterly distribution plan.[86]  They did not make investor distributions for the first quarter of 2019.[87]  As of June 2019, Automotive had stopped paying distributions, and the value of the limited partnership units for Automotive and Holdings II had dropped by 39 percent and 25.4 percent, respectively.[88]

In September 2019, GPB Capital informed the limited partners that, due to ongoing investigations by the Securities and Exchange Commission ("SEC") and the Federal Bureau of Investigation ("FBI"), the release of the 2015 and 2016 financial restatements and the 2017 and 2018 financial statements for the GPB Investments had been delayed.[89]  As of the filing of the complaint, the limited partners had received neither the 2015 and 2016 financial restatements nor the 2017 and 2018 financial statements.[90]

---

[84]      *Id.*

[85]      *Id.* ¶ 140.

[86]      *Id.* ¶ 149.

[87]      *Id.* ¶ 151.

[88]      *Id.* ¶ 152.

[89]      *Id.* ¶¶ 138-39.

[90]      *Id.* ¶ 139.

IV.     *Related Lawsuits and Government Investigations*

Since 2017, GPB Capital and the entities it controls have been the subjects of a variety of lawsuits and government investigations, which the complaint quotes and references extensively.[91]

A.      *Dibre and Rosenberg Lawsuits*

The first lawsuit extensively discussed in the complaint relates to dealership owner Dibre. In July 2017, GPB Capital sued Dibre for breach of contract.[92] It alleged generally that Dibre used improper and manipulative tactics to inflate the historic earnings of dealerships that he sold to GPB Capital.[93] Dibre filed counterclaims alleging that GPB Capital was operating a Ponzi scheme and defrauding limited partners invested in funds managed by GPB Capital.[94] He alleged, *inter alia*, that GPB Capital "manipulat[ed] the financial statements of the dealerships" to make them look more profitable, "overfunded itself . . . by drawing out more than the net cash flows . . . in order to entice new investors, and . . . used that overfunded cash to distribute to investors as a 'special distribution.'"[95] Dibre alleged also that "on several occasions" in 2016, "GPB Capital transferred

---

[91]

See *id.* ¶¶ 80-107; 140-46, 153-55.

[92]

*Id.* ¶ 80.

[93]

*Id.* ¶ 81.

[94]

*Id.*

[95]

*Id.* ¶ 82.

funds from GPB Holdings I to Automotive and vice versa in order to bolster returns if one fund was lagging behind."[96]

The second lawsuit began in July 2019, when dealership owner David Rosenberg sued entities controlled by GPB Capital.[97]  Rosenberg claimed that the entities controlled by GPB Capital breached their contract to pay Rosenberg $5.9 million in connection with an agreement to purchase a controlling interest in Rosenberg's dealership group.[98]  According to Rosenberg, this breach occurred after he "made efforts to address fraudulent and wrongful conduct" by GPB Capital.[99]  Rosenberg's claims relate to alleged financial misconduct he observed, including the fabrication of revenue and self-dealing transactions, with respect to GPB Capital, Gentile, and Lash.[100]

B.    *Government Investigations*

The complaint lists also a number of apparently unresolved government investigations regarding GPB Capital, entities controlled by GPB Capital, and the broker-dealers with which GPB Capital worked.  Starting in the summer of 2018, GPB Capital received subpoenas and other requests for information from the U.S. Attorney's Office for the Eastern District of New York, the SEC, the New York City Business Integrity Commission ("BIC"), and the New Jersey

---

[96]    *Id.* ¶ 85.

[97]    *Id.* ¶¶ 91-92.

[98]    *Id.* ¶¶ 92-93.

[99]    *Id.*

[100]    *Id.* ¶ 95.

Bureau of Securities.[101]  Some of the requests related to a waste management fund that GPB Capital managed as well as "issues raised by . . . Patrick Dibre" in his counterclaims.[102]

In September 2018, Massachusetts announced that it had opened an investigation into "broker-dealer firms" that sold limited partnership units in the GPB Investments.[103]  Likewise, the SEC and the Financial Industry Regulatory Authority ("FINRA") "reportedly" made inquiries of broker-dealer firms that sold securities "in partnerships controlled by" GPB Capital.[104]

In February 2019, FBI and BIC agents executed a search warrant at "GPB offices."[105]

In October 2019, GPB Capital's managing director and chief compliance officer, Michael S. Cohen, was indicted by the Eastern District of New York.[106]  Cohen, who had worked as a securities compliance examiner and industry specialist in the SEC's Enforcement Division before joining GPB Capital, was charged with disclosing inside information about SEC's investigation of GPB Capital to GPB Capital's senior management in order to "land a job."[107]

---

[101] *Id.* ¶¶ 143-44.

[102] *Id.*

[103] *Id.* ¶ 141.

[104] *Id.* ¶ 142.

[105] *Id.* ¶ 143.

[106] *Id.* ¶¶ 153-54.

[107] *Id.* ¶¶ 153, 155.

V.      *Current Securities Litigation*

In November 2019, plaintiffs brought this action on behalf of all limited partners in the GPB Investments under the Class Action Fairness Act of 2005.[108]  The complaint consists of six claims for relief under state law, including:

- Two fraud claims (Count I and Count II) against all defendants, which solely relate to alleged misstatements and omissions in the PPMs used to market the limited partnership units;

- One aiding and abetting fraud claim (Count V) against the Selling Defendants, which also relates to misstatements and omissions in the PPMs;

- Two breach of contract claims (Count III and Count IV) against GPB Capital, which relate to the limited partnership agreements ("LP As") that governed the GPB Investments' relationship with its partners;

- One claim for unjust enrichment (Count VI) against all defendants.

All of the defendants except Lash[109] move to dismiss under the doctrine of *forum non conveniens* and for failure to state a claim under Rule 12(b)(6).  Likewise, all of the defendants except Lash moved to stay the action due to pending state litigation.

Plaintiffs' action is one of at least six putative class actions filed in the summer and fall of 2019 regarding the GPB Investments.[110]  The others include one brought in the Supreme Court of New York County by Adam Younker on behalf of all limited partners of the GPB

---

[108]    28 U.S.C. § 1332(d)(2)(B).

[109]    Despite accepting service, *see* DI 26, Lash neither has filed a motion to dismiss nor has had counsel appear on his behalf in this matter.  As the Court finds that the other defendants' claims equally apply to Lash, it considers their claims with respect to Lash *sua sponte.  See Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) ("[T]he district court has the power to dismiss a complaint sua sponte for failure to state a claim on which relief can be granted").

[110]    Automotive, Holdings II, and GPB Capital's Mot. to Dismiss [DI 60-9] at 2 & n. 4 [hereinafter GPB Defs.' Mot. to Dismiss].

Investments and other funds, which has been consolidated with a related action under the caption *In re GPB Capital Holdings, LLC., Litigation* [hereinafter *Younker*].[111] *Younker*, in which there are currently motions to dismiss pending, brings claims for, *inter alia*, negligence, breach of fiduciary duty, fraud, aiding and abetting fraud, and unjust enrichment.[112] The defendants in *Younker* include all of the defendants in this action except Martino, as well as other entities and individuals that are not defendants here.[113]

## *Discussion*

### I. *Motion for a Stay*

Defendants request a stay of this action until the New York Supreme Court determines pending motions to dismiss in *Younker*.[114] As a stay of this action due to parallel state litigation is not warranted under *Colorado River Water Conservation Dist. v. United States*,[115] and defendants have not established that the balance of factors supports a discretionary stay, defendants' request is denied.

---

[111]

Index No.: 157679/2019 (Sup. Ct., N.Y. County).

[112]

Verified Consol. Compl., *In re GPB Capital Holdings, LLC, Litig.*, Index No.: 157679/2019 (NYSCEF Doc. No. 82) [hereinafter Consol. Younker Compl.].

[113]

*Id.*

[114]

Index No.: 157679/2019.

[115]

424 U.S. 800 (1976).

*A.*    Colorado River *Stay*

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them."[116] Nevertheless, the Supreme Court held in *Colorado River* that certain "exceptional" circumstances require a federal court to abstain from exercising its jurisdiction – that is, when parallel state court litigation exists that could result in a "comprehensive disposition" of the litigation and it would conserve judicial resources.[117]   Though defendants have not requested explicitly that the Court abstain under *Colorado River* – they have requested generally that the Court use its discretion to stay this action in light of the state action[118] – the Second Circuit has held that "[t]here is no difference between a stay and a dismissal for purposes of the *Colorado River* doctrine."[119]   Accordingly, the Court applies *Colorado River*.

Under *Colorado River* and its progeny, courts consider six factors in determining whether to stay an action in favor of a parallel state proceeding:

> "(1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal

---

[116]

*Colorado River*, 424 U.S. at 817.

[117]

*Id.* at 813, 817-18.

[118]

*See, e.g.*, GPB Defs.' Mot. to Dismiss at 14-15.  Plaintiffs, on the other hand, do argue that *Colorado River* applies.  *See* Pls.' Omnibus Brief in Opp. to Defs.' Mot. to Dismiss [DI 77] at 54 [hereinafter Pls.' Omnibus Opp.].

[119]

*Burnett v. Physician's Online, Inc.*, 99 F.3d 72, 76-77 (2d Cir. 1996) (citations omitted).

law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights."[120]

No one of these factors necessarily is determinative. Rather, "a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required."[121] The facial neutrality of a factor "is a basis for retaining jurisdiction, not for yielding it."[122]

Before delving into the six-factor *Colorado River* analysis, a court must make the threshold determination "that the concurrent proceedings are 'parallel.'"[123] "Federal and state proceedings are parallel if substantially the same parties are contemporaneously litigating substantially the same issue in both forums."[124]

This action and *Younker* are indeed parallel. The plaintiffs in both actions purportedly include all investors who purchased limited partnership units in the GPB Investments.[125]

---

[120]

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100-01 (2d Cir. 2012) (quoting *Woodford v. Cmty. Action Agency of Greene Cty., Inc.*, 239 F.3d 517, 522 (2d Cir. 2001)).

[121]

*Colorado River*, 424 U.S. at 818-819.

[122]

*Woodford*, 239 F.3d at 522.

[123]

*Dittmer v. Cty of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998).

[124]

*Iacovacci v. Brevet Holdings, LLC*, No. 18-cv-8048 (JFK), 2019 WL 2085989, at *4 (S.D.N.Y. May 13, 2019) (quotations omitted), *reconsideration denied*, No. 18-cv-8048, 2019 WL 2992165 (S.D.N.Y. July 9, 2019).

[125]

Consol. Younker Compl. at 1-2; Compl. at 1.

Likewise, the defendants in both actions include all of the defendants in this action except Martino.[126]

Moreover, claims common to both actions are based on substantially the same issues. Namely, both actions bring, *inter alia*, fraud claims based on alleged misrepresentations or omissions regarding:

- Whether the GPB Investments' distributions would be made from cash rather than capital funds;[127]

- Whether the GPB Investments used convertible loans to cover up the fact that they had not acquired dealerships;[128]

- Whether the GPB Investments' financial statements were accurate when provided to the limited partners;[129]

- Whether the GPB Investments were a Ponzi scheme.[130]

As this action and *Younker* feature substantially the same parties litigating substantially the same issues, the actions are parallel.

Though the actions are parallel, the balance of the six *Colorado River* factors do not favor a stay of this action.  First, no property exists over which the state court has exercised exclusive jurisdiction.  Second, no party would be inconvenienced by having to litigate in federal

---

[126]

    *Id.*

[127]

    Consol. Younker Compl. at ¶ 422; Compl. at ¶ 165.

[128]

    Consol. Younker Compl. at ¶ 422; Compl. at ¶ 166.

[129]

    Consol. Younker Compl. at ¶ 425; Compl. at ¶ 165.

[130]

    Consol. Younker Compl. at ¶ 422; Compl. at ¶ 165.

court: this courthouse and New York Supreme Court are next door to each other.[131] Thus, the first two factors do not support a stay.

Third, there is no significant need to avoid piecemeal litigation. As the state court has not resolved the pending motions to dismiss, *Younker* is still in its early stages. Accordingly, though certain issues are common between the two actions, a final judgment by the state court pertaining to those issues is not likely to come for some time. And even if the state court does arrive at a final judgment applicable to issues or claims in this case before this Court does, "this Court would give [that judgment] the appropriate preclusive effect."[132] At best, the third factor is neutral with respect to a stay.[133]

Fourth, as mentioned, there is no need to defer to *Younker* because it is still in its early stages. Though *Younker* was filed before this action, the Supreme Court has made clear that the fourth factor "does not turn exclusively on the sequence in which the cases were filed, 'but rather in terms of how much progress has been made in the two actions.'"[134] As both this action and *Younker* have progressed in an equal manner – indeed, this action now is farther ahead given this opinion – the fourth factor does not support a stay.

---

[131]    *See Iacovacci*, 2019 WL 2085989, at *6.

[132]    *Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 665 (S.D.N.Y. 2016); *see also Abe v. New York Univ.*, No. 14-cv-9323 (RJS), 2016 WL 1275661, at *7 (S.D.N.Y. Mar. 30, 2016) ("The mere existence of parallel federal and state suits does not, without more, warrant abstention, particularly where 'the nature of the parallel actions is such that principles of res judicata and collateral estoppel should be effective to prevent inconsistent outcomes.'") (quoting *CVR Energy, Inc. v. Wachtell, Lipton, Rosen & Katz*, No 14-cv-6566 (RJS), 2014 WL 7399040, at *4 (S.D.N.Y. Dec. 29, 2014)).

[133]    *See id.*

[134]    *Vill. of Westfield v. Welch's*, 170 F.3d 116, 122 (2d Cir. 1999) (quoting *Moses H. Cone Men'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 (1983)).

Fifth, though plaintiffs have brought exclusively state claims, those claims "are not particularly novel or complex."[135] And, importantly, federal jurisdiction exists over this putative class action under the Class Action Fairness Act of 2005, which is "a statute Congress enacted to facilitate adjudication of certain class actions in federal court."[136] The fifth factor is, at best, neutral.

Sixth, there is "no serious question" that the New York Supreme Court can "adequately protect [plaintiffs'] procedural and substantive rights and provide a fair forum that will promptly resolve the parties' claims."[137] Nevertheless, "the ability of the state court to adequately protect [plaintiffs'] interests only makes this factor neutral."[138]

The Court counts three "neutral" factors and three factors that do not support a stay. As neutrality is a basis for retaining jurisdiction, the Court concludes that "exceptional circumstances" do not warrant a stay under *Colorado River*.

B.      *Discretionary Stay*

Nor is a discretionary stay warranted.

---

[135]

*Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 666 (S.D.N.Y. 2016).

[136]

*Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 82 (2014).

[137]

*Dalzell Mgmt. Co. v. Bardonia Plaza, LLC*, 923 F. Supp. 2d 590, 602 (S.D.N.Y. 2013).

[138]

*Id.*; *see also Dunkin' Donuts Franchised Rests. LLC v. Rijay, Inc.*, No. 06-cv-8237 WCC, 2007 WL 1459289, at *6 (S.D.N.Y. May 16, 2007) ("[T]he sixth factor – whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction – is consequential only when the answer is negative and thus weighs in favor of federal jurisdiction.").

Courts have inherent power over their dockets and thus have discretion to stay proceedings when they consider it appropriate.[139] Considerations pertinent to the exercise of that discretion include "economy of time and effort for [the court], for counsel, and for litigants" and whether the applicant has made "out a clear case of hardship or inequity in being required to go forward."[140] "[A]ssessment of whether an applicant would suffer hardship in being required to go forward necessarily involves consideration of the likelihood that some useful purpose would be served by delay."[141]

No useful purpose would be served by a stay here. As mentioned, the state action has not progressed past its preliminary stages, so there is no real need to delay this action due to a risk of inconsistent legal or factual rulings. Furthermore, aside from vague concerns about litigation costs, defendants have not established a clear case of hardship or inequity in being required to go forward. As plaintiffs have recognized, "[p]arallel state and federal litigation is quite common."

II.    Forum Non Conveniens

In connection with their purchases of the limited partnership units, plaintiffs signed Subscription Agreements that contained the following clause: "Venue for any litigation arising out of, under, or in connection with this Agreement will lie in the state courts having jurisdiction over

---

[139]

*Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

[140]

*Id.* at 254-55.

[141]

*Jackson v. Scotts Co.*, No. 08-cv-1064 (LAK), 2009 WL 321010, at *5 (S.D.N.Y. Feb. 10, 2009), *aff'd*, 356 F. App'x 513 (2d Cir. 2009).

such matters located in New York County, New York."[142]  Defendants argue that this is a forum selection clause that warrants dismissal of the complaint under the doctrine of *forum non conveniens*.  This argument raises a number of issues but fails on the basis of one: the relevant clause is permissive, not mandatory.  It therefore does not warrant dismissal of the case.

Under the doctrine of *forum non conveniens*, a federal court can dismiss a case based on an enforceable forum selection clause requiring resort to a state or foreign forum.[143]  The Second Circuit applies a four-part, burden-shifting framework to determine whether a forum selection clause is enforceable.[144]  Such a clause is presumptively enforceable if the party seeking enforcement establishes that: "(1) the clause was reasonably communicated to the party resisting enforcement; (2) the clause was mandatory and not merely permissive; and (3) the claims and parties involved in the suit are subject to the forum selection clause."[145]  Once the party establishes these three conditions, "the burden shifts to the party resisting enforcement to rebut the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."[146]

Although the four-part framework governing the enforceability of a forum selection clause derives from federal law, "the body of law selected in an otherwise valid choice-of-law

---

[142]
    Automotive Subscription Agreement ¶ 40(b); Holdings II Subscription Agreement ¶ 40(b).

[143]
    *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas,* 571 U.S. 49, 60 (2013); *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007).

[144]
    *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383-84 (2d Cir. 2007).

[145]
    *Altvater Gessler–J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A.*, 572 F.3d 86, 89 (2d Cir.2009) (citing *Phillips*, 494 F.3d at 383-84).

[146]
    *Altvater Gessler–J.A. Baczewski Int'l (USA) Inc.*, 572 F.3d at 89 (quotation marks omitted).

clause" is applied to answer the "interpretive questions posed by parts two and three of the four-part framework."[147]   As defendants recognize, and plaintiffs do not question, the Subscription Agreements included a governing law clause stating that they are governed "by the laws of the State of New York."[148] Accordingly, the Court looks to New York law to determine whether the forum selection clause is mandatory or permissive.

Under New York law, forum selection clauses are mandatory where "the contractual language . . . provides unambiguously that any disputes are to be decided" in a specified forum.[149] New York courts repeatedly have found forum selection clauses mandatory where they include language indicating that a forum is exclusive.[150] By contrast, where the "plain meaning of the words

---

[147]

*Martinez v. Bloomberg LP*, 740 F.3d 211, 217-18 (2d Cir. 2014); *see also Glob. Seafood Inc. v. Bantry Bay Mussels Ltd.*, 659 F.3d 221, 224 n.3 (2d Cir. 2011) ("[C]hoice of law provisions are generally applied when determining whether a forum selection clause is mandatory or permissive under step two of the *Phillips* analysis").

[148]

GBP Defs.' Mot. to Dismiss at 10 n.3. Plaintiffs do not object to defendants' assertion that New York law applied to this issue. *See* Pls.' Omnibus Opp. at 48-51.

[149]

*Boss v. Am. Express Fin. Advisors, Inc.*, 6 N.Y.3d 242, 246 (N.Y. 2006).

[150]

*See, e.g., Boss*, 6 N.Y.3d at 245-46 (finding forum selection clause mandatory where it stated: "You expressly waive any privileges contrary to this provision.  You agree to the jurisdiction of [the] State of Minnesota courts for determining any controversy in connection with this Agreement."); *New Greenwich Litig. Tr., LLC v. Citco Fund Servs. (Europe) B.V.*, 145 A.D.3d 16, 28, 41, N.Y.S.3d 1, 11 (1st Dep't 2016) (finding forum selection clause mandatory where it stated: "[u]nless the parties expressly agree otherwise in writing, all disputes between the Client and the Contractor relating to this Contract will be referred to the competent District Court of Amsterdam."); *see also Buhler by Buhler v. French Woods Festival of Reforming Arts, Inc.*, 154 A.D.2d 303, 304, 546 N.Y.S.2d 591, 591 (1st Dep't 1989) (enforcing forum selection clause where it stated: "The venue of any dispute that may arise out of this agreement or otherwise between the parties to which the camp or its agents is a party shall be either the Village of Hancock, N.Y. Justice Court or the County or State Supreme Court in Delaware County."); *Callanan Indus., Inc. v. Sovereign Const. Co.*, 44 A.D.2d 292, 293, 354 N.Y.S.2d 486, 487 (3rd Dep't 1974) (enforcing forum selection clause where it stated: "any controversy or claim arising out of or relating to this agreement or the breach thereof shall be finally settled by the Courts of the State of New York, Rockland County . . . . The SUBCONTRACTOR agrees that it will not commence any action . . . in

used by the parties . . . do[es] not manifest an intention to limit jurisdiction to a particular forum," the clause is permissive.[151]

The forum selection clause in the Subscription Agreements plainly does not manifest an intention to limit jurisdiction to the state courts in New York County. The word "venue" describes a "proper or a possible place for a lawsuit to proceed."[152] The word "lie," in this context, means "[t]o have foundation in the law; to be legally supportable, sustainable, or proper."[153] The clause therefore establishes that a state court in New York County is a "proper or possible place" for any lawsuits arising out of the agreements "to proceed." But the clause contains no "further language" providing that such a court shall be the exclusive venue where an appropriate case may be heard.[154] Accordingly, the clause is permissive.[155]

--------

any Courts other than those in the County of Rockland, State of New York.").

[151]

*Brooke Grp. Ltd. v. JCH Syndicate 488*, 87 N.Y.2d 530, 534 (N.Y. 1996) (finding forum selection clause permissive where it stated: "the underwriters will submit to the jurisdiction of a United States court"); *see also Columbia Cas. Co. v. Bristol-Myers Squibb Co.*, 215 A.D.2d 91, 95, 635 N.Y.S.2d 173, 175-76 (1st Dep't 1995) (same); *Mena Films, Inc. v. Painted Zebra Prods., Inc.*, 13 Misc. 3d 1221(A), 831 N.Y.S.2d 348 (Sup. Ct., N.Y. County 2006) (finding forum selection clause permissive under New York law where it stated: "[t]his Agreement shall be governed by California Law and shall be subject to the jurisdiction of the Federal and State Courts located in Los Angeles County."); *see also Fear & Fear, Inc. v. N.I.I. Brokerage, L.L.C.*, 50 A.D.3d 185, 187, 851 N.Y.S.2d 311, 313 (4th Dep't 2008) ("[W]hen only jurisdiction is specified," the forum selection clause "will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive.") (quotation marks omitted).

[152]

*Venue, Black's Law Dictionary* (11th ed. 2019).

[153]

*Lie, Black's Law Dictionary* (11th ed. 2019).

[154]

*See Fear & Fear, Inc.*, 50 A.D.3d at 187.

[155]

*Cf. Bernstein v. Wysoki*, 77 A.D.3d 241, 244, 250–51, 907 N.Y.S.2d 49, 56 (2d Dep't 2010) (finding forum selection clause mandatory where it stated: "[t]he venue of any dispute that may arise out of this agreement . . . shall be either the local District Justice Court or the

Though defendants argue that "[w]ords such as 'will' or 'shall' . . . make a clause mandatory in nature,"[156] the words "will" and "shall" are not interchangeable.  Although some New York courts have held generally that "shall" conveys "a clear indication of intent regarding . . . exclusion,"[157] the Court has not identified any cases in which this reasoning was extended to the word "will," and definitely not the phrase "will lie."  Indeed, interpreting the phrase "venue will lie" as distinct from the phrase "venue shall be" finds support in the language of Article 5 of the CPLR, which contains New York's venue rules.  Instead of stating that venue "will lie" in a specified place – which would not exclude other places – those provisions state that venue "shall be" in a specified place.[158]  It is clear from these authorities that the phrase "venue will lie" indicates a permissive rather than mandatory forum selection clause.  The clause in the Subscription Agreements thus cannot be the basis for a dismissal under the doctrine of *forum non conveniens*.


III.    *Failure to State a Claim*

The Court now addresses defendants' arguments that the complaint should be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

---

Court of Common Pleas, Wayne County, Pennsylvania").

156

GPB Defs.' Mot. to Dismiss at 11.

157

*INVESTOOLS INC. v. Waltz*, No. 602876-2006, 2006 WL 4682091 (Sup. Ct., N.Y. County Nov. 28, 2006).

158

*See, e.g.,* CPLR § 503(a) ("the place of trial shall be in the county in which one of the parties resided when it was commenced . . . ."); *id.* § 505 ("[t]he place of trial of an action by or against a public authority constituted under the laws of the state shall be in the county in which the authority has its principal office . . . .").

A.    *Motion to Dismiss Standard*

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face."[159]  In determining whether a plaintiff has met this burden, the Court accepts as true all well-pleaded factual allegations and "draw[s] all reasonable inferences in the plaintiff['s] favor."[160]  Unsupported legal conclusions, threadbare recitals of the elements of a cause of action, and conclusory statements will not suffice to defeat a motion to dismiss.[161]

Fundamentally, a plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level."[162]  If a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed."[163]

B.    *Fraud Claims (Counts I & II)*

Plaintiffs have alleged two almost identical causes of action for fraud against all defendants: "Fraud in the Inducement" (Count I) and "Fraudulent Misrepresentation" (Count II).[164]

---

159

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted).

160

*Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).

161

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Iqbal, 556 U.S. at 678).

162

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

163

*Id.* at 570.

164

There are two differences in plaintiffs' allegations with respect to Count I and Count II. First, the Selling Defendants' alleged culpability is different: Count I alleges the Selling Defendants had "knowledge" of the alleged misrepresentations and omissions, which were made by the Fund Defendants, whereas Count II alleges the Selling Defendants made the misrepresentations and omissions with the Fund Defendants.  Second, Count II alleges a

Each count is based on the same alleged misrepresentations and omissions in the PPMs.

The alleged misrepresentations are:

- The GPB Investments would invest in "a legitimate automobile dealership acquisition strategy." Plaintiffs allege that this representation was false when made because the GPB Investments actually were "an illegitimate Ponzi Scheme."

- The limited partners would be paid distributions "from actual cash flows and profits arising from the acquisition of dealerships." Plaintiffs allege this representation was false when made because the limited partners actually were paid distributions from "capital funds invested by subsequent investors."

- The equity fund model provided market advantages in the auto dealership industry.

- GPB Capital had expertise in the automotive retail industry.

- The GPB Investments' financial statements complied with GAAP and FASB accounting standards.[165]

---

"special relationship of trust" between defendants and plaintiffs. Given that the elements of fraudulent inducement and fraudulent misrepresentation under New York law are the same, it is not immediately clear why Plaintiffs have pleaded Count I and Count II differently. *See Choquette v. Motor Info. Sys., Inc.*, No. 15-cv-9338 (VEC), 2017 WL 3309730, at *5 (S.D.N.Y. Aug. 2, 2017) (listing elements of "fraudulent inducement" under New York law); *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (N.Y. 2011) (listing same elements of "fraudulent misrepresentation" under New York law).

The Court, however, does not need to analyze whether the differences in plaintiffs' allegations with respect to Count I and Count II are appropriate under New York law. As described below, plaintiffs have not pleaded sufficiently their claims with respect to the Selling Defendants for either count under Rule 9(b). Likewise, as described below, the only theory upon which this Court plausibly can infer that plaintiffs have stated a claim for fraud is regarding the alleged misrepresentation about investor distributions being made from cash rather than subsequent investor capital. Plaintiffs are not required to plead a special relationship between themselves and defendants to state a claim for relief based on a misrepresentation. Accordingly, the Court does not address the differences between the two counts.

[165]

Compl. ¶¶ 165, 173.

The omissions, which allegedly rendered statements in the PPMs false or misleading, are:

- The Fund Defendants would employ the Convertible Loan Scheme to end-run manufacturer approval requirements.

- The Fund Defendants had not obtained manufacturer approval for dealerships that they claimed to have acquired.

- The fees deducted from limited partners' capital investments were being paid to affiliates and/or related parties of the Fund Defendants with whom the Fund Defendants collaborated to defraud investors.[166]

### 1.    Common Law Fraud

Under New York law,[167] fraudulent inducement and fraudulent misrepresentation have identical elements of proof and "can be treated together as common law fraud."[168]   Fraud requires proof of five elements: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."[169]

---

[166]    *Id.* ¶¶ 166, 174.

[167]    In line with the governing law provision in the Subscription Agreements, the parties have applied New York law to the fraud claims. GPB Defs.' Mot. to Dismiss at 17 & n.5; Schneider Defs.' Mot. to Dismiss at 10 & n.8; Axiom Mot. to Dismiss at 14, 20; Gentile Mot. to Dismiss n. 2; Pls.' Omnibus Opp. 5, 29.

[168]    *Baril v. JPMorgan Chase Bank, N.A.*, No. 14-cv-02364 JGK, 2014 WL 6684055, at *3 (S.D.N.Y. Nov. 26, 2014) (citing *Fax Telecommunicaciones Inc. v. AT & T*, 138 F.3d 479, 490 (2d Cir. 1998)); *see also Choquette*, 2017 WL 3309730, at *5 (listing elements of fraudulent inducement under New York law); *Mandarin Trading Ltd.*,16 N.Y.3d at 178 (listing the same elements for fraudulent misrepresentation under New York law).

[169]    *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).

All fraud claims made in federal court must satisfy the additional pleading requirements of Federal Rule of Civil Procedure Rule 9(b) to survive a motion to dismiss.[170]  Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  The Second Circuit has interpreted Rule 9(b) as "plac[ing] two further burdens on fraud plaintiffs."[171]  First, a fraud plaintiff must plead factual allegations about the "circumstances of the fraud" with "particularity."[172]  Second, "though mental states may be pleaded 'generally,'" a fraud plaintiff must plead factual allegations "'that give rise to a strong inference of fraudulent intent.'"[173]

### 2.    *Fraud Claims Against the Selling Defendants and Schneider*

Counts I and II fail to satisfy Rule 9(b) with respect to the Selling Defendants and Schneider because the complaint alleges no facts that connect these defendants to the alleged misrepresentations or omissions in the PPMs.[174]

---

[170]    *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015).

[171]    *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 171.

[172]    *Id.*

[173]    *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir.2006)).

[174]    The Selling Defendants and Schneider initially represented that they were served with significantly redacted complaints that did not satisfy Rule 9(b). Schneider Defs.' Mot. to Dismiss at 11; Axiom Mot. to Dismiss at 12-13. Plaintiffs denied this and asserted that the Selling Defendants and Schneider were served with unredacted complaints. Pls.' Ominibus Opp. at 6 & n.6. Axiom walked back this claim when filing its reply, in which it asserted that it had "now reviewed the unredacted Complaint." Axiom Reply [DI 86] at 8 n.8. Ascendant Capital and Schneider did not address the issue in their reply, and Ascendant

To satisfy Rule 9(b)'s particularity requirement, fraud allegations must "specify the time, place, speaker, and content of the alleged misrepresentations [or omissions]."[175] Additionally, where "multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."[176] With regard to securities fraud cases, however, *Luce v. Edelstein* held that when "defendants are *insiders or affiliates* participating in the offer of the securities in question," "no specific connection between fraudulent representations [alleged] in [an] Offering Memorandum and particular defendants is necessary."[177]

As a general matter, the complaint frequently fails to assign particular roles to any of the defendants in relation to the alleged misrepresentations and omissions in the PPMs, which were issued by the GPB Investments. Instead, it repeatedly lumps the defendants together and alleges that they knew various misrepresentations and omissions were false or misleading without describing which defendants had such knowledge or how such knowledge may have been

---

Alternative and Martino did not file a reply. The Court need not address this issue, however, as the *unredacted* Complaint fails under Rule 9(b) with respect to the Selling Defendants and Schneider.

[175] *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *see also Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

[176] *DiVittorio*, 822 F.2d at 1247.

[177] 802 F.2d 49, 55 (2d Cir. 1986) (emphasis added).

obtained.[178]  At the same time, the complaint is devoid of any non-conclusory factual allegations

regarding how – and by whom – the PPMs were drafted.

Though this scrapes by under *Luce* for the GPB Investments, GPB Capital, Gentile,

and Lash , it is not sufficient for the Selling Defendants and Schneider.  "*Luce* does not stand for the

proposition that mere reliance on an offering memorandum or similar document satisfies a pleader's

burden under Rule 9(b)."[179]  In other words, simply alleging that entities are "insiders or affiliates"

of a general partner – as plaintiffs do here with the Selling Defendants and Schneider – is not enough

to satisfy Rule 9(b), even under *Luce*.[180]  Plaintiffs must allege "grounds for attributing the

statements to the group,"[181] *i.e.*, non-conclusory facts from which the Court can infer plausibly that

the Selling Defendants and Schneider participated in making the alleged misrepresentations and

omissions or at least asserted some control over the partnership or the drafting of the PPMs.

---

[178]

    *E.g.*, Compl. ¶ 78 ("***the Fund Defendants and the Selling Defendants*** knew that the equity fund model was viewed in the industry as a far riskier model than traditional ownership by a member of the community.") (emphasis added); *id.* ¶ 116 ("***the Fund Defendants and the Selling Defendants*** knew that the GPB Investments could not meet the distributions expectations set forth in the PPMs") (emphasis added); *see also id.* ¶ 56 ("***the Fund Defendants and the Selling Defendants*** shared knowledge of the schemes that they were using to fraudulently induce investors into investing in the GPB Investments, *i.e.*, the Ponzi Scheme and the Convertible Loan Scheme.") (emphasis added).

[179]

    *DiVittorio*, 822 F.2d at 1248.

[180]

    *Id.* at 1248-49 (Plaintiffs' "allegations [were] inadequate to charge [the] defendants with liability for misrepresentations in the Offering Memorandum" where the complaint merely stated that various entities were affiliates of the general partner of a limited partnership in which plaintiffs invested). *Cf. Luce*, 802 F.2d at 52, 55 (finding no specific connection between defendants and misstatements was necessary where the complaint asserted that the general partners were "the 'alter egos of their affiliates, and the affiliates exercised complete direction and control over the partnership.'").

[181]

    *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 173.

No such facts are alleged.  The complaint simply asserts that the Selling Defendants and Schneider were the broker-dealers and marketers of the limited partnership units at issue. Though plaintiffs cite various indirect connections between the Selling Defendants and Schneider on the one hand, and the GPB Investments, GPB Capital, Gentile, and Lash on the other, none of those connections suggests that the Selling Defendants and Schneider significantly controlled the GPB Investments or GPB Capital.  Moreover, the only allegations that connect the Selling Defendants and Schneider to the PPMs are conclusory statements that Schneider was "integrally involved" in drafting the PPMs and Axiom was the underwriter for the offerings and therefore "played a key role" in drafting the offering memoranda.[182]  Given that Schneider was not an officer of GPB Capital and Axiom's role as underwriter is not described in any detail, the Court is left to guess about the particulars of how these defendants controlled or participated in the making of the alleged misrepresentations and omissions in the PPMs.  This does not suffice under Rule 9(b).[183]

On the other hand, the GPB Investments and GPB Capital obviously qualify as "insiders" under *Luce* because they are, respectively, the partnerships in which the limited partnership units were offered and their general partner, which had exclusive authority over their management.  Likewise, Gentile (GPB Capital's chief executive officer) and Lash (GPB Capital's "officer" and director of automotive retail) also qualify as insiders because they are officers of the

---

[182]

See Compl. ¶¶ 25, 28.  Merely alleging that an entity was the underwriter of the securities offerings at issue is not sufficient under heightened pleading requirements for fraud claims. *See Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 91-93 (S.D.N.Y. 2015); *In re Puda Cool Securities, Inc., Litig.*, 30 F. Supp. 3d 261, 267 (S.D.N.Y. 2014); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 485 (S.D.N.Y. 2012), *aff'd*, 525 Fed. Appx. 16 (2d Cir. 2013).

[183]

See *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir. 1990) (finding *Luce* and *DiVittorio* "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.").

40

general partner.[184]  Accordingly, with respect to these defendants, Counts I and II satisfy Rule 9(b)'s

particularity requirement.  With respect to the Selling Defendants and Schneider, however, Counts

I and II are not pleaded sufficiently under Rule 9(b) and are dismissed.

### 3.  Fraud Claims Against the GPB Investments, GPB Capital, Gentile, and Lash

The bulk of plaintiffs' alleged misrepresentations and omissions also fail to support

a claim for relief with regard to the remaining defendants: the GPB Investments, GPB Capital,

Gentile, and Lash.  A careful analysis of the complaint reveals that plaintiffs' overarching claim that

the sale of units in the GPB Investments was a Ponzi scheme is no more than an allusion propped

up by conclusory allegations and claims improperly taken from other lawsuits.

### a.  Allegations from the Dibre and Rosenberg Actions

As a threshold matter, plaintiffs cannot rely on allegations from other lawsuits to

plead legally sufficient fraud claims.  A fraud complaint that "*merely* recites others' allegations" is

generally insufficient under Rule 9(b) where it does not allege also non-conclusory facts to support

its claim for relief.[185]  This is because "secondhand allegations" quoted in a complaint are "in the

nature of allegations 'upon information and belief,' which cannot ordinarily form the basis of a fraud

---

[184]    *Luce*, 80. F.2d at 52, 55 (finding there is no need to plead specific facts linking insiders such as officers and directors to particular misstatements in an offering memorandum); *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 283 (S.D.N.Y. 1994) (same); *Cf. DiVittorio*, 822 F.2d at 1249 ("None of the individual . . . defendants . . . is tied to the Offering Memorandum in any specific way, or even alleged to have been an officer or director of any non-individual . . . defendant when the Offering Memorandum was issued or the specified class of plaintiffs bought their limited partnership interests .")

[185]    *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 180.

claim 'except as to matters peculiarly within the opposing party's knowledge.'"[186]  "Even as to the

latter, a fraud plaintiff must generally state the facts upon which her belief is founded."[187]

        Almost thirty paragraphs of the complaint are attributed directly to the Dibre and

Rosenberg actions.[188]  These paragraphs largely parrot allegations that GPB Capital, Gentile, Lash,

and Schneider engaged in fraudulent acts with respect to Dibre's and Rosenberg's dealerships.[189]

If plaintiffs had made these allegations on their own knowledge, they may have led to a "strong

inference" that defendants intentionally made the misrepresentations and omissions alleged in this

action.  But they have not done so.  Indeed, the complaint alleges no non-conclusory facts that

support the truth of these secondhand allegations.  Allowing plaintiffs to rely on them is therefore

impermissible under Rule 9(b).[190]

---

[186]

      *Id.* (quoting *Luce*, 802 F.2d at 54 n.1).

[187]

      *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 180.

[188]

      *See* Compl.¶¶ 80-107.  Outside of those paragraphs, other conclusory statements in the complaint appear to have been pulled also from those actions.  *E.g., id.*¶¶ 69, 70 .

[189]

      *E.g., id.* ¶ 82 (repeating Dibre's allegation that "GPB Capital . . . overfunded itself from the dealerships by drawing out more than the net cash flows . . . and then used that overfunded cash to distribute . . . a 'special distribution'" to entice investors); *id.* ¶ 83 (repeating Dibre's allegation that "Defendants Gentile and Schneider recorded the purchase price of dealerships they purchases at several million dollars more than the actual purchase price"); *id.* ¶ 96-97 (repeating Rosenberg's allegation that he saw "two contracts titled 'Performance Guarantee,'" with Lash, which were a sham to boost profits); *id.* ¶ 99 (repeating Rosenberg's allegation that he "witnessed documents evidencing improper 'round tripping' by GPB Capital in an effort to inflate revenues").

[190]

      It is worth noting also that the complaint's recitation of inconclusive government investigations into matters related to the GPB Investments – some of which are not related to the funds at issue in this lawsuit – similarly does not suffice under Rule 9(b) to support a strong inference of fraud.  *See, e.g., City of Rockton Retirement Sys. v. Avon Products, Inc.*, 11-cv-4665 (PGG), 2014 WL 4832321, at *24 (Apr. 24, 2015) ("[T]he existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter."); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167

Putting aside the secondhand allegations from the Dibre and Rosenberg actions, most of plaintiffs' alleged misrepresentations and omissions do not support an independent claim for fraud.  The Court addresses each of the alleged misrepresentations and omissions in turn.

b.    The "Convertible Loan Scheme"

First, plaintiffs allege that the Fund Defendants misled them by failing to disclose "that . . . the Fund Defendants would employ the Convertible Loan Scheme to end-run manufacturer approval requirements."[191]  But the Automotive PPM from March 2015 described what plaintiffs characterize as the "Convertible Loan Scheme" as it was employed with respect to the loans given to Lash and Dibre in 2013 and 2014.  Indeed, it did so in the same language that appears in the complaint.

With regard to Lash, Automotive's PPM disclosed that Automotive used convertible loans to purchase a Buick/GMC dealership from Lash in 2013 and 2014.[192]  The transactions were described as two "convertible loans" totaling around $2 million each, which "enhance[d] [Automotive's] ability to obtain ownership . . . faster than [it] would otherwise be able."[193]  The PPM stated that "[t]he terms of [the loans] provide that Mr. Lash is required to pay us 100% of the

_____

(S.D.N.Y. 2015) ("[G]overnment investigations cannot bolster allegations of scienter that do not exist, and, as currently plead, the government investigations are just that, investigations.").

[191]    Compl. ¶¶ 166, 174.

[192]    Automotive PPM at 23-24; *see also* Compl. ¶ 66.

[193]    Automotive PPM at 23-24.

net cash flow of the [dealership], offset by a performance bonus payable to Mr. Lash."[194]  The PPMs

stated also that the initial loan to Lash was recorded as a receivable on Automotive's books.[195]

The same PPM disclosed that, in 2014, Automotive gave Dibre a convertible loan

of over $6 million, under which Automotive "has the right to convert the debt into 51% of the

equity" in an entity that owned and operated a Nissan dealership.[196]  The PPM disclosed that

subsequently, "two additional tranches of debt were added to the investment which reserve the right

to convert the loan into 90.1% of the equity" in the entity that operated the dealership.[197]  The PPM

stated that the loan was "coupled with a pledge of all of the seller's economic and management

rights in [the dealership]" and that its "[c]urrent interest" was "90.1% of [the dealership's] net cash

flow, with a minimum of $157,151 monthly."[198]  Finally, the PPM stated that the transaction was

"structured . . . as debt instead of equity to better enable us to gain control of the [dealership] and

obtain operating financing."[199]

In light of these clear disclosures to the limited partners, it would defy reason to infer

that such a "scheme" was intentionally concealed – either to support a Ponzi scheme or to bring

---

[194]     *Id.*

[195]     *Id.*

[196]     Automotive PPM at 24; *see also* Compl. ¶ 68.

[197]     Automotive PPM at 24.

[198]     *Id.*

[199]     *Id.*

about any other fraudulent purpose.[200] And though plaintiffs allege, on information and belief, that GPB Capital gave Dibre a convertible loan totaling $42 million to purchase six Nissan and Volkswagen dealerships between 2013 and 2015 – which was not disclosed in the PPMs – fraud pleadings cannot be made on information and belief alone under Rule 9(b).[201] Likewise, plaintiffs' allegations that GPB Capital "withdrew amounts in excess of the cash flow generated by the dealerships and paid it as a special distribution based on the alleged performance of the dealerships,"[202] "falsified financial reports to make the dealerships look more profitable than they were,"[203] and hid that the dealerships did not generate the necessary cash by transferring funds from GPB Holdings I to Automotive "on several occasions in 2016"[204] – all of which purportedly highlight the nefariousness of the "Convertible Loan Scheme" – clearly are lifted from the Dibre action.[205] They are thus similarly deficient under Rule 9(b).

---

[200]

See *In re Apple REITs Litig.*, No. 11-cv-2919 KAM, 2013 WL 1386202, at *14 (E.D.N. Y . Apr. 3, 2013) (finding prospectuses "not misleading given that the prospectuses 'state[ ] exactly the fact[s] that [plaintiffs] contend[ ] [have] been covered up.'") (quoting *I. Meyer Pincus & Assocs. , P. C. v. Oppenheimer & Co, Inc.* ,936 F.2d 759 , 762 (2d. Cir.1991 ), *aff'd in part, vacated in part sub nom. Berger v. Apple REIT Ten, Inc.*, 563 F. App'x 81 (2d Cir. 2014).

[201]

See, e.g., *Luce*, 802 F.2d at 54 n.1.

[202]

Compl. ¶ 69.

[203]

*Id.*

[204]

*Id.* ¶ 70.

[205]

*Cf. id.* ¶ 82 (repeating Dibre's allegation that GPB Capital "manipulat[ ed] the financial statements of the dealerships" to make them look more profitable and "overfunded itself from the dealerships by drawing out more than the net cash flows . . . and then used that overfunded cash to distribute . . . a 'special distribution'" to entice investors); *id.* ¶ 85 (repeating Dibre's allegation that "on several occasions" in 2016 "GPB Capital transferred funds from GPB Holdings I to Automotive and vice versa in order to bolster returns.")

c.      *Lack of Automobile Manufacturer Approval*

Next, plaintiffs have not alleged plausibly that the GPB Investments lacked "manufacturer approval for the dealerships they claimed to acquire" and that such a fact was concealed from the limited partners.[206]  As a preliminary matter, plaintiffs appear to be asserting that the existence of convertible loans given to certain dealership owners should lead to an inference that the GPB Investments were hiding a lack of manufacturer approval for these dealerships.  As these loans were disclosed to the limited partners, however, this is not a reasonable inference.  Likewise, the mere fact that the manufacturer approval process was "rigorous" does not support an inference that the GPB Investments were not approved by manufacturers.

Putting aside these allegations, the complaint makes just one reference to a dealership transaction with Dibre that was not completed because an automobile manufacturer declined to approve GPB Capital, which it characterized as an "unknown equity fund."[207]  The complaint makes another reference, however, to a transaction with Dibre that was not completed because the GPB Investments "lacked the funds" to complete it.[208]  It is unclear from the complaint whether these allegations relate to the same transaction or different transactions.  Regardless, these contradictory assertions, without more, do not support a plausible inference that the GPB Investments lacked manufacturer approval for dealerships they claimed to acquire.

---

[206]     Compl. ¶¶ 166, 174.

[207]     *Id.* ¶ 77.

[208]     *Id.* ¶ 69.

    d.     *The "Equity Fund Model" and GPB Capital's Expertise in the Auto Industry*

Likewise, the complaint does not allege plausibly that the PPMs misrepresented that the equity fund model "provided market advantages" and that GPB Capital "had expertise in the automotive retail industry." As a preliminary matter, these statements are not actionable as misrepresentations because they are statements of puffery and opinion.[209]

In any event, allegations in the complaint do not lead to an inference that these representations were false when made. With regard to the equity fund model, the complaint lists many advantages of the model that patently are reasonable, including its ability to aggregate and consolidate dealerships for reasons of cost-control, efficiency, and scaling. Likewise, the complaint alleges that George Soros and Warren Buffett reportedly were "embarking on similar ventures" and using equity funds to acquire auto dealerships, which supports an inference that the model was effective. Taken together, these facts do not lead to an inference that the equity fund model was in any way disadvantageous.

Similarly, aside from making conclusory statements that GPB Capital had no expertise in the auto industry,[210] the complaint makes no factual allegations whatsoever for why

---

[209]

    *See Hamilton Exhibition, LLC v. Imagine Exhibitions, Inc.*, No. 19-cv-1470 (LLS), 2019 WL 2590639, at *3 (S.D.N.Y. June 11, 2019) ("Defendants' general statements that they are experts at producing exhibitions and can 'take broad concepts and translate them into concrete realities' are non-actionable statements of puffery and opinion about their expertise."); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018) (holding that statements that ProNAi's "technology, knowledge, experience, and scientific resources provide [ProNAi] with competitive advantages" and that ProNAi was "a leader in developing and commercializing a broad and diverse portfolio of cancer therapies and deliver therapeutic outcomes that dramatically changed patients' lives" are puffery and not actionable)).

[210]

    *E.g.*, Compl. ¶ 78 ("[N]either [GPB Capital], nor the GPB Investments, possessed the requisite expertise or track record to obtain manufacturer approval for the dealership[s].")

plaintiffs believe this was the case.  At the same time, the PPMs stated that Lash, one of GPB

Capital's former officers and its director of automotive retail, had "more than 23 years of automotive

retail expertise with a focus on operations and underperforming dealership turnaround."[211]  The

complaint's failure to allege non-conclusory facts that refute this statement gives the Court no reason

to infer that the PPMs misrepresented GPB Capital's experience.

        *e.*     *Fees Paid to Affiliates and Related Parties*

        Plaintiffs' claim that fees were "deducted" from the GPB Investments and paid to

"affiliates" and "related parties" with whom the "Fund Defendants . . . collaborated to defraud

investors" – and that this was concealed from the limited partners – fares no better than the above

allegations.

        As mentioned, the complaint alleges no particular facts that the Selling Defendants

"collaborated" with the Fund Defendants in a fraudulent scheme to make misrepresentations and

omissions to investors.  Conclusory allegations that "[d]efendants" received "excessive" fees and

expenses do not bridge this gap.  The receipt of fees alone, which is standard practice for corporate

officers, managers, and broker-dealers, is not sufficient to give rise to a "strong inference" of

fraudulent intent under Rule 9(b).[212]  And aside from management, acquisition, and sales fees that

---

[211]

      *See* Holdings II PPM at 24; Automotive PPM at 25.

[212]

      *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Motives that are generally possessed by most corporate directors and officers do not suffice [to give rise to fraudulent intent]; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."); *Sec. & Exch. Comm'n v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 512 (S.D.N.Y. 2018) ("The mere 'desire to earn management fees . . . does not suffice to allege a 'concrete and personal benefit' resulting from the fraud. To accept a generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute.'") (quoting *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F.Supp.2d 210, 231 (S.D.N.Y. 2008)).

groups of the defendants received, the complaint makes no non-conclusory allegations to support

an inference that such fees were "excessive" or that defendants profited from improper expenses and

benefits.  It merely makes the vague allegation that $103 million in "expenses" "appeared to filter

down to Defendants."  This is not sufficient to support a strong inference of fraudulent intent.


*f.*      *GAAP and FASB Financial Statements*

Nor does the complaint allege a "strong inference" of knowledge of falsity with

respect to the PPMs' representation that the GPB Investments' financial statements complied with

GAAP and FASB accounting standards.  Merely alleging that Automotive's auditor resigned and

that the GPB Investments' 2015 and 2016 financial statements were misstated  does not suffice to

support a strong inference of knowledge that the financial statements did not comply with

accounting standards.[213]  And the complaint's vague assertion that GPB Capital's chief financial

officer (who is not a defendant in this action) resigned due to concerns about fraud does not remedy

this.  Plaintiffs need to "allege facts and circumstances that would support an inference that

defendants knew of specific facts that [were] contrary to their public statements."[214]  No such facts

and circumstances are alleged in the complaint.

---

[213]

        *Rombach*, 355 F.3d at 176 ("As this Court has observed, a 'pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent' is insufficient to 'support the inference that the defendants acted recklessly or with fraudulent intent.'") (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir.1994)).

[214]

        *Rombach*, 355 F.3d at 176.

g.      *The Alleged Ponzi Scheme and Distributions Made from Investor Capital*

As is now clear, few of plaintiffs' claims of misrepresentations and omissions are supported by non-conclusory factual allegations based on personal knowledge.  Accordingly, their claim that the GPB Investments were misrepresented to the limited partners as having a "legitimate automobile dealership acquisition strategy that could be feasibly achieved" when in fact they were "an illegitimate Ponzi scheme" necessarily fails.  Without the benefit of plaintiffs' conclusory claims relating to the so called "Convertible Loan Scheme," the lack of manufacturer approval for dealerships, and the alleged collaboration among the Fund and the Selling Defendants in fraud – as well as the allegations lifted from the Dibre and Rosenberg actions – there is nothing alleged in the complaint that "nudge[s]" this claim of a Ponzi scheme "across the line from conceivable to plausible."[215]

One alleged misrepresentation, however, is sufficient at this stage: the allegations in the complaint give rise to a strong inference that the PPMs intentionally misrepresented that investor distributions would be made from cash rather than capital funds.  In December 2016, the Holdings II PPM stated that Holdings II "reserve[ed] the right to return Capital Contributions to [limited partners] as part of our distributions, ***though we do not presently have plans to do so***."[216]  Despite this disclosure, the complaint alleges that significant distributions were made from new investor capital in 2016 and 2017, which gives rise to a strong inference that the remaining defendants (the

---

[215]

*Id.* at 570.

[216]

Holdings II PPM at 12 (emphasis added).  As this disclosure relates to a "present fact," *i.e.*, whether the GPB Investments "presently have plans" to make distributions from investor capital, the bespeaks caution does not apply.  *See Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142-44 (2d Cir. 2010).

GPB Investments, GPB Capital, Gentile, and Lash) knew that the disclosure was false when made. Indeed, in 2016, GPB Capital used around $22 million in new investor capital to pay distributions to the limited partners, over $8 million of which went to Holdings II investors.   In 2017, GPB Capital used around $39 million in new investor capital to pay distributions, over $11 million of which went to Holdings II investors.

Both parties point the Court to *In re Apple REITs Litigation*, which is inapplicable to the disclosure at issue here.[217]   In *In re Apple REITs Litigation*, the court found that a similar claim of misrepresentation regarding the character of distributions was not pleaded sufficiently where the offering memorandum stated that defendants "may from time to time distribute funds that include a return of capital."[218]   There, the court's decision turned on the word "may," which the Second Circuit has found to mean "permitted, but not required."[219]   Here, the word "may" does not appear in the disclosure.   The key language is "we do not presently have plans" to make distributions.   In the years before and after the PPMs stated "we do not presently have plans" to make distributions from investor capital, the GPB Investments paid millions of dollars of distributions in investor capital.   This is significantly inconsistent with what was printed in the PPMs.   It therefore supports a strong inference of knowledge of falsity.

It is worth noting that, despite the strong inference that the remaining defendants knew that the statement in the PPMs about investor distributions was false when it was made, this is not enough to support an inference that the remaining defendants were engaged in a Ponzi

---

[217]   No. 11-cv-2919 KAM, 2013 WL 1386202, at *13.

[218]   *Id.*

[219]   *Id.*

scheme.  There are many potential reasons for why distributions would be made from investor capital and hidden from investors – for instance, a knowledge that the dealerships were being mismanaged and/or were not as profitable as expected – that fall short of the existence of a Ponzi scheme.  Without more specific factual allegations, the Court cannot plausibly make such an inferential leap.

Accordingly, one fraud claim survives solely on the basis of the alleged misrepresentation that investor distributions would be made from cash. As this alleged misrepresentation is pleaded redundantly in Counts I and II, it survives dismissal as one claim for common law fraud against the GPB Investments, GPB Capital, Gentile, and Lash only.

### C.    Aiding and Abetting Fraud (Count V)

Plaintiffs' claim of aiding and abetting fraud (Count V) is against the Selling Defendants only and is premised on a smaller subset of the misrepresentations and omissions alleged in Counts I and II. As Rule 9(b)'s particularity requirement equally applies to an aiding and abetting fraud claim, Count V must be dismissed as against the Selling Defendants for same the reasons as Counts I and II must be dismissed against them.

Moreover, the aiding and abetting claim fails because plaintiffs have not sufficiently alleged that the Selling Defendants had actual knowledge of the alleged fraudulent conduct.  To state a claim for aiding and abetting fraud in New York  plaintiffs must allege: (1) the existence of a fraudulent scheme, (2) that the defendant had actual knowledge of the fraud, and (3) that the defendant provided substantial assistance to advance the fraudulent scheme.[220] "A failure to allege

---

[220]   Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006).

sufficient facts to support the inference that the alleged aider and abettor had actual knowledge of the fraudulent scheme warrants dismissal of the aiding and abetting claim at the pleading stage."[221] "[C]onstructive knowledge" is insufficient to constitute the knowledge element of an aiding and abetting claim.[222]

Plaintiffs' assertion in Count V that "[t]he Selling Defendants acted with willful blindness or recklessness in offering the [limited partnership units] to investors" and therefore are "charged with constructive knowledge" of the alleged misrepresentations and omissions is patently insufficient under New York law.[223]  And the complaint's factual allegations do not remedy this deficiency: apart from conclusory statements that the Selling Defendants "knew" certain misrepresentations and omissions were made and "collaborated" in selling the limited partnership units,[224] the complaint asserts no facts whatsoever regarding the Selling Defendants' actual knowledge of alleged misrepresentations and omissions.

D.     *Breach of Contract Claims (Counts III & IV)*

Plaintiffs bring two breach of contract claims against GPB Capital with respect to three contractual provisions.  In Count III, Plaintiffs allege that GPB Capital breached provisions of the LPAs regarding (i) the production of audited financial statements and (ii) the submission of "Related Party Transactions" to an Advisory Committee.  In Count IV, Plaintiffs allege that GPB

---

221

      *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014).

222

      *Id.* (quoting *Oster v. Kirschner*, 77 A.D.3d 51, 905 N.Y.S. 2d 69, 72 (1st Dep't 2010)).

223

      Compl. ¶ 191.

224

      *See, e.g., id.* ¶ 47.

Capital breached its duty to make distributions consistent with the Delaware Revised Uniform Limited Partnership Act ("DRULPA"). Plaintiffs' allegation regarding GPB Capital's failure to provide financial statements allows Count III to survive. Count IV fails.

> *1.     Alleged Breach Regarding Related Party Transactions*

Plaintiffs' claim that GPB Capital breached its duty under the LPAs to submit "Related Party Transactions" to an advisory committee fails because it requires derivative standing, which plaintiffs have not alleged.

Under Delaware law,[225] investors with limited partnership interests in a partnership do not have standing to bring "derivative" claims with respect to harm to the partnership unless they have made a demand to the general partner, which was wrongfully refused, or demand is excused.[226] The question of whether a claim is direct or derivative "turn[s] solely on . . . : (1) who suffered the alleged harm (the [partnership] or the suing [limited partners], individually); and (2) who would receive the benefit of any recovery or other remedy (the [partnership] or the [limited partners], individually)?"[227] A claim is direct if the plaintiff has "demonstrate[d] that the duty breached was owed to the [limited partner] and that he or she can prevail without showing an injury to the

---

[225]

      The LPAs contained a governing law provision that provides for the application of Delaware law. GPB Defs.' Mot. to Dismiss at 4-5. Both parties applied Delaware law in their papers. *Id.* at 20-21; Pls.' Omnibus Opp. at 43-44.

[226]

      *See El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1260 (Del. 2016); *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 366-67 (Del. 2006).

[227]

      *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

[partnership].'"[228]

Section 3.15(c) of the LPAs states that:

"The Partnership may not enter into a Related Party Transaction without the approval of all of the members of the Advisory Committee. In approving any Related Party Transaction, the General Partner must provide the Advisory Committee with an independent valuation of the proposed acquisition, and the Advisory Committee must determine that the Related Party Transaction *is in the best interests of the Partnership.*" (emphasis added).

According to the Delaware Supreme Court, language in an LPA stating that conflicted party transactions must be "in the best interests of the Partnership" – as the LPAs state here – is indicative of harm to the partnership, not to the plaintiff.[229] This is because claiming that a transaction with a related party was not "in the best interests of the Partnership" is really a claim of "corporate overpayment."[230] As the benefit of recovery for such a claim "must flow solely to the Partnership," it is derivative.[231] Accordingly, plaintiffs' claim for breach under this provision is must be dismissed.[232]

---

[228] See *El Paso Pipeline*, 152 A.3d at 1260.

[229] *Id.* at 1258-59.

[230] *Id.* at 1261.

[231] *Id.* at 1261, 1264.

[232] As an aside, the Court notes that, even if plaintiffs had alleged derivative standing, plaintiffs' theory for relief does not allege that this provision regarding related party transactions was breached. Plaintiffs' theory is not that defendants acquired or sold assets to a related party. Plaintiffs allege that "the vast majority of the fees, expenses, compensation and benefits on sales, acquisitions, management, and operations were being paid to related parties." Compl. ¶ 112. A related party's receipt of such fees and benefits plausibly cannot violate this provision of the LPA, which relates to "proposed acquisitions" with related parties.

2.    *Alleged Breach Regarding DRULPA Distributions*

Likewise, Plaintiffs' claim that GPB Capital breached its duty to make investor distributions only to the extent of available cash in the partnership, in compliance with DRULPA, must be dismissed for failure to state a claim.

Section 17-607 of DRULPA states:

> "A limited partnership shall not make a distribution to a partner to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited partnership, other than liabilities to partners on account of their partnership interests and liabilities for which the recourse of creditors is limited to specified property of the limited partnership, exceed the fair value of the assets of the limited partnership, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the limited partnership only to the extent that the fair value of that property exceeds that liability."

"In simplified terms," this section of DRULPA prevents a limited partnership from "mak[ing] a distribution when it is balance sheet insolvent or if the distribution would render the limited partnership insolvent."[233]

Plaintiffs' conclusory allegations that GPB Capital's "improper distributions" caused the GPB Investments to "essentially cease[] its operations" do not plausibly state a claim for breach under this provision of DRULPA, which requires allegations of insolvency.[234]  According to the complaint, the GPB Investments still are operating, and Holdings II still is paying distributions. Plaintiffs have not alleged any facts that lead to the inference that the GPB Investments were "balance sheet insolvent" when it made distributions or were rendered insolvent by such

---

[233]    *ESG Capital Partners II, LP v. Passport Special Opportunities Master Fund, LP*, No. CV 11053-VCL, 2015 WL 9060982, at *8 (Del. Ch. Dec. 16, 2015).

[234]    *See* Compl. ¶ 188.

distributions.  Without more, the Court cannot make the inferential jump from paying certain distributions from capital contributions to insolvency.  Accordingly, this claim for relief fails.


3.       *Alleged Breach Regarding Audited Financial Statements*

On the other hand, plaintiffs' claim that GPB Capital breached a provision in the LPAs requiring it to provide the limited partners with yearly audited financial statements survives dismissal.  It is a direct claim under Delaware law, and the complaint plausibly states a claim for relief for breach.

A claim for breach of contract based on a duty to provide limited partners with financial statements is a direct claim because it regards a duty owed directly to the limited partners.[235]  Delaware courts have interpreted such claims as direct because they essentially allege that "[p]laintiffs were injured because they were stripped of 'their right to withdraw from the [partnership] or to seek rescission of their investment.'"[236]

Under Delaware law, "[o]n a claim of breach of contract, the plaintiff must prove a) the existence of a contract; b) the breach of an obligation imposed by that contract; and c) resulting damages to the plaintiff."[237]  Here, plaintiffs have alleged plausibly that GPB Capital breached its obligation under the LPAs to provide them with yearly audited financial statements because it failed to provide the GPB Investments' audited financials for 2017 and 2018.  Moreover,

---

[235]      *See MKE Holdings Ltd. v. Schwartz*, No. CV 2018-0729-SG, 2019 WL 4 723 816, at *8 n. 150 (Del. Ch. Sept. 26, 2019); *Sehoy Energy LP v. Haven Real Estate Grp., LLC*, No. CV 12387-VCG, 2017 WL 1380619, at *9 (Del. Ch. Apr. 17, 2017).

[236]      *Sehoy Energy LP*, 2017 WL 1380619, at *9; *Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. CIV.A. 762-N, 2005 WL 2130607, at *6 (Del. Ch. Aug. 26, 2005).

[237]      *Lorenzetti v. Hodges*, 62 A.3d 1224 (Del. 2013).

the complaint plausibly alleges "that the plaintiffs were harmed by either not being able to ask for a redemption, or not being able to sue for rescission or a like remedy."[238] Accordingly, plaintiffs' claim for breach regarding the failure to provide financial statements states a claim for relief under Delaware law.

### E.  Unjust Enrichment (Count VI)

Finally, plaintiffs' claim for unjust enrichment is dismissed in its entirety against all defendants. The unjust enrichment claim is premised on vague allegations that "[d]efendants" were unjustly enriched through "unearned compensation and fees." As an initial matter, this claim makes no sense as against the GPB Investments, which are alleged to have "hemorrhaged hundreds of millions of dollars" in the allegedly improper fees paid to the other defendants."[239] The complaint therefore cannot sustain a claim for unjust enrichment against the GPB Investments.

With regard to the rest of the defendants, the Court already has concluded that plaintiffs have not alleged plausibly that the GPB Investments were a Ponzi scheme through which defendants "enriched" themselves via the receipt of unearned fees. Likewise, with regard to the Selling Defendants and Schneider, the Court has concluded that plaintiffs' fraud claims are insufficiently pleaded. Those conclusions apply with the same force here, and thus require dismissal of this count.[240]

---

[238]

See Albert v. Alex. Brown Mgmt. Servs., Inc., No. CIV.A. 762-N, 2005 WL 2130607, at *6.

[239]

Compl. ¶ 113.

[240]

See DiMuro v. Clinique Labs., LLC, 572 F. App'x 27, 32 (2d Cir. 2014) (finding Rule 9(b) applies to unjust enrichment claims premised on alleged fraudulent conduct).

Moreover, with respect to GPB Capital in particular, the unjust enrichment claim fails for another reason: the "unearned compensation and fees" paid to GPB Capital – *i.e.*, its management fees – were paid pursuant to the LPAs.   Under New York law,  a claim for unjust enrichment is precluded where "a valid and enforceable written contract govern[s] [the] particular subject matter."[241]

### Conclusion

Defendants' motions [DI 58, 60, 61, 62, 70] are disposed of as follows:

1.   Insofar as the motions seek dismissal of the complaint for failure to state a claim upon which relief may be granted, the motions are granted in all respects except that they are denied with respect to:

   a.   So much of Counts I and II as are against GPB Capital, the GPB Investments, Gentile, and Lash and assert fraudulent misrepresentation with respect to the source of investor distributions.

   b.   So much of Count III as asserts breach of contract by GPB Capital for failure to provide audited financial statements and reports.

2.   Insofar as the motions seek to stay proceedings and to dismiss on the basis of *forum non conveniens*, the motions are denied in all respects.

SO ORDERED.

Dated:        December 13, 2020

_____
Lewis A. Kaplan
United States District Judge

---

[241]   *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388 (N.Y. 1987).