# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA DELUCA, DREW R. NAYLOR, and PEGGY ROLLO, on behalf of themselves and other similarly situated limited partners, | : <br> : <br> : <br> : <br> : |
| Plaintiffs, | : <br> : |
| v. | :    Civil Action No. 19-cv-10498 <br> : |
| GPB HOLDINGS, LP, GPB AUTOMOTIVE PORTFOLIO, LP, GPB HOLDINGS II, LP, GPB WASTE MANAGEMENT, LP, GPB CAPITAL HOLDINGS, LLC, ASCENDANCY ALTERNATIVE STRATEGIES, LLC, ASCENDANT CAPITAL, LLC, AXIOM CAPITAL MANAGEMENT, INC., DAVID GENTILE, MARK MARTINO, JEFFREY LASH, JEFFRY SCHNEIDER, CROWE LLP, EISNERAMPER LLP, MARGOLIN, WINER & EVENS LLP, RSM US LLP, COHNREZNICK LLP, and MACRINA KGIL (A/K/A MINCHUNG KGIL) | : <br> :    **JURY TRIAL DEMANDED** <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants. | : <br> : |

## AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 2

II.    PARTIES ............................................................................................................... 7

    A.    Plaintiffs ..................................................................................................... 7

    B.    Defendants ................................................................................................. 8

        1.    GPB Defendants ............................................................................ 8

        2.    Selling Defendants ...................................................................... 11

        3.    Auditor Defendants ..................................................................... 13

III.    JURISDICTION, VENUE, AND DEMAND FOR TRIAL BY JURY ........................ 14

IV.    FACTUAL ALLEGATIONS ................................................................................. 15

    A.    Defendants Gentile, Schneider, and Lash Scheme to Defraud Investors.......................... 15

    B.    The Structure of GPB Capital and the GPB Funds ........................................... 17

    C.    GPB and Selling Defendants Sold Fund Units to Investors through False and Misleading Materials and Sales Practices ..................................................................... 21

        1.    Selling Defendants Concealed Their Deep Ties to Gentile and the General Partner ......................................................................................... 21

        2.    GPB and Selling Defendants Misrepresented the Source of Monthly Distributions to Investors ..................................................................... 24

    a.    Holdings I ................................................................................................. 28

    b.    Automotive ............................................................................................... 33

    c.    Holdings II ............................................................................................... 38

    d.    Waste Management .................................................................................. 42

        3.    The GPB Defendants Engaged in Accounting Fraud ......................... 43

        4.    Additional Misrepresentations Involving the Automotive Dealership Operating Companies ................................................................................ 57

    a.    The Strict Requirements Surrounding the Automobile Dealership Approval Process Are Concealed.................................................................................................. 57

    b.    GPB Defendants Seek to Improperly Circumvent Manufacturer Approval Using a Convertible Loan Scheme ...................................................................................... 59

    c.    Materially False Statements and Omissions Concerning the Risks Associated with Automobile Dealerships.......................................................................................... 62

    d.    GPB and Selling Defendants Bilk Investors Through the Use of Management Fees and Expenses .......................................................................................................... 64

    e.    Lawsuits Emerge Involving GPB's Automobile Dealerships........................... 67

    D.    The Funds Close to New Investment ...................................................... 75

    E.    The Auditor Defendants Provided Substantial Assistance in the GPB Fraud ................. 76

    F.    GPB Defendants' House of Cards Begins to Crumble ................................... 113

|   | 1. | The General Partner's Then-CFO Macrina Kgil Resigns | 113 |
|   | 2. | The General Partner's Auditor Resigns and the GPB Investments' Financials Need to Be Restated | 113 |
|   | 3. | GPB Capital and the Funds Become the Target of Government Investigations | 117 |
|   | 4. | GPB Defendants Admit to Paying Distributions Using Investor Capital Contributions Instead of Operating Income, as Previously Represented, and Then Promptly Cease Making Investor Distributions | 118 |
|   | 5. | The General Partner's Chief Compliance Office Is Indicted for Obstruction of Justice | 119 |
|   | 6. | Defendants Gentile, Schneider and Lash Are Indicted for Securities Fraud | 120 |
| V. | CLASS ALLEGATIONS | | 121 |
| VI. | COUNTS | | 123 |

COUNT I: FRAUD IN THE INDUCEMENT AGAINST GPB DEFENDANTS AND THE SELLING DEFENDANTS ... 123

COUNT II: AIDING AND ABETTING FRAUD IN THE INDUCEMENT AGAINST THE SELLING DEFENDANTS ... 125

COUNT III: AIDING AND ABETTING FRAUD IN THE INDUCEMENT AGAINST THE AUDITOR DEFENDANTS ... 126

COUNT IV: FRAUD AGAINST GPB DEFENDANTS ... 128

COUNT V: AIDING AND ABETTING ACCOUNTING FRAUD AGAINST THE AUDITOR DEFENDANTS ... 129

COUNT VI: FRAUDULENT MISREPRESENTATION AGAINST MARGOLIN, CROWE, AND RSM ... 130

COUNT VII: BREACH OF CONTRACT AGAINST THE GENERAL PARTNER ... 133

| VII. | PRAYER FOR RELIEF | 134 |

Plaintiffs Barbara DeLuca, Drew R. Naylor and Peggy Rollo (together, "Plaintiffs") bring this class action on behalf of themselves and all persons or entities that purchased or otherwise acquired limited partnership units ("Units") in GPB investment funds against: (a) Defendants GPB Capital Holdings, LLC ("GPB Capital" or "General Partner"), GPB Automotive Portfolio, LP ("Automotive"), GPB Holdings, LP ("Holdings I"), GPB Holdings II, LP ("Holdings II"), GPB Waste Management, LP ("Waste Management"), David Gentile ("Gentile"), Jeffrey Lash ("Lash"), Jeffry Schneider ("Schneider"), and Macrina Kgil, also known as Minchung Kgil ("Kgil") (collectively, **"GPB Defendants"**); (b) Schneider, Mark Martino ("Martino"), Ascendant Alternative Strategies, LLC ("AAS"), Ascendant Capital, LLC ("Ascendant"), Axiom Capital Management, Inc. ("Axiom") (collectively, **"Selling Defendants"**); (c) Crowe LLP ("Crowe"), EisnerAmper LLP ("EisnerAmper"), Margolin, Winer & Evens LLP ("Margolin"), RSM US LLP (f/k/a, McGladrey LLP) ("RSM"), and CohnReznick LLP ("CohnReznick") (collectively, **"Auditor Defendants"**).

Plaintiffs allege the following upon information and belief, except as to those allegations concerning Plaintiffs individually which are based upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation, their review of: (a) nearly 5,500,000 documents produced by certain Defendants in 2021; (b) over 300,000 pages of documents produced by Defendants pursuant to Plaintiffs' demands to inspect books and records pursuant to 6 *Del. C.* § 17-305 sent to Holdings II on November 28, 2018 and February 4, 2019, and sent to Automotive on June 18, 2019; (c) relevant limited partnership agreements ("LPAs") and private placement memoranda ("PPMs") and other GPB Capital investor updates and marketing correspondence; (d) regulatory filings made with the U.S. Securities and Exchange Commission ("SEC"); (e) filings in the civil and

administrative actions taken by Securities Exchange Commission, Massachusetts, Alabama, New Jersey, New York, Georgia, Illinois, Missouri, and South Carolina; (f) press releases and media reports issued by or concerning Defendants; (g) public court filings by Defendants and others; and (h) other publicly-available information concerning Defendants.

I.   **INTRODUCTION**

1.   By 2013, the GPB Individual Defendants had developed a nationwide scheme to defraud investors through a series of investment funds managed by a then newly-formed, New York–based investment advisor named GPB Capital Holdings, LLC ("GPB Capital").

2.   GPB Capital served as the general partner and manager of at least seven investment funds, with its four largest being: (a) GPB Holdings, LP ("Holdings I"), launched in March 2013; (b) GPB Automotive Portfolio, LP ("Automotive"), launched in May 2013; (c) GPB Holdings II, LP ("Holdings II"), launched in April 2015; and (d) GPB Waste Management, LP ("Waste Management"), launched in August 2016.   Holdings I, Automotive, Holdings II and Waste Management are referred to herein as the "Funds".

3.   The two leaders of the scheme were David Gentile ("Gentile") and Jeffry Schneider ("Schneider"). Gentile, a former accountant, started GPB Capital in 2013 and has been its sole managing member. Schneider, a friend and former accounting client of Gentile's, is a registered securities broker with a long, sordid history in the securities industry.

4.   Gentile, Schneider, and the Selling Defendants marketed the GPB Funds to investors as an attractive "income-producing" alternative to traditional private equity funds. They highlighted the Funds' generous monthly cash distributions.   The Class was promised a safe "[s]ustainable" investment that was "[r]ecession [r]esilient", "[h]igh [b]arriers to [e]ntry" that would pay a "Preferred Return [of] 8%" and "Total Projected Annual Return [of] 15%+."

5.     The Class was promised that these distributions would be "fully covered" by the profits of the operating companies within the Funds' portfolios – which included auto dealerships and waste management companies.

6.     In addition to regular monthly distributions, GPB Defendants issued special distributions for the sole purpose of creating the illusion that the Funds were flush with profit, when in truth the Funds routinely failed to generate enough operating income to pay distributions. When the Funds were losing money, GPB Defendants made distributions entirely from investor capital. Nonetheless, GPB Defendants continued paying monthly and "special" distributions and filling in cash shortfalls with investor capital contributions, to continue attracting new investors and investment.

7.     The payment of special distributions was a chief marketing tool used by the GPB and Selling Defendants to sell more Units. After a special distribution was made, the Selling Defendants would immediately engage in a marketing blitz touting the investment by pointing to the additional special distribution, attracting new investors and enticing existing investors to invest more. Meanwhile, the GPB and Selling Defendants knew that these special distributions were being paid out of investor capital contributions and not operating income as promised.

8.     The operating companies were unable to cover, let alone sustain, the promised monthly and special distributions for several reasons.

9.     GPB and Selling Defendants front-loaded exorbitant acquisition, seller and/or management fees, compensation, and expenses for themselves and related entities. Defendants Gentile and Schneider also diverted investor income to themselves through undisclosed excessive compensation and shifting of personal obligations to the Funds.[1]

---

[1] For example, Gentile and Schneider collected nearly $2 million in undisclosed "stipends." Investors paid for private planes, Gentile's wife's shopping allowance, and Gentile's Ferrari.

10.     The GPB Defendants purchased the operating companies in haste, often overpaying for operating companies in which Gentile, Lash and other insiders often owned a personal interest. They also grossly overstated the experience of the General Partner in the automobile dealership and waste industries.

11.     The GPB Defendants, with the aid of the Auditor Defendants, concealed the state of the Funds' finances. GPB Defendants created false documents and made undisclosed and undocumented inter-fund loans and issued phony personal guarantees, and despite recognizing the unorthodox transactions and accounting thereof, the Auditor Defendants continued allowing the GPB and Selling Defendants to continue using their reputations and issuing clean audit opinions on what were material false and misleading financial statements in order to induce investors to invest in the Funds.

12.     By May 2018, Defendants had used more than $100 million of investor capital to pay the supposedly "fully covered" distributions. These fraudulent distributions were used to maintain the charade of profitable operations, which was central to GPB and Selling Defendants' marketing strategy. But, again, every dollar of investor capital that was paid out in monthly distributions was a dollar not deployed towards productive investments, thereby reducing the Funds' potential returns.

13.     All told, GPB and Selling Defendants raised roughly $1.8 billion from investors in eight separate investment fund offerings, with nearly $1.7 billion of that total raised by the four flagship Funds—Holdings I, Automotive, Holdings II and Waste Management. Investors also received overinflated quarterly valuation reports by GPB Capital valuing the portfolio assets of each of the Funds that showed a false picture of stability. GPB often harped on the fact that these

valuations were being performed by top firms, like RSM, as part of rigorous valuation process. These statements were materially false.

14.    The value of the Funds' portfolio assets were grossly overstated on account of (i) unchecked exaggerations by management about its future growth prospects; (ii) fraudulent accounting practices (*i.e.*, inter-Fund transactions and phony guarantee income); (iii) lack of internal controls and weaknesses in the accounting systems; (iv) lack of any independent oversight of Gentile, Schneider and Lash; (v) concealment of operational problems with automobile manufacturers and dealership partners; (vi) overall inexperience of GPB Capital as an investment adviser; and (vii) an obscene amount of undisclosed related party dealings, embezzlement and misappropriation of funds.

15.    Investors were misled by false and misleading representations about the value and stability of their investments and monthly distributions when in reality: (i) significant and increasing portions of the monthly distributions were secretly being paid from the investors' own capital contributions rather than from operating profits, as promised; (ii) GPB Defendants falsified financial statements though inter-Fund loans and by adding fictitious performance guarantee payments which created a false appearance to investors of illusory profits earned by certain Fund auto dealerships; (iii) Defendants Gentile, Schneider, and Lash enriched themselves at investors' expense by diverting money and business opportunities from certain Fund-owned auto dealerships to a shell company owned by themselves; (iv) Defendants Gentile, Schneider, and Lash used investor funds without investors' knowledge for personal benefit, including private jet travel and luxury automobiles; Gentile and GPB Capital caused certain GPB Funds to borrow unneeded money at high interest rates from other GPB entities and to assume unwarranted liabilities; and (v)

Gentile, Schneider, and other Defendants paid themselves undisclosed and undeserved fees and stipends, while engaging in persistent conflicted transactions and self-dealing.

16.     As of June 2019, GPB Capital estimated the fair market value of its Funds' portfolio assets at approximately $1 billion – representing a more than 42% loss on investors' initial capital contributions. The exact values of the Funds' portfolio assets are unknown, as the Funds have not issued financials since 2016 and the financials issued in 2015 and 2016 were deemed unreliable and need to be restated.

17.     On February 4, 2021, the United States Attorney's Office for the Eastern District of New York announced that it had criminally indicted Defendants Gentile, Schneider, and Lash, charging them with securities fraud and deceptive marketing practices used to lure investors with promises of monthly distributions covered by operating income when significant portions of distributions were paid using investor capital.  Schneider and Lash were arrested and Gentile agreed to surrender. Massachusetts, Alabama, New Jersey, New York, Georgia, Illinois, Missouri, and South Carolina have all brought civil or administrative proceedings against GPB Defendants, in addition to the United States Securities and Exchange Commission ("SEC").

18.     By employing these fraudulent schemes, GPB and Selling Defendants induced Plaintiffs and other Class Members to purchase Units in the Funds to their detriment, and as a result, they are responsible for Plaintiffs' losses.  Each of the aiders and abettors involved in this scheme and each of the Defendants who substantively participated in the scheme was or should have been aware of the fraud alleged herein.

19.     As shown herein, the Funds, GPB, and Selling Defendants could not have achieved their fraudulent goals alone. The Auditor Defendants unlawfully aided and abetted them by, among other things, recklessly preparing and blessing false and misleading financial statements, accepting

non-existent recordkeeping, missing documentation, severe weaknesses in GPB's internal controls and accounting practices, inordinate and unorthodox related party dealings and other accounting fraud that were so abysmal that GPB Capital and the Funds have been unable, despite many years of effort, to restate the 2015 and 2016 financial statements, nor has the General Partner nor any Fund been able to issue audited financial statements for the 2017, 2018, 2019 or 2020 calendar years.

20.     Plaintiffs are entitled to the return of their capital investments and punitive damages. They seek rescission, disgorgement, and monetary relief for themselves and the Class, and any other such relief as the Court may deem just and appropriate.

## II.     PARTIES

### A.     Plaintiffs

21.     Plaintiff Peggy Rollo ("Rollo") is a natural person who resides in Portland, Oregon. Rollo purchased 1.0 unit of Holdings I for $50,000 on May 7, 2015, 0.6 units of Automotive for $30,000 on September 2, 2016, 1.3 units of Automotive for $65,000 on March 7, 2018, 0.5 units of GPB Waste Management for $25,000 on July 10, 2017, and 1.5 units of Waste Management for $75,000 on January 12, 2018, and has continuously held all such units from the times of purchase through present.

22.     Plaintiff Barbara DeLuca ("DeLuca") is a natural person who resides in Boynton Beach, Florida. DeLuca purchased two units in Automotive for $100,000 on June 1, 2015, and has continuously held such units from the time of purchase through present.

23.     Plaintiff Drew R. Naylor ("Naylor") is a natural person who resides in North Carolina.  Naylor's spouse, Dr. Lee Ann Naylor, purchased one unit in Holdings II for $50,000 in March 2018 and has continuously held such unit from the time of purchase through present. Naylor is the assignee of his wife's interests in Holdings II.

7

B.    **Defendants**

1.    **GPB Defendants**

24.    Defendant GPB Capital is a Delaware limited liability company that holds itself out as having its principal place of business located at 535 West 24th Street, Floor 6, New York City, NY 10011.  GPB Capital markets itself as a "global asset management firm" and was at all relevant times the General Partner, control person, manager, and majority owner of the GPB Investments. GPB Capital orchestrated the offerings of the Funds and offered and sold the Units issued by the Funds to Plaintiffs and other investors.  GPB Capital is owned by its sole member, Defendant Gentile, who on February 4, 2021, was criminally indicted for his role in the Ponzi-like scheme detailed herein.

25.    Defendant Automotive is a Delaware limited partnership with its principal place of business located at 159 Northern Boulevard, Great Neck, NY 11021; 1581 Franklin Ave., Garden City, NY 11530; and 535 West 24th Street, Floor 6, New York, NY 10011.  GPB Capital is the General Partner of Automotive.  Defendant Lash owned a 15% membership interest in Automotive and was its Managing Director.

26.    During the relevant times hereto, Automotive offered and sold Units to investors, including Plaintiffs DeLuca and Rollo.

27.    Defendant Holdings I is a Delaware limited partnership with its principal place of business located at 159 Northern Boulevard, Great Neck, NY 11021.  GPB Capital is the General Partner of Holdings I.  During the relevant times hereto, Holdings I offered and sold Units to investors, including Plaintiff Rollo.

28.    Defendant Holdings II is a Delaware limited partnership with its principal place of business located at 535 West 24th Street, Floor 4, New York, NY 10011.  GPB Capital is the General Partner of Holdings II.

29.     During the relevant times hereto, Holdings II offered and sold Units to investors, including Plaintiff Naylor.

30.     Defendant Waste Management is a Delaware limited partnership with its principal place of business located at 535 West 24th Street, Floor 4, New York, NY 10011.  During the relevant times hereto, Waste Management offered and sold Units to investors, including Plaintiff Rollo.

31.     Defendant David Gentile is a natural person who resides in New York.  Together with Defendants Lash and Schneider, Gentile co-founded GPB Capital in 2013.  At all relevant times, Gentile was the sole owner and Chief Executive Officer ("CEO") of the General Partner. He was integrally involved in the preparation of the PPMs for the GPB Investments and managed the day-to-day operations of the Funds and the underlying investments.  Gentile is also an indirect owner in Selling Defendant AAS.

32.     Defendant Jeffry Lash is a natural person who resides in New York. Lash masterminded the automotive dealership investment strategy that culminated in Holdings I, Holdings II and Automotive, having brought the original idea to Gentile in 2012. Gentile brought in Schneider, who was the president of a private equity firm, and together they co-founded GPB Capital in 2013, whereby Lash became Managing Partner of Automotive.

33.     Lash is also a former officer of the General Partner and a former Co-Director of Automotive Retail for the General Partner.  Lash oversaw the various operating partners at the dealership level.  He was integrally involved in seeking investors for the GPB Funds, the preparation of the PPMs for the GPB Funds, and managed the day-to-day operations of the GPB Funds.  On February 10, 2018, Lash resigned and entered into a Resignation Agreement with GPB Holdings, which subsequently was amended by a Restated Agreement. In October 2018, Lash filed

a lawsuit against GPB Capital, Automotive, Gentile, and others for breach of contract in the Eastern District of New York, which he later voluntarily withdrew in November 2018—the same month that the GPB Funds' auditor resigned.

34.     Defendant Jeffry Schneider is a natural person who resides in Austin, TX.  He is the co-founder of GPB Capital with Defendants Gentile and Lash and serves as GPB Capital's Strategic Advisor.  Schneider is also founder and CEO of Ascendant and the Founding Principal of Ascendant Alternative Strategies. Schneider is also the former Senior Vice President of Axiom Capital Management. Schneider was the mastermind behind the marketing scheme and integrally involved in seeking investors for the GPB Funds, the preparation of marketing and solicitation materials for the Funds, and the special distribution marketing scheme.

35.     Defendant Macrina Kgil is a natural person who resides in the State of New York. Kgil was the manager, control person, and officer of GPB Capital, GPB Holdings, GPB Holdings II, GPB Holdings III, GPB Automotive, and GPB Waste Management. Kgil was also the CFO of GPB Capital from September 2016 to July 2018. Kgil was instrumental in orchestrating and executing this fraudulent scheme until she resigned in 2018 due to concerns about fraud. It is worth noting that Kgil has since erased all references to GPB Capital on her Linkedin profile.

36.     Defendants Gentile, Lash, Schneider, and Kgil are collectively referred to as the "Individual Defendants" and collectively with the General Partner and the Funds, the "GPB Defendants".

37.     The Individual Defendants, as a result of their senior positions within the Funds and/or their affiliates, had access to material non-public information of GPB Capital and the Funds, possessed the power and authority to control the content and form of the GPB Funds' solicitation materials to prospective investors, knew that the solicitation materials contained false and/or

misleading statements, permitted investors, including Plaintiffs, to rely on those false and/or misleading statements in making their investments in the Funds, and took no steps to remediate the false and/or misleading statements made to investors, including Plaintiffs.

### 2.  Selling Defendants

38.  Defendant Axiom Capital Management, Inc. ("Axiom") is a Delaware corporation with its principal place of business located at 780 Third Avenue, New York, NY 10017.  Axiom is a financial services business and licensed broker-dealer firm.  Axiom served as the underwriter (or managing broker-dealer) of the GPB Investments' LP Unit offerings.  As underwriter of the GPB Investments' LP Unit offerings, Axiom played a key role in structuring and overseeing those offerings, preparing the offering materials distributed to investors, overseeing the distribution of such offering materials to investors, and/or offering or selling the GPB Investments' Units to investors. Defendant Schneider is a former Senior Vice President at Axiom. Defendant Martino was the former-CEO and President of Axiom prior to founding AAS.  Ascendant is a registered representative of Axiom.

39.  Defendant Ascendant Alternative Strategies, LLC ("AAS") is a Delaware limited liability company with its principal place of business located at 535 West 24th Street, Floor 4, New York City, NY 10011.  AAS is a managing broker-dealer, providing investment banking and securities servicing to investment advisors and broker dealers.  AAS has an agreement with GPB Capital whereby it serves as the exclusive dealer manager for GPB Capital's funds.  AAS earns commissions revenue from this agreement, and GPB Capital has engaged AAS as a financial advisor on a number of acquisitions from which AAS earned acquisition fees and revenues. Defendant Martino is the co-founder and CEO of AAS.  AAS is an affiliate of Ascendant. GPB Capital is an affiliate of AAS.  Defendant Schneider, one of GPB Capital's co-founders, is the Founding Principal of AAS.  Defendant Gentile, GPB Capital's sole owner and co-founder, is an

owner of AAS through DJ Partners, LLC ("DJP"), an entity that is co-owned by Defendants Schneider and Gentile. ███████████████████████████████████████████████████ ████████████████████████████████████████████████████ AAS also has an expense sharing agreement with GPB Capital dated June 3, 2016 (amended March 15, 2018), whereby AAS pays GPB Capital for facilities and services, including rent, shared spaces, maintenance, utility usage, and internet connectivity.

██.     Defendant Ascendant Capital, LLC ("Ascendant") is a Delaware limited liability company with its principal place of business located at 14412 Galleria Circle, Building H, Suite 100, Austin, TX 78738.  According to Ascendant's website, securities products and services of Ascendant are offered through AAS, and all Ascendant members are Registered Representatives of AAS.  Ascendant's provides services to GPB Capital for marketing, event planning, administration, client services, and other support services.  AAS, as the agent for Ascendant, receives payment from GPB Capital for the services that Ascendant provides to GPB Capital and passes 100% of those payments, upon receipt, to Ascendant. ████████████████████████ ███████████████████████████████████████████████████

41.     Defendant Mark Martino is a natural person who resides and does business in New York.  He is the co-founder and CEO of AAS.  Martino spent 24 years at Axiom Capital Management, which culminated with his role as CEO and President.  During his time at Axiom, he held a variety of leadership positions, such as Head of Investment Banking, Director of Research, and Head of Equity Trading.

42.     Defendants Axiom, AAS, Ascendant and Martino collectively are referred to as the "Selling Defendants."

### 3. **Auditor Defendants**

43.     Crowe LLP ("Crowe") is a limited liability partnership with its principal place of business located at 225 West Wacker Drive, Suite 2600, Chicago, Illinois 60606. Crowe is a public accounting, consulting, and technology firm with offices worldwide. Crowe served as the auditor for Automotive as well as the portfolio operating companies, including Holdings II from 2016 until November 2018. In or around the summer of 2018, Crowe ceased its work auditing certain of GPB's companies and informed GPB Capital that it would be unable to provide a clean audit opinion for 2017, and further, that it was withdrawing its previous clean opinions for 2015 and 2016. Crowe stated that such financial statements should not be relied upon. In November 2018, Crowe resigned due to "perceived risks they determined fell outside of their internal risk tolerance parameters."

44.     EisnerAmper LLP ("EisnerAmper") is a limited liability partnership with its principal place of business located at 733 Third Avenue, New York, New York 10017. EisnerAmper provides accounting, audit, advisory, consulting, financial, tax, and insurance services. EisnerAmper replaced Crowe as GPB Capital's auditor in November 2018. EisnerAmper was the auditor of GPB Capital and some of the other GPB Funds, including Automotive.

45.     Margolin, Winer & Evens LLP ("Margolin") is a limited liability partnership with its principal place of business located at 1500 RXR Plaza, Uniondale, New York 11556. Margolin has been providing accounting, auditing, tax planning, and advisory services since 1946. Margolin served as Automotive's auditor for the fiscal years 2014 and 2015 but was replaced by Crowe in 2016.

46.     RSM US LLP, formerly known as McGladrey LLP ("RSM") is a limited liability partnership with its principal place of business located at 30 S Wacker Drive, Suite 3300, Chicago, Illinois 60606. RSM is one of the leading providers of audit, tax, and consulting services in the

U.S. RSM has been and continues to be the outside auditor for certain of GPB Capital's Funds, including Holdings II. RSM audited the financial statements of Holdings II for fiscal years 2015 and 2016 but its opinion regarding those audits has since been withdrawn.

47. CohnReznick LLP ("CohnReznick") is a limited liability partnership with its principal place of business located at 1301 Avenue Of The Americas, New York, New York 10019. CohnReznick has provided advisory, assurance, and tax services since 1919, and currently employs more than 2,400 individuals. CohnReznick served as the outside auditor for certain of GPB Capital's Funds, including at least GPB Waste Management, for fiscal years 2016, 2017, and 2018. CohnReznick audited and issued an audit opinion for the financial statements of Waste Management for fiscal year 2016.

## III. JURISDICTION, VENUE, AND DEMAND FOR TRIAL BY JURY

48. This Court has jurisdiction over this dispute pursuant to the Class Action Fairness Act of 2005, codified at 28 U.S.C. § 1332(d)(2)(B). The amount in controversy exceeds $5 million. The class includes more than 100 individuals; at least one Plaintiff is a citizen of a foreign state, and the Fund Defendants and some of the Selling Defendants are all citizens of New York.

49. Venue is proper in this Court under 28 U.S.C. § 1391(a)(3), as one or more of the Defendants reside in the district encompassed by this Court and the principal place of business of one or more Defendants is in the district encompassed by this Court. Furthermore, a substantial part of the events and omissions giving rise to the claim occurred in the district encompassed by this Court.

50. Pursuant to the Subscription Agreement governing Plaintiffs' investments, to the extent it applies, venue lies in New York.

51.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all matters triable thereby, to the extent the claims are not subject to the jury trial waiver in the Subscription Agreement.

## IV.     FACTUAL ALLEGATIONS

### A.     Defendants Gentile, Schneider, and Lash Scheme to Defraud Investors

52.     Gentile was an accountant who, before founding GPB Capital, was a partner in a New York-based accounting firm, Gentile, Pismeny & Brengel, LLC ("GP&B"). Gentile's clients included local small businesses to whom Gentile offered strategic advice on growth and business development. It was through his work at GP&B that Gentile met Lash and Schneider, who were clients of GP&B.

53.     Lash had been a business associate and friend of Gentile since around 1990 when Lash was a client of GP&B. Lash owned and operated a series of automobile dealerships, for which GP&B performed auditing and accounting services. Gentile had invested in several of Lash's Volkswagen dealerships.

54.     Schneider became a broker-dealer in 1991. During his thirty-year career, he had worked for twelve different broker-dealers, had been fired by past employers and sanctioned, fined, and suspended by regulators. He has had over a dozen consumer complaints lodged against him and he has worked for firms that were expelled by FINRA from the securities industry. Schneider even helped market a fund with R. Allen Stanford who was sentenced to 110 years in prison in connection with a $7 billion Ponzi scheme.

55.     On or about 2012, Defendants Gentile and Lash discussed starting an investment fund, whereby Gentile would serve as the general partner of the fund that would invest in, among other things, automotive dealerships, and Lash would serve as the manager of the fund's

automotive segment. Lash and Gentile met with Defendant Schneider, Gentile's friend and President of Ascendant and started sketching out a business plan.

56. Schneider was the "co-creator" with Gentile of the overall business plan. Both Schneider and Gentile stated under oath that they jointly developed GPB Capital and its Fund structures; they have been described as "essentially partners".

57. They agreed that Schneider would raise funds from outside investors using a series of interconnected entities that would be marketed as alternative-asset investment funds invested in businesses with a focus on the automotive industry, waste management and other industries. They would claim that these businesses were recession proof and would generate predictable and sustainable cash flow that would result in outsized, steady returns for investors. The plan, however, was to misrepresent the profitability of the operating companies and their ability to pay distributions to investors though operating income, while charging investors exorbitant upfront fees, embezzle investor funds, and quickly line their pockets without regard to the actual performance of the underling operating companies owned by the Funds.

58. Despite Schneider's sordid past and Gentile's inexperience, in May 2013, Gentile, Schneider, and Lash formed General Partner GPB Capital to implement their plan followed by the creation of the various investment Funds[2] which they used for the better part of a decade to defraud investors and enrich themselves and their co-Defendants.

59. In marketing the GPB Funds, Gentile and Schneider underscored Gentile's accounting background, representing that "during [Gentile's] career at GP&B, David has advised,

---

[2] The General Partner also operates and manages several other funds that are formed through LPAs. For example, it manages and operates GPB Holdings III, LP, GPB Holdings Qualified LP, GPB Cold Storage, LP, GPB Eurobond Finance PLC, GPB NYC Development, and GPB Scientific, for whom the General Partner made private-placement offerings similar to the offerings that the GPB Investments made.

oversaw [sic], structured or financed over $1 billion worth of transactions in the private and public markets."

60.     Gentile, however, had never previously managed an investment fund. In fact, Gentile has since admitted under oath that he was a "novice" in private placements and private equity funds: "I'd never been in this business. I've been a CPA for 25 years in an accounting firm. . . So, I'm learning. I'm a novice...." Despite being a self-proclaimed "novice," Gentile was personally involved in the key decisions of the Funds including decisions on how investor capital should be deployed and whether distributions should made. All decisions that Gentile made were clouded by his own self-interest.

61.     With Lash serving as GPB Capital's Director for Automotive Retail, he and Gentile ensured that early acquisitions were of companies in which they held an interest and that investor funds would be directed to related entities. Gentile, Schneider and Lash also embezzled and misappropriated investors' funds to benefit themselves and their families through, among other things, expense payments for luxury items and family salaries, and offloading financial obligations on to the GPB Funds.

62.     Lash participated in the misappropriation of Fund assets for their personal benefit, creating, signing, and back-dating misleading "performance guaranties" in order to inflate the reported income of some of the Funds.

63.     All told, Gentile reaped undisclosed benefits of over $27 million while Schneider received at least $13 million from his association with GPB Capital and Gentile. Lash resigned in February 2018 with a generous severance package.

**B.      The Structure of GPB Capital and the GPB Funds**

64.     GPB Capital is an SEC-registered investment adviser that describes itself as "a New York-based middle-market acquisition and operations firm with a management team of

experienced financial, management and accounting professionals with private investment and acquisitions experience."

65. GPB Capital serves as the general partner or manager of a series of investment funds. GPB Capital's four flagship funds (the "GPB Funds") are:

· GPB Holdings, LP ("Holdings I"), launched in March 2013;

· GPB Automotive Portfolio, LP ("Automotive"), launched in May 2013;

· GPB Holdings II, LP ("Holdings II"), launched in April 2015; and

· GPB Waste Management, LP ("Waste Management"), launched in August 2016.

66. The GPB Funds are structured as limited partnerships that act as holding companies, "acquir[ing] controlling majority (and in many cases, wholly owned) interests . . . in income-producing, middle-market private companies in North America." The portfolio companies acquired by the GPB Funds are in the "automotive retail, waste management, technology enabled services, energy, healthcare, and real estate" sectors. GPB Capital promotes its "hands-on managerial and operational assistance" to the portfolio companies owned by the funds.

67. From 2013 through mid-2018, the Funds sold unregistered limited partnership interests in what are known as "private placement" transactions. The limited partnership interests were marketed to "accredited investors" as defined by the SEC's Regulation D. When a securities offering qualifies for a Regulation D exemption from registration, its regulatory burden is significantly reduced. That is to say, there are fewer rules and less oversight.

68. Gentile was and is the sole member and Chief Executive Officer of GPB Capital, and thus had total legal control over it and, therefore, also over each of the Funds.

69. Schneider, despite having no formal role at GPB Capital, in practice exercised significant control over the GPB Funds and their portfolio companies. Schneider was regularly

involved in, among other things, acquisition discussions, analysis of fund and portfolio company performance, negotiation of payments that would flow from the portfolio companies to the GPB Funds, meetings with portfolio company operators, and establishing the structure of the funds. Schneider also reviewed and approved the language used in the Funds' private placement memoranda ("PPMs").

70.     All investors in the Funds (or their nominees) were provided copies of the PPMs for the investment fund in which they invested, and all investors were required to acknowledge that they received a copy of the PPMs as a condition to purchasing Units. The PPMs received by investors in each GPB Fund were nearly identical in form and attached as exhibits as financial statements that were purportedly audited by the Auditor Defendants in accordance with Generally Accepted Accounting Principles.

71.     Automotive offered two classes of Units:  Class A and Class B.  Each class is governed by the same LPA and was sold to investors pursuant to the same General Partner disclosure brochure and substantially similar PPMs.

72.     Holdings I offered one class of Units: Class A. The Class A is governed by the same LPA and was sold pursuant to the same General Partner disclosure brochure and substantially similar PPMs.

73.     Holdings II offered four classes of Units: Class A, A-1, B, and B-1.  Each class is governed by the same LPA and was sold pursuant to the same General Partner disclosure brochure and substantially similar PPMs.

74.     Waste Management offered one class of Units: Class A.  The class is governed by the same LPA and was sold to investors pursuant to the same General Partner disclosure brochure and substantially similar PPMs.

75. The GPB Investments' offerings to investors increased substantially over time. For example, Automotive's initial offering was $50 million in 2013. By March 2015, Automotive had increased its offering to $150 million. Less than a year later, it reportedly increased its offering to $250 million even though it had sold only $32 million in Units. By 2016, Automotive reported an indefinite offering and had sold more than $176 million in Units, and its PPM for Class A Units disclosed an offering of $500 million. In 2017, Automotive reported an indefinite offering and that it had sold more than $369 million in Units. In 2018, it reported an indefinite offering and that it had sold more than $622 million in Units, and the PPM disclosed an offering of $750 million for Class B Units. On June 30, 2018, Automotive stopped selling Units after having raised approximately $673 million.

76. Holdings I's offerings to investors also increased substantially over time. For instance, on May 13, 2014, Holdings I initiated an offering of Class B units up to $150 million and stated in its PPM that the offering "may be increased at the sole discretion of" the General Partner "up to a maximum of $200,000,000." Subsequently, in its May 2016 PPM, Holdings I disclosed that for year-end 2015, it had offered up to $200 million in Class A units and "received total gross proceeds from the Offering of $192,744,615." However, Holdings I's audited financials for year-end 2015 disclosed that it had only sold approximately $97 million in Class A capital contributions for that fiscal year.

77. Holdings II's offerings likewise increased exponentially. In April 2015, Holdings II initiated an offering of up to $350 million. In a December 2015 supplement to the Holdings II PPM, the $350 million offering was maintained, but it was noted that the offering "may be increased at the sole discretion of" the General Partner "up to an anticipated maximum of $500 million." By March 2016, Holdings II had increased the Class A LP Unit offering to $500 million.

20

The 2016 PPM disclosed that it had reached that maximum, despite Holdings II's audited financial statements for the year ending 2016 indicating that it had only sold $110 million in Class A capital contributions that year. In its January 2018 PPM, Holdings II disclosed that it had exceeded its "anticipated maximum" and increased the offering to $750 million.

78.     For years 2016, 2017, and 2018, Waste Management reported indefinite offerings. In its August 2016 SEC filing, it reported sales of $0. By August 2017, Waste Management sold more than $76 million in Units and finally, in its April 2018 SEC filing, Waste Management reported sales of more than $135 million in Units.

### C.     GPB and Selling Defendants Sold Fund Units to Investors through False and Misleading Materials and Sales Practices

#### 1.     Selling Defendants Concealed Their Deep Ties to Gentile and the General Partner

79.     From 2013 until June 30, 2018, the General Partner worked primarily with two registered broker dealers to manage the sale of Units in the Funds: Axiom and AAS. The General Partner had deep relationships with and, in the case of AAS, even ownership interests in each of these entities. The GPB Defendants and the Selling Defendants collaborated in selling Units to investors in the Funds, which were represented as stable, long-term investments in car dealerships and waste management among other industries, but for which they knew had no conceivable chance of producing the promised return on the investment.

80.     GPB Capital worked especially closely with Schneider's company, Ascendant, the placement agent for the Funds. Indeed, one 2017 marketing document described the two companies as "essentially one organization."

81.     In exchange for serving as the broker-dealer for the Units, the Selling Defendants received excessive fees and expenses well above industry rate for a comparable investment. For example, Automotive's investments paid the Selling Defendants fees as high as ███████████

██████████████ for the sale of Class A Units, and for Class B Units, the Selling Defendants received a servicing fee ██████████████████ upon an investor's subscription, which was payable annually so long as the investor held an interest in the LP Unit.  Likewise, Holdings II investments provided fees as high as ████████████████████ for sales of Class A Units.

82.     Axiom sold Units in the Funds beginning in 2013 for Automotive and in 2015 for Holdings II. According to public filings, by May 19, 2016, Axiom had sold Automotive Units to 1,869 investors, raised $176,110,533 in capital, and received $19,372,158 in sales commissions. By May 19, 2016, Axiom had sold Holdings II Units to 899 investors, raised $76,017,028 in capital, and was paid $8,361,873 in commissions. By June 6, 2013, Axiom had sold an undisclosed amount of Holdings I units to investors and took a reported $16,500,000 in sales commissions.

83.     In 2017, the General Partner also began selling Units in the Funds through AAS. By May 2017, the General Partner, through AAS and Axiom, had more than doubled the number of investors in Automotive to 3,851 and increased the total capital raised to $369,234,443; Holdings II investors climbed to 3,505 and increased the total capital raised to $364,072,884; and Waste Management investors climbed to 801 and increased the total capital raised to $76,295,381.

84.     In 2017 alone, the Selling Defendants received sales commissions and fees deducted from these investments in an aggregate amount of $92,350,343 ($43,385,047 for Automotive, $42,778,563 for Holdings II, and $6,186,733 for Waste Management).

85.     Between 2017 and 2018, AAS continued to aggressively expand the sale of Units in the Funds by retaining dozens of brokers and investment advisors from across the country, referred to as "Soliciting Brokers," who took instruction from AAS on the sale of Units to investors.

86.     In a Form D/A filed on May 14, 2018, Automotive reported that that it had increased the number of investors to 6,353, increased the capital raised to $622,143,273, and reported that the amount of sales commissions paid from these investments had increased to more than $52 million. Similarly, Holdings II reported that the number of investors had increased to 6,095, the capital raised increased to $645,813,889, and the amount of sales commissions paid from these investments had increased to nearly $50 million, totaling more than $100 million in commissions to the Selling Defendants for Automotive and Holdings II combined.

87.     By this time, Waste Management reported that the number of investors had increased to 1,414, the capital raised increased to $135,012,605, and the amount of sales commissions paid from this investment had increased nearly $10,828,655, totaling more than $110 million in commissions to the Selling Defendants for Automotive, Holdings I, Holdings II and Waste Management combined.

88.     Significantly, Axiom, AAS, and Ascendant have numerous overlapping and interrelated interests with the General Partner. Axiom's former CEO, Defendant Martino, became a co-founder and CEO of AAS, in which the General Partner has an ownership interest.

89.     Both Axiom and AAS managed offerings for other GPB entities operated by the General Partner, including GPB Holdings III. Gentile, who is the sole owner of the General Partner, is also an indirect owner of AAS.

90.     Defendant Schneider, who co-founded GPB Capital, is Special Advisor to the General Partner and acted as a manager of some of the dealerships that Automotive claimed to acquire. He is also a co-founder of AAS and the founder and CEO of Ascendant, which the Fund Defendants describe as "a branch office of and offers securities through AAS."

91.     Ascendant and Gentile also are members of GPB SLP, LLC, which the PPMs and LPAs identify as a Special LP. Under the LPA, the Special LP is eligible for, and paid itself, advances on profits that were not yet due to be paid under Automotive's distribution scheme.

92.     The General Partner and AAS are also next-door neighbors, listing offices in the same building in the Chelsea district on the west side of Manhattan, and even sharing basic business expenses.

93.     The GPB and Selling Defendants were all related parties and acted in concert with the same motive of generating fees from the investors' capital contributions and taking advances on profits before they were due and embezzling funds unbeknownst to investors. Likewise, the GPB and Selling Defendants shared knowledge of the schemes that they were using to fraudulently induce investors into investing in the Funds, *i.e.* misleading investors about their ability to pay ordinary and special distributions from operating profits. None of the Defendants disclosed to Plaintiffs or the Class the nature of these related party interests and/or relationships prior to making their investments in the Funds; nor were Plaintiffs or the Class provided with information concerning the nature or amount of the exorbitant fees that the Selling Defendants were taking out of the Funds.

### 2.     GPB and Selling Defendants Misrepresented the Source of Monthly Distributions to Investors

94.     GPB and Selling Defendants repeatedly represented to investors that the monthly distributions being made to them were fully from the profits of the portfolio companies when, in fact, they were not. GPB Defendants were, instead, using money from new investors' capital contributions to pay promised distributions to existing investors, thus covering up the poor performance of the operating companies.

95.     The central marketing concept for the GPB Funds was that they were "unique" products without any real competitors in the alternative investment space – "income-producing private equity," as GPB and Selling Defendants often described them. GPB Capital and Ascendant consistently told investors, broker-dealers, and investment advisors that the GPB Funds would pay investors regular monthly distributions, at an 8% annualized rate, that were "fully earned" or "fully covered" by cash flow from the portfolio companies.

96.     The statements made in the PPMs that the GPB Investments would "make cash distributions based on **cash flow we have received from the Dealerships**" (emphasis added) beginning "three months after their subscription at annual return rates targeted to be at least 8% of the LPs' Capital Contributions" were false and misleading because the GPB and Selling Defendants knew that the GPB Investments could not meet the distribution expectations set forth in the PPMs based on the cash flows or profits of operating companies that they claimed to have acquired. Instead, the GPB and Selling Defendants knew that the distributions promised in the PPMs would need to be made, and in fact, were made, at least in part, from "investor contributions."

97.     Investors were also told that the Funds might pay special additional distributions where GPB Capital determined it was appropriate, based on the Funds' ability to pay them. Variations on these fundamental representations appeared in offering and marketing documents, responses to Due Diligence Questionnaires, and correspondence with investors and broker-dealers.

98.     Given the low interest-rate environment that prevailed during the time the Funds were offered, the robust 8% annual distribution from operating profits was a powerful marketing tool that enabled GPB Capital to raise nearly $2 billion in investor capital in just five years.

99.     For example, an August 2014 GPB Capital response to a DDQ described a fund as "[u]nlike any other private equity investment program" because "it pays a substantial current dividend that is fully covered with funds from operations." In differentiating the fund from other investments, GPB Capital identified as "of utmost importance" that the fund "is the only income producing private equity offering in the space" paying distributions "fully covered with funds from operations."

100.     GPB and Selling Defendants' emphasis on this issue demonstrates that the source of the monthly distributions was material to investors. Indeed, Ascendant repeatedly responded to broker-dealers and investment advisers who sought to clarify and confirm that the distributions paid by the Funds would not include invested capital.

101.     GPB and Selling Defendants also lured investors by having the Funds pay additional "special" distributions on top of the regular monthly distributions. The special distributions were effective fundraising tools for at least two reasons. First, they served as a proof of concept, demonstrating the Funds' ability to generate excess income from their portfolio companies. GPB and Selling Defendants routinely represented that these special distributions were also "fully covered with funds from operations." Second, they created a sense of urgency. The special distributions were announced in advance, and payable only to those who invested by a stated deadline. Ascendant then sent out "blast" emails promoting the special distributions and investment deadlines to whip up investor interest. GPB Capital and Ascendant used special distributions as a critical part of their plan to raise money for the GPB Funds.

102.     In reality, however, these representations were false and misleading because the portfolio companies did not produce sufficient income to fully funded the monthly distributions to

investors, let alone "special" distributions. In fact, GPB Defendants routinely returned investor capital as distributions, falsely claiming the money was from portfolio company operations.

103.     GPB Defendants' own internal records show that their representations about the source of monthly distributions were false. Internally, GPB and Selling Defendants tracked whether distributions to investors were "fully covered by cash flow" from operations. This measurement was expressed as a percentage figure – sometimes referred to as the "coverage ratio" – that was based on the Fund's net investment income, plus any realized gains or losses, divided by the distributions paid to investors.

104.     A coverage ratio of 100% or higher meant the fund's net investment income plus realized gains were equal to or greater than the distributions to investors; in other words, the distributions were "fully covered." A coverage ratio below 100% meant that a fund was paying distributions in excess of operating income. In that event, the shortfall would have to be made up from another source – most commonly, investors' capital contributions. If a fund had negative operating income – *i.e.*, losing money – but continued to pay distributions, the coverage would also be negative, or less than 0%. A negative coverage ratio effectively meant that every dollar distributed to investors was coming from investors' own capital contributions.

105.     Any use of investor capital to pay distributions necessarily reduced the amount of capital a Fund could deploy in productive investment. Because GPB Capital assumed significant positive returns on deployed capital, each dollar of investor capital paid out in distributions would reduce long-term value by an even greater amount.

106.     Starting in 2014, the Funds repeatedly used investor capital to make distributions to investors, while falsely stating that the distributions were fully funded from operations. Between

2014 and 2018, more than $100 million was distributed to investors under the false pretenses that the monies were profits from the Funds' investments in income-producing portfolio companies.

### a. **Holdings I**

107.    Holdings I, launched in March 2013, was the first GPB Fund. The initial offering was in the amount of $150 million, and the PPM described the purpose of the fund as investing in "early-stage and middle-market Portfolio Companies" in the sectors of automotive retail, information technology and healthcare.

108.    A 2014 due diligence presentation prepared to educate investors and broker-dealers about the Funds stated that the targeted monthly distributions at an annualized rate of 8% were "paid 100% [with] funds from operations" – in other words, with the "cash flow from portfolio companies." A 2015 version of the presentation repeated these representations, and added a "highlights" slide stating that the Funds provided investors with "meaningful income... 100% fully covered distribution – funds from operations."

109.    In truth, however, for the full year 2014, Holding I's income fell far short of the roughly $2.5 million in distributions it made to investors. Effectively, a large chunk of the distributions Holdings I paid out in 2014 was simply a return of the investors' own capital.

110.    In early 2015, GPB Capital and Ascendant continued to represent in marketing and due diligence materials that Funds distributions were fully covered with funds from its operations. For instance, in March 2015 GPB Capital represented in a Due Diligence Questionnaire response that "the initial distribution rate of 8% is paid monthly only from funds from operations."

111.    GPB Defendants covered up this shortfall by manufacturing fictitious "performance guaranties" and falsifying financial statements. Specifically, on May 8, 2015, Holdings I released its audited financial statements for 2014, which reported $2,498,858 in net

investment income. This was false: the net investment income figure relied on fictitious earnings from portfolio companies – in particular, two auto dealerships that Lash operated.

112.    The falsehood had its roots in February 2015, when GPB Capital and Ascendant personnel began to prepare the 2014 financial statements. As they looked at the numbers, they saw a significant shortfall in Holdings I' income "when you compare it to what we distributed."

113.    To cover up the shortfall, GPB Capital created back-dated "performance guaranties" from Lash to the two auto dealerships. The performance guaranties purported to require Lash to pay the portfolio companies for any shortfalls in dealership net income below stated thresholds. Although the documents are dated "as of February 20, 2014," they were not drafted until early 2015, after GPB Capital and Ascendant had discovered the income shortfall.

114.    As an Ascendant Managing Director wrote in an October 2015 email, the guaranties were ██████████████████████████" They were reverse engineered to generate the amount of fictitious dealership income that Holdings needed to get its coverage ratio back to 100%. For that reason, GPB and Selling Defendants had to wait to finalize the guaranty agreements for "all of the accounting to be resolved as the first step so the agreements would reflect that," as GPB Capital's Director of Asset Management described it in a March 2015 email.

115.    Gentile, Schneider, and Lash were actively involved in this deception.

116.    In early March 2015, one GPB Capital employee emailed another about getting Gentile and Schneider to agree to the precise amount of the income manipulations (referred to as a "true up"): "██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████."

29

117.     On March 18, 2015, Gentile texted Schneider and Lash asking them to " 

"

118.     Later that day, GPB Capital's Chief Operating Officer sent Lash two "deficiency notices" for the portfolio companies operating the dealerships, stating that Lash owed a combined total of $1,136,201 pursuant to the performance guaranties. The amounts supposedly due under the performance guaranties were never collected in full.

119.     In October 2015, a GPB Capital finance manager noted that no payments had been made, commenting: "

"

120.     The fictional guaranties were also part of a false marketing scheme. GPB Capital was offering a new fund in April 2015, called Holdings II (discussed in more detail below). The marketing pitch relied heavily on the supposed 100% coverage ratio for the original Holdings I Fund. Disclosing the large shortfall in Holdings I's 2014 income would have undermined the central premise of GPB Capital's business model.

121.     Indeed, despite the 2014 shortfall, Holdings I made yet another special distribution in order to maintain the false image of the Funds as producing dependable returns from portfolio companies' operations. Thus, in April 2015, Holdings I paid a special distribution of 1.5%, which totaled roughly $500,000. Even Lash, whose fake performance guaranty was being crafted at the time, texted Gentile and Schneider that he had met with GPB Capital's then–Chief Financial

Officer, who told Lash that making another special distribution under the circumstances was

"███████████."

122.    Holdings I, nonetheless, went ahead and made the April 2015 distribution, using investor capital again. For the second quarter of 2015, Holdings I booked net investment income of only $3,219,501 but paid total distributions of $3,851,958 -- a quarterly coverage ratio of 84%. By this point, Holdings I's quarterly coverage ratio had been below 100% for three of the first seven quarters in which it had paid distributions.

123.    Yet GPB Capital and Ascendant continued to falsely state that Holdings I's distributions were fully covered by operating income. For example, on May 8, 2015 (the very same day that Holdings I released its false 2014 financial statements), an Ascendant representative emailed a prospective investor, attaching a copy of the financial statements and highlighting Holdings I's "full FFO coverage (funds from operations)." Similarly, a June 2015 GPB Capital Due Diligence Questionnaire response again falsely stated that all Holdings I's "distributions are fully covered with funds from operations."

124.    In the summer of 2015, Holdings I continued to use investors' money to pay distributions. On August 10, 2015, the third-party fund administrator transferred $8.7 million of new investor capital into Holdings' investment account. The following month, GPB Capital caused Holdings I to transfer nearly $700,000 of that new investor capital from its investment account to its distribution account, used to make the monthly payments to investors.

125.    Gentile was fully aware of and approved these transactions. In October 2015, a GPB Capital employee emailed Gentile and CFO-1 to get approval to move cash from Holdings' investment account to the distribution account.

126.    In the next calendar year, May 2016, Holdings issued a second amended PPM. For the first time, this new PPM stated that "we could include LPs' invested capital in amounts we distribute to LPs," but also stated, "we have no present plans to do so." This new statement was false and misleading. As Gentile and Schneider well knew, Holdings I already had used investor capital to pay distributions, and falsified financial statements to cover it up.

127.    And, notwithstanding its assertion of no "present plans," the Fund continued to pay distributions using investor capital. Between July and September 2016, Holdings I lost more than $1.5 million. Despite that, Gentile continued to direct and approve monthly distributions. Holdings I paid nearly $4 million in distributions during the third quarter. Holdings I's quarterly coverage ratio came in at negative 38%, meaning that every single dollar distributed to investors during those three months came from investor capital rather than operations.

128.    The fourth quarter of 2016 was even worse. Holdings I recorded positive net investment income of nearly $1.4 million, but also realized a loss of more than $3.6 million in connection with an asset sale. Holdings I continued to use investor funds to make monthly distributions, which totaled more than $3.9 million and led to a coverage ratio of negative 57%.

129.    For full-year 2016, Holdings I booked net investment income of $8.4 million, realized a loss of $3.6 million, and paid distributions of more than $15.8 million, resulting in an annual coverage ratio of 30%. In other words, more than two of every three dollars Holdings I distributed to investors in 2016 came directly from investor capital.

130.    In December 2016, Holdings I issued a third amended PPM, which repeated the phrase that had first appeared in May: "While we have no present plans to do so, we could include LPs' invested capital in amounts we distribute to LPs." This statement was false and misleading.

131.     Holdings I had been paying distributions mostly out of invested capital for the preceding six months, and would continue to do so for at least the next three quarters.

132.     By the end of 2017, the cumulative amount of distributions funded by investors' own capital exceeded $20 million. The repeated statements that Holdings I's distributions were fully funded by operational income, and that there were no "present plans" to use investor capital to make distributions, were false and misleading.

### b.  <u>Automotive</u>

133.     GPB and Selling Defendants repeated the scheme with the Automotive Fund, GPB's second fund, which was launched in May 2013 – only two months after Holdings I. Automotive was focused on the acquisition, operation and resale of retail car dealerships, relying heavily (at least initially) on Lash's existing dealership portfolio.

134.     As it had for Holdings I, GPB and Selling Defendants marketed Automotive to investors as a reliable, income-generating investment. In February 2014, GPB Capital issued an amended PPM for Automotive that stated: "At the core of the GPB strategy is the provision that all distributions paid to limited partners will be fully covered by funds from the portfolio company's operations."

135.     But as the year went on, GPB Capital and Ascendant personnel repeatedly noted in internal emails that Automotive's distributions exceeded income from the portfolio companies.

136.     In July 2015, the CFO reviewed the monthly management report and wrote: "█████ ████████████████████████████████████ In September, GPB Capital's Director of Fund Accounting confirmed to the CFO that Automotive was "████████ █████████████████████████████████ The CFO forwarded the email to Ascendant's then–Chief Operating Officer, saying, "███████████████ ██████████████████████████"

137.    In October, the Director of Fund Accounting emailed Gentile directly, making clear that Automotive had used more than $500,000 from its investment account to pay investor distributions for the preceding two months. He also sought Gentile's approval to repeat the transfer to cover the October distribution.

138.    Nonetheless, the false statements continued. In January 2016, an Ascendant sales representative emailed an investment adviser firm and insisted that Automotive's distributions were solely from operating profits: ███████████████████████████████████████ ████████████████████████████████████████████████████████."

139.    This was untrue. Automotive recorded a fourth quarter 2015 coverage ratio of only 34%. Measured from the inception of the fund, Automotive's coverage ratio had fallen to 80% as of year-end 2015, meaning that one of every five dollars distributed to limited partners had come from investor capital rather than profits from operations.

140.    Even the 80% coverage rate was inflated. As GPB and Selling Defendants had done for Holdings I in 2014, Automotive's 2015 numbers were inflated by a manufactured performance guaranty from Lash. Like the earlier guaranty, this was a document created after-the-fact to generate artificial earnings to ██████████████████████████████████████████████" as one GPB Capital employee described it.

141.    In March 2016, GPB Capital's Director of Automotive Strategy emailed a large group, including Gentile and Schneider, summarizing "████████████████████████████████ ████████████████████████." The email proposed increasing Automotive's 2015 net investment income by $1,050,000 in order to "█████████████████ for the year.

142.     Initially, GPB Defendants intended to inflate the fund's net investment income figure by reducing fund expenses. An early draft of the Fund's 2015 financial statements said that GPB Capital (by Gentile) had "agreed to refund $1,050,000" in management fees to Automotive.

143.     But by late April 2016, Defendants scrapped that plan and decided to increase net investment income by padding Automotive's top-line earnings. As the CFO wrote in an email, the management fee refund "████████████████████████████████████████ ████████████████████████████" Although the Automotive performance guaranty was first conceived of in April 2016 and was not signed by Lash until early May 2016, it was back-dated as of January 1, 2015.

144.     Automotive's 2015 financial statements, released in May 2016, stated:

> In some cases the Partnership has agreements in place with the operating partners to guarantee a certain amount of income at the dealership level for a specified amount of time. For the year ended December 31, 2015, $1,050,000 was earned by the Partnership and is included in income receivable from investments on the balance sheet. The $1,050,000 was collected in April 2016.

145.     This statement was materially misleading. The performance guaranty was not in place during 2015 (it was manufactured after the fact) and it was never paid in full. In December 2016, Automotive wrote off a related receivable of $515,808 from Country Motors II, the Lash dealership whose performance purportedly was being guaranteed.

146.     Even had the performance guaranty been paid in full, Automotive's coverage ratio would have been no better than 71% for full-year 2015, and only 80% inception-to-date. Without the artificial boost provided by the performance guaranty, the Fund's inception-to-date coverage ratio at the end of 2015 would have been 61%.

147.     Nevertheless, GPB and Selling Defendants continued to falsely assure investors that the distributions were funded from operations. For instance, an Ascendant representative

emailed a broker-dealer firm in April 2016, falsely stating that Automotive's distributions were

"███████."

148.    In June 2016, Automotive amended its PPM, stating for the first time that the fund reserved the "right to return Capital Contributions to LPs as part of our distributions," but adding that it had "no present plans to do so." This statement was false and misleading. At the time the PPM was issued, Automotive had used over $2 million of investor capital to pay distributions.

149.    In December 2016, Automotive issued yet another amended PPM, and repeated the representation that the fund had "no present plans" to use investor capital to fund investor distributions. This statement was still false and misleading. Automotive's own 2016 financial reports show that for the full year the fund made $14.3 million in distributions to investors while recording only $5.4 million of net investment income. Its coverage ratio for the full year was only 35%. In other words, at the moment that Automotive was assuring investors it had "no present plans" to include investor capital in its monthly distributions, more than $9 million – nearly two of every three dollars distributed to limited partners over the previous twelve months – had come from investors' capital. GPB Capital's then–CFO Kgil,[3] stated in sworn testimony that the December 2016 PPM language was not accurate.

150.    The scheme continued into 2017. In March 2017, Kgil emailed Gentile and Schneider, stating that the inception-to-date coverage ratio for Automotive had fallen below 50%. That month, GPB Capital directed Automotive to use more than $500,000 of new investor capital to pay the monthly distribution to existing investors.

151.    Similarly, on July 11, 2017, Automotive received approximately $11.5 million of new investor capital. Within two days, GPB Capital caused Automotive to immediately transfer

---

[3] Macrina Kgil served as CFO of GPB Capital from September 2016 to July 2018.

more than $2.3 million of that new investor capital from the Fund's investment account to its distribution account in order to make the monthly distribution to existing investors, which was paid on July 15, 2017.

152.    An agenda for a GPB Capital leadership meeting that same month contained a talking point under Schneider's name noting that coverage for Automotive had declined to "20% fund to date." In November 2017, Kgil emailed Schneider and Gentile with an update that Automotive's cumulative coverage deficit – *i.e.,* the amount of investor capital used to pay distributions – had reached at least ▓▓▓▓▓▓▓▓▓

153.    In April 2018, Automotive issued its fourth amended PPM, which again falsely stated that "we do not presently have plans" to return investor capital as part of fund distributions.

154.    By August 2018, Automotive's coverage deficit had grown to more than $60 million. Every investor dollar fraudulently returned as a distribution permanently damaged the fund's long-term returns. As the new Director of Fund Accounting told Gentile in an email that month, using investor capital to pay distributions "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"

155.    Automotive's representation that it had made a "special distribution of 0.5% of gross capital (in December 2013), a 0.5% special distribution in June 2014, a special distribution of 3% in December 2014 and have declared a 1.5% special distribution for April 2015" were patently false and misleading.  Similarly, a 2016 "Offering Overview" brochure that the General Partner distributed for Holdings II, advertising a "Total Projected Annual Return" of "15%+" was similarly false and misleading.

156.    Indeed, it was impossible for Automotive (and Holdings I and II) to distribute dividends to investors from operations, as promised in the PPMs, because Automotive (as well as

Holdings I and Holdings II) did not have enough operational income to afford such distributions after expenses and all related-party payments were made.

157. Similarly, in 2015, the General Partner used at least ██████ in new investor capital to pay distributions to Automotive investors, in 2016 the General Partner used ██████ in new investor capital to pay distributions to existing Automotive investors, and in 2017, the General Partner used ██████ in new investor capital to pay distributions to existing Automotive investors, as net income from operations was insufficient to make such payments in each of those respective years.

**Distributions Paid from Automotive Investor Capital**

| YEAR | Total | Class A | Class A-1 | Class B | Class B-1 |
|------|-------|---------|-----------|---------|-----------|
| 2015 | (████ | ████ | ███ | ████ | ███ |
| 2016 | ████ | ████ | ███ | ███ | ██ |
| 2017 | ████ | ███ | ████ | ██ | ████ |

158. By affirmatively misrepresenting and omitting the actual source of the distributions, and the various accounting schemes used to cover up the shortfall, the GPB and Selling Defendants concealed the fraud.

### c. <u>Holdings II</u>

159. In April 2015, GPB Capital and Ascendant began to fraudulently market a new, larger fund called Holdings II, which shared the name and multi-sector strategy of its Holdings predecessor. Part of the marketing effort was to falsely tell potential investors that the first Holdings fund had paid all distributions out of operating income.

160. These false and misleading statements began at the very time Defendants were aware of, and concealing, that Holdings had been using investor capital to pay distributions (leading to the May 2015 falsified financial statement for Holdings). For instance, a May 2015 due diligence response for Holdings II untruthfully said: "██████████████

█████████████████████████████████████████████████████" A July 2015 due

diligence questionnaire response for Holdings II falsely claimed that "████████████████

████████████████████████████████████████████████████████████████████"

161.    The April 2015 PPM for Holdings II – presaging similar language that would later

appear in amended PPMs for Holdings and Automotive – said that "presently" the fund had no

plans to make distributions using investor capital:

> We will make cash distributions when determined by GPB in its discretion. . . .
> GPB intends for us to make distributions of cash, if any, to the LPs. . . at annual
> return rates targeted to be 8% of LPs' gross Capital Contributions (though
> distributions could be more, less or none at all, depending on our cash flow. . . .
> We reserve the right to return Capital Contributions to LPs as part of our
> distributions, though we do not presently have plans to do so.

162.    This statement about "not presently hav[ing] plans to do so" was false and

misleading, as Holdings II's predecessor fund – on which it was closely modeled – was already

repeatedly making distributions with investor capital.

163.    In other investor documents and marketing communications, GPB Capital

promised unequivocally that all Holdings II distributions to investors would be "fully" funded by

operations income. For example, an April 2015 response to a due diligence questionnaire asserted

that Holdings II would seek to pay 8% annualized monthly distributions, plus special distributions,

and that "[a]ll distributions will be fully covered with funds from operations." Likewise, an April

2016 Ascendant email to a broker-dealer firm described Holdings II's distributions as "████████

██████"

164.    But as was true for Holdings I and Automotive, Holdings II used investor capital to

pay dividends. An April 2016 special distribution of 1.5% caused Holdings II's second quarter

2016 coverage ratio to fall to less than 50%, and the Fund's inception-to-date coverage to slip

below 100%, only a year after accepting its first investors. Still, the April 2016 amended PPM

falsely repeated that Holdings II "did not presently have plans" to use investor capital to pay distributions.

165.    By the fourth quarter of 2016, Holdings II was below 100% coverage whether measured by quarter, year, or inception to date. Once again, however, an amended PPM released in December 2016 falsely and misleadingly asserted there were no "plans" to pay distributions out of investor capital.

166.    In 2017, as Holdings II's performance steadily declined, GPB Capital and Ascendant continued to misrepresent the source of fund distributions. At the end of April 2017, Kgil warned Gentile and Schneider that the fund's coverage ratio for first quarter 2017 was only 27%. That same month, GPB Capital directed Holdings II to use more than $1.6 million in new investor capital to pay distributions to existing investors.

167.    For example, by 2015, the General Partner had used at least ████████ in new investor capital to pay distribution to existing Holdings II investors, in 2016 the General Partner used ████████ in new investor capital to pay distributions to existing Holdings II investors, and in 2017, the General Partner used ████████ in new investor capital to pay distributions to existing Holdings II investors, as net income from operations was insufficient to make such payments in each of those respective years.

**Distributions paid from Holdings II Investor Capital**

| YEAR | Total | Class A | Class B |
|------|-------|---------|---------|
| 2015 | ████ | ████ | ████ |
| 2016 | ████ | ████ | |
| 1/1/2017 - 9/30/2017 | ████ | ████ | |

168.    Yet, in a May 2017 due diligence presentation, GPB Capital and Ascendant falsely claimed that distributions were "based off cash flows from portfolio companies." From May

through at least July 2017, Ascendant representatives continued to falsely state that distributions to Holdings II investors were "fully covered from funds from operations."

169.    In November 2017, Kgil sent Gentile and Schneider a chart illustrating the continued decline in Holdings II's coverage ratio and showed that Holdings II's coverage ratio had been well below 100% throughout the first three quarters of 2017.

170.    By the end of 2017, Holdings II's coverage ratio was 72% for the year, and 78% for the life of the Fund. At this point, GPB Capital had caused Holdings II to use more than $7.7 million of investor capital to pay distributions.

171.    In April and May 2018, as Holdings II continued to hemorrhage money, GPB Capital and Ascendant produced and distributed investor presentations disclosing that the Fund's distributions could include invested capital, and that doing so "may negatively impact the value of the portfolio's investments."

172.    Even this disclosure was materially misleading, because it failed to disclose that by the end of first quarter 2018, Holdings II had already used more than $21 million of investor capital to pay distributions. In addition, although the marketing deck disclosed that the Fund's coverage ratio from inception through year-end 2016 was 94.48%, it misleadingly omitted the material information that the Fund's coverage ratio had worsened significantly thereafter. Holdings II's inception-to-date coverage ratio stood at only 53% by the end of first quarter 2018.

173.    Holdings II issued a fourth amended PPM in July 2018, acknowledging to all investors for the first time that: "amounts that we distribute to LPs have been and may in future include LPs' invested capital, and have been and may in the future not be entirely comprised of income generated by the Portfolio Companies."

### d. **Waste Management**

174.    In August 2016, just as Holdings, Holdings II, and Automotive were using large amounts of investor capital to pay distributions, GPB Capital rolled out yet another new fund, Waste Management. Waste Management focused on acquiring and operating private carting companies and recycling and waste processing plants.

175.    Once again, GPB and Selling Defendants advertised monthly distributions of 8% "based off cash flow from portfolio companies." They scheduled a large 1.5% special distribution for those who invested early, acknowledging internally that "obviously the special distributions are key to the raise efforts."

176.    Waste Management's initial PPM recited the by then standard language that the fund "reserve[d] the right to return Capital Contributions to LPs as part of our distributions, though we do not presently have plans to do so." This statement was false and misleading. GPB and Selling Defendants knew full well that Waste Management's sister funds were already repeatedly making distributions that included investor capital and that they were misleading investors about the source of distributions. Waste Management employed a nearly identical business model.

177.    Indeed, Waste Management fell behind on its coverage ratio right out of the gate. Yet, GPB and Selling Defendants nonetheless falsely marketed Waste Management's distributions as fully covered.

178.    In May 2017, Ascendant's Executive Director asked GPB Capital's then–Director of Fund Accounting for an estimate of Waste Management's coverage ratio. The Director of Fund Accounting replied, "███████████████████████████ Ascendant's Executive Director responded, "███████████████

179.    By the end of second quarter 2017, Waste Management had an inception-to-date coverage ratio of only 62%. By the end of 2017, the fund's coverage ratio had fallen below 50%.

Nevertheless, as late as October 2017, Ascendant continued to falsely claim that Waste Management's monthly distributions had been "fully covered with funds from operations since inception."

180.    In first quarter 2018, Waste Management actually lost money, but continued to make monthly distributions nonetheless, bringing its cumulative coverage deficit to more than $4.7 million. Waste Management issued an amended PPM in April 2018, in which it repeated the false and misleading assurance that it "d[id] not presently have plans" to include investor funds in its distributions.

### 3.    The GPB Defendants Engaged in Accounting Fraud

181.    As described throughout, GPB first overpaid for its portfolio companies, inflating their value using knowingly unrealistic management projections, and then, when the portfolio companies were not as profitable as forecast—and they never were—GPB engaged in related party transactions and high advance sales and management commissions, further depleting the Funds.

182.    In order to conceal this scheme, GPB and its Funds engaged in significant accounting fraud, flouting GAAP standards, documenting sham interfund transfers and phony personal guarantees, and failing to document many fraudulent transactions entirely. This collective papering-over of the facts allowed GPB's true business model to go undetected for years.

183.    Without this accounting fraud, GPB's scheme could not have succeeded or continued. Overstating the financial results of GPB and its Funds gave them the appearance of profitability, financial success, and viability while hiding its operating companies' poor performance and GPB Defendants' embezzlement of funds. Engaging in sham related party transactions and executing fictitious personal guarantees allowed GPB and its Funds to falsely prop up the value of their assets and conceal their income shortfall.

### a.    GPB Capital Engages in Sham, Often Undocumented Interfund Loans

184. In 2013 through mid-2016, GPB Capital moved money between the GPB Funds through a series of undisclosed (and at times wholly undocumented) interfund loans that exaggerated the strength of the "borrowing" funds.

185. The existence of interfund loans was material to investors. For example, due diligence firms repeatedly asked about them. When challenged, Defendants falsely stated that they would discontinue the practice, but instead made even larger interfund loans.

186. GPB investors were not told about the interfund loans until 2016. Before 2016, none of the PPMs for the GPB Funds disclosed that Defendants would make interfund loans. For example, in Automotive's February 2014 PPM, GPB Capital told investors that the investment objective of the fund was to "identify assets ("Assets") of auto dealerships ("Dealerships") to acquire, profitably operate and then resell for gains." GPB Capital also told investors that any distributions paid to investors would come from "cash flow we have received from Dealerships." Nothing in that PPM told investors that their money would be used to make loans to other GPB funds to acquire companies in unrelated sectors.

187. Several PPMs affirmatively stated that the funds would not engage in related-party transactions without the approval of an independent Advisory Committee. With respect to interfund loans, this was false. Between September 2013 and November 2015, GPB Capital caused the GPB Funds to make at least 20 interfund loans (some of which were undocumented) in amounts ranging from $12,000 to $25 million, for periods from one day to several months. Upon information and belief, none of these transactions were approved by the Advisory Committee.

188. The harm of undisclosed loans to investors is illustrated by a fraudulent set of transactions in March and April 2015. On March 30, 2015, Automotive had only $7,927,605.59 in its investment account. The next day, March 31, 2015, Holdings sent $1,456,040 to Automotive,

bringing Automotive's balance to just over $9 million. There was no loan agreement related to this transaction. Then, the very next day, April 1, 2015, Automotive loaned $9 million to Holdings – a loan that included the money that Holdings had secretly sent to Automotive just the day before. As Holdings then duly paid interest to Automotive on that $9 million loan, Holdings' investors were paying interest on their own money.

189.    Beginning in mid-2015, GPB Capital and Ascendant were questioned about interfund loans by broker-dealers and due diligence firms. For example, on June 1, 2015, responding to apparent concerns raised by a broker-dealer about interfund loans, GPB Capital's Chief Operating Officer sent a letter to the broker-dealer stating: "This letter serves as notice that GPB Capital Holdings, LLC will not make any intra-fund [sic] loans between affiliated entities as of the date of this memo." Ascendant gave similar oral representations to a third-party diligence firm that was copied on the June 1, 2015 letter.

190.    A few months later, in October 2015, Ascendant's newly hired Director of Capital Markets sent Schneider an email expressing concerns about the use of interfund loans at GPB Capital. He wrote that such loans could be ███████████████████████" and might "███████ ████████████" He stated that in his personal experience, many prominent BDs would not agree to market investment products that ██████████████████████████

191.    Schneider and Gentile, however, dismissed the Director of Capital Market's email. Schneider waited three days to send the email to Gentile, doing so with a quick note: ██████████ ██████████████████" Gentile wrote back: "███████████████████████████." Schneider replied: ██████

192.    Despite the representations that it had made and despite the internal warnings, on October 22, 2015, GPB Capital executed an additional series of interfund loans. First, GPB Capital

45

transferred $25 million from Automotive to Holdings. Upon information and belief, this transfer was made without any loan documentation between Automotive and Holdings. The same day, Holdings transferred $25 million to Holdings II in another undocumented transaction.

193.    Shortly thereafter, GPB Capital caused Holdings II to invest in three portfolio holding companies using roughly $24.2 million of the $25 million it had borrowed from sister funds in undocumented transactions.

194.    All told, between 2013 and early 2016, GPB Capital moved over $65 million around the various GPB Funds without disclosing the practice to investors, and, at times, without any written agreements.

195.    In March 2016, Holdings II first disclosed interfund loans its First Amended PPM. In June 2016, Automotive disclosed the practice to its investors. It was not until December 2016 that Holdings disclosed the practice to its investors.

### b. Gentile and GPB Capital Cause Funds to Execute Unwarranted Guarantees and Incur Baseless Liabilities

196.    Despite the influx of unwarranted interest from the fraudulently made loans described above, Borrower ended up sustaining heavy operating losses. In the fifteen months between May 2015 and August 2016, Borrower reported more than $5.3 million in losses, most of which consisted of fees, commissions and expenses for GPBAIF. Because Gentile held a 100% membership interest in Borrower's profit and loss, these losses represented a significant personal liability for him.

197.    Borrower's losses also created a potential tax liability for GPBAIF and its investors. If Borrower were unable to make its interest payments on the loans from GPBAIF, those loans could be considered an equity investment by GPBAIF, which would necessitate imposing a 30% withholding tax on GPBAIF investors.

198. To avoid these consequences, Gentile executed a guaranty dated as of December 2015 that had GPB Capital both guarantee any losses by Borrower and provide cash infusions to Borrower.

199. Then, in August 2016, Gentile and GPB Capital offloaded most of Borrower's losses onto the books of Automotive and Holdings. Borrower effectively was dissolved and replaced by a new offshore entity called GPB Automotive Income Sub-Fund ("Sub-Fund"). The existing loans from Borrower to Automotive and the Holdings subsidiary were retired; in their place, Automotive and Holdings entered into new promissory notes with Sub-Fund.

200. A critical and fraudulent feature of the new promissory notes was that they increased the amount of aggregate principal to be repaid by more than $4.8 million – from $17 million to nearly $22 million – with no legitimate justification. A subsequent memorandum by the auditors for the Automotive and Holdings funds summarized the effect of the restructuring as follows ("Fund Expenses" here refers to GPBAIF's organizational and operational expenses as well as sales commissions and fees):

201. Neither Automotive nor Holdings – nor any of their investors – received any net benefit from this restructuring. Neither fund received any supplemental infusion of capital in exchange for assuming significant additional repayment liability. The restructured notes did lower the interest rate from 13.5% to 8.75%, and established a fixed 4-year maturity date, but any reduction in interest expenses was dwarfed by the increase in principal.

202. A senior executive at the Cayman Islands–based administrator, registrar and transfer agent for GPBAIF and Sub-Fund questioned executives at GPB Capital over email: ███

███████████████████████████████████████████████████



203.     In a July 26, 2016 email to GPB Capital's CFO-1, the same senior executive asked pointedly about ████████████████████████████████████████████ ████ that had been – and should have continued to be – guaranteed by Gentile. When CFO-1 raised the issue internally, GPB Capital's Chief Compliance Officer wrote "████████████████ ████████████████████████████████████."

204.     Gentile and GPB Capital went ahead with the restructuring nevertheless, and the final restructured notes included even more injurious terms. For instance, the restructured notes obligated Automotive and Holdings to pay for all of GPBAIF's and Sub-Fund's future organizational and operational expenses, including sales commissions and fees payable in part to Schneider and Ascendant.

205.     Worse, Gentile and GPB Capital directed Automotive and Holdings to enter into a side agreement that required those two funds to pay an additional "Arranger Fee." The side agreement provided that, upon maturity of the restructured notes, Automotive and Holdings would be obligated to "pay to [GPB Capital] (or its designee) an arranger fee in an amount equal to one half of the gross realized profits, if any, that such [] Fund achieved attributable to the proceeds of such [] Fund's Notes."

206.     All told, Gentile's and GPB Capital's misappropriations and breaches of fiduciary duty with respect to the original and restructured notes cost Automotive and Holdings at least $14 million ($4.8 million in the restructuring, and more than $9 million in unnecessary interest payments over the life of the loans and notes), before even accounting for the additional expenses and arranger's fees.

### c. Gentile and GPB Capital Caused the Funds to Borrow Unneeded Funds at High Interest Rates to Gentile and Schneider's Profit

207.    In addition to making fraudulent misrepresentations about distributions to new and existing investors, as discussed below, Gentile and GPB Capital misappropriated assets from Automotive and Holdings I and II – allowed them to:  (a) borrow millions of dollars unnecessarily from a Gentile-owned entity at a marked-up interest rate, and (b) having Funds assume that entity's liabilities to protect that entity and Gentile from incurring losses.

208.    Gentile and GPB Capital created two new entities in 2015: (1) an offshore investment fund called GPB Automotive Income Fund ("GPBAIF"), and (2) a Delaware corporation called GPB Borrower, LLC ("Borrower"). Both GPBAIF and Borrower were managed by GPB Capital – and therefore were controlled by Gentile. Gentile also held a 100% membership interest in Borrower's profits and losses.

209.    GPBAIF raised money from non-U.S. investors by advertising an 8.25% return "through investment in income-producing, retail automotive assets." GPBAIF did not, however, invest directly in auto dealerships. Nor did it act as a feeder fund for the existing Automotive or Holdings funds. Instead, GPBAIF simply loaned money to Borrower at an interest rate of 8.25%. To be able to pay the interest to GPBAIF, Borrower, in turn, loaned money to the Automotive and Holdings funds.

210.    But in making those loans, Borrower marked-up the interest rate to 13.5%.

211.    In addition, upon information and belief, there was no valid business purpose for Automotive and Holdings to borrow the money at all. In October 2015, for instance, Automotive had approximately $70 million in un-deployed investor capital, and had no apparent need to borrow any additional funds, much less loans that had been marked up by Gentile. Indeed, as

discussed below, GPB Capital was at this very time using Automotive's un-deployed capital to make undisclosed loans to other GPB funds.

212.    Nevertheless, Gentile and GPB Capital directed Automotive to borrow $12 million from Borrower in October 2015, causing Automotive to incur an unnecessary interest obligation of approximately $1.6 million per year. Gentile and GPB Capital then directed a subsidiary of the Holdings fund to borrow an additional $5 million from Borrower in December 2015, creating another unnecessary interest obligation of $675,000 per year. These unnecessary loans and the marked-up interest on them directly contributed to the coverage shortfalls in both funds.

213.    Others benefitted at the expense of the investors in Automotive and Holdings. Non-U.S. investors in GPBAIF, for instance, were promised a substantial 8.25% return but – unlike investors in Automotive and Holdings – paid no upfront fees. The new Borrower entity reimbursed GPBAIF for every penny of its organizational and operational expenses.

214.    Schneider and Ascendant also benefitted from the fraud. Upon information and belief, they earned commissions on every investment into the GPBAIF.

### d.    Gentile, Schneider, and Lash Embezzle F&I Income through a Shell Company

215.    Schneider, Gentile, and Lash unlawfully misappropriated portfolio company earnings from 2014 to 2016.

216.    The instrumentality of this diversion was a shell company called LSG Auto Wholesale, LLC ("LSG") – named for Lash, Schneider and Gentile, its primary beneficiaries. LSG was formed on April 9, 2014 as a Delaware limited liability holding company. It had only three corporate members: (1) Jachirijo, LLC ("Jachirijo"), controlled by Gentile; (2) GPB Lender, LLC, also controlled by Gentile, and (3) EMDYKYCOL, Inc., a now-dissolved Florida corporation owned by Lash. The existence of LSG and the payments through it were a secret even to Kgil, its

current Chief Operations Officer and former auditors. All of them testified that they had been unaware of LSG's existence until after it was disclosed in a counterclaim filed against GPB Capital in 2018.

217.    Retail automobile dealerships make money not only from the sale of automobiles, but also from the sale of extended warranties, service contracts, credit insurance and guaranteed asset protection insurance – collectively known in the industry as financial and insurance products or "F&I." F&I income can represent a significant portion of a dealer profit. In a due diligence presentation in March 2017, GPB Capital stated that F&I sales represented 27% of the gross profits of the automotive assets of the Automotive and Holdings Funds in the third quarter of 2016. GPB Capital and its valuation experts classified F&I income as an asset when valuing the dealerships within the GPB Funds.

218.    Defendants Gentile, Lash and Schneider misappropriated F&I monies from two groups of car dealerships: (1) nearly $500,000 from dealerships owned by an operating partner ("Non-Party Manager") who was, for a time, the co-manager (with Lash) of GPB Capital's Automotive Retail unit; and (2) more than $830,000 dollars from a dealership owned by Lash. At Non-Party Manager's dealerships, Defendants routed the misappropriated funds through two intermediate holding companies. These two companies, in turn, paid the F&I profits to LSG from where it went on to Gentile, Lash, and Schneider.

219.    These Defendants carefully tracked the cash they diverted from the Non-Party Manager dealerships. The affected dealerships prepared monthly accounting statements listing the F&I products sold and the amount of profit that would be sent to LSG.

220.    As shown in the statement above, during this time period, Gentile, Lash and Schneider received almost $500,000 in F&I profits from Non-Party Manager's dealerships.

221.    Gentile, Lash, and Schneider used the same scheme at one of Lash's dealerships – Bob's Buick – to divert an additional nearly one million dollars from 2014 to 2017. As they had at Non-Party Manager's dealerships, they funneled F&I profits to LSG. From LSG, the diverted monies were then transferred to Gentile, Lash, and Schneider either directly or through companies that these Defendants controlled or in which they had interests.

222.    Upon information and belief, there is no record that LSG provided genuine goods or services to the dealerships. The monies were simply misappropriated from the investors in Automotive and the Holdings Funds. And the diversions were, of course, not disclosed to investors.

223.    All told, through this scheme Gentile received more than $525,000, Lash received nearly $435,000, and Schneider received more than $360,000 – for a total of over $1.3 million. In sworn testimony, Gentile called the diversion a "mistake." After coming under regulatory scrutiny in 2018, Gentile made a series of payments to the GPB Funds for the ostensible purpose of refunding amounts that had been misappropriated through LSG.

### e.  Gentile and Schneider Embezzle Funds through Undisclosed Stipends, Fees, and Commissions

224.    Schneider and Gentile together received roughly $1.7 million dollars of undisclosed payments from portfolio companies from 2013 to 2017, some in the form of "stipends" and other styled as "finance management fees." While the PPMs contained some boilerplate language about possible related party compensation, the fact that Schneider and Gentile were actually receiving these payments was not disclosed to investors. To the contrary, when GPB Capital was directly asked in June 2015 about separate compensation for executives, it denied it.

225.    From 2013 through 2016, portfolio companies within the Automotive and Holdings funds collectively paid more than $930,000 in "board stipends" to Gentile through Jachirijo.

During the same time period, Gentile also received nearly $185,000 in additional "stipends" and other fees through Jachirijo Realty Holdings, another limited liability company wholly owned by Gentile.

226.   Schneider was similarly paid board stipends, including through an entity he owned, JS Board Stipend, LLC. In 2015 alone, he was paid stipends of more than $540,000.

227.   On top of that, Gentile and Schneider received nearly $18,000 per month – totaling more than $715,000 over several years – in "finance management fees" from D1 Holdings, LLC, a company within the Holdings corporate structure. Those fees were evenly split between two corporate entities: Jachirijo (owned by Gentile) and JS Board Stipend Account LLC (owned by Schneider).

228.   Investors were not told that Gentile and Schneider received these payments. For example, in the initial PPM for Automotive, neither the board stipends nor the "finance management fees" were included among the various fees described in the "Selling & Company Fees & Expenses" which detailed the fees investors could expect to pay. While certain of the PPMs contained boilerplate language that discussed the possibility that "related parties may ... receive fees or other compensation in connection [with serving as a portfolio company officer or director]," the PPMs did not tell investors that Gentile and Schneider were in fact being paid board stipends and other fees. Failure to inform investors that these fees were actually being paid was false and misleading.

229.   In fact, when questioned about the practice as part of the broker-dealer due diligence process, GPB Capital flatly denied it. Specifically, in June 2015, a third-party due diligence firm asked whether management and executives were collecting fees and other stipends.

In response, GPB Capital falsely responded that management was not receiving any such fees (GPB Capital's responses in lighter text):

230. The third-party due diligence firm repeated GPB Capital's representations that management did not receive separate compensation for managerial assistance in its July 2015 due diligence report, which was made available to the broker-dealer firms selling the GPB Funds.

231. Each of these representations was false because Gentile was in fact receiving such payments. As with the amounts misappropriated through LSG, Gentile later made payments to the GPB Funds that he claimed were intended to reimburse the funds for the board stipends and finance management fees. Gentile made these payments only after coming under regulatory scrutiny.

232. In another scheme to divert money from the Funds to the Defendants, GPB Capital directed the Funds to pay acquisition fees to Axiom, AAS, and Ascendant that, without disclosure to investors, were ultimately funneled to Gentile and Schneider.

233. The PPMs provided no notice that the acquisition fees – which could total up to 2.75% of the cost of the acquisition – were actually being paid to Gentile and Schneider. Initially, the PPMs told investors only that the acquisition fees would be paid to "qualified third parties or affiliates" and did not disclose that those fees were being paid to Axiom or Ascendant. In later years, the disclosure language was modified to inform investors that acquisition fees would be paid to Axiom and Ascendant (as of 2016), and eventually AAS (as of 2018). But investors still were not told that the ultimate recipients of those fees included Gentile and Schneider, neither of whom was a "qualified third party" as represented to investors.

234. Between 2013 and 2018, the Funds paid acquisition fees of roughly $26 million. Axiom was paid more than $10 million in acquisition or "project fees" between 2013 and 2017. Starting in 2017, the broker-dealer activity – and related cash flows – were transferred to AAS, in

which Gentile and Schneider each held a 33.3% stake. In 2017 and 2018 alone, the GPB Funds paid AAS acquisition fees of more than $16.3 million, meaning that Gentile and Schneider each received roughly $5.4 million through acquisition fees in this period. Investors were never told that they were paying Gentile an additional $5.4 million in his capacity as an owner of AAS to perform the same tasks for which he was already compensated as the sole member of GPB Capital.

235. In addition, bank records show that Gentile was indirectly paid acquisition fees even before AAS was formed. Specifically, in a series of transfers beginning in February of 2015, Schneider sent portions of acquisition fees he had received through Axiom to a Chase bank account that was controlled by Gentile under yet a different corporate name. On March 11, 2015, Schneider transferred another $375,000 to a Crescent GP, LLC Chase account controlled by Gentile.

236. On March 26, 2015, GPB Capital wired $701,583 to Axiom "representing a project fee that needs to be paid to Jeff." The next month, on April 14, 2015, Axiom tendered a check payable to Schneider for $500,000. Six days later, Schneider transferred $250,000, half of the "project fee," to the Crescent GP, LLC account controlled by Gentile. Those funds were then transferred to another account controlled by Gentile and his wife.

### f. Gentile, Schneider, and Others Engaged in Improper Conflicted Transactions for their Benefit

237. Gentile, Schneider and others used money from GPB Capital and the GPB Funds to enrich themselves, pay family members, support luxurious lifestyles, and even purchase a Ferrari for Gentile's personal use. GPB Capital made numerous payments to Gentile's wife, both through her law firm and also individually.

238. While GPB Capital represented to investors that its funds would avoid related party transactions, the GPB Funds made repeated payments to individuals and entities closely linked to Gentile, including to one of Gentile's brothers-in-law as manager of the GPB Cold Storage, LP

fund, and to a now-defunct law firm that was owned by Gentile's wife and another brother-in-law ("Family Law Firm"). A third brother-in-law became GPB Capital's initial CFO.

239.    As of March 24, 2017, GPB had paid Family Law Firm at least $194,064 in consulting fees. At the time, Gentile's wife was the 100% owner of the firm. In addition, GPB Capital paid Family Law Firm $12,129 in monthly fees during the course of several months in both 2016 and 2017. On top of paying Gentile's wife as the owner of Family Law Firm, GPB Capital also paid her $91,291 individually as a so-called "payroll expense."

240.    GPB Capital failed to disclose to investors that Family Law Firm, a related party, would perform work for GPB Capital. GPB Capital also failed to disclose to investors that it paid Gentile's wife substantial consulting fees and a salary.

241.    Likewise, GPB Capital and its principals for years incurred expenses without a clear business purpose and for their own personal enrichment.

242.    In particular, both Gentile and Schneider made luxury purchases for their personal use at the expense of the GPB Funds or their portfolio companies. Documents prepared by GPB Capital's former auditors: (1) approximately $47,000 on private jets; (2) $2,500 for Gentile's wife's travel expenses; (3) approximately $58,000 in travel expenses for Jachirijo, a company 100% owned by Gentile; (4) $12,040 in charges for ATV rentals in Florida; and (5) $29,837 for an American Express bill that, the former auditor noted, "includes David's 50th Bday."

243.    In January 2017, in violation of company policy, Gentile created a company, Volaire Management LLC, in order to purchase business aircraft and ultimately hire a flight attendant at a $90,000 annual salary beginning in the summer of 2017. Airfare expenses accrued by Volaire Management for Gentile and other GPB executives were allocated to GPB funds, at

56

times without any explained business purpose. GPB Capital paid Volaire $1.4 million in 2017 and $1.2 million in 2018.

244.     Gentile even used fund assets to buy himself a Ferrari at investors' expense. In November 2014, a Lash dealership that was a Holdings portfolio company purchased a new 2015 Ferrari FF for $355,000. A few weeks later, that dealership sold the Ferrari to another Lash-operated portfolio company doing business as Bob's Buick. Gentile has stated under oath that this Ferrari was his car for his own personal use.

245.     Gentile's brand-new Ferrari, however, was never transferred into his name. Instead, with Gentile driving it, the Ferrari stayed on the books of Bob's Buick. Internal email traffic occasionally discussed whether Gentile would finally pay for it. He never did.

246.     Finally, in 2017, GPB sold the car to someone else for $172,000. Investors in the Holdings fund bore the loss. As one employee wrote to another: "We are looking at a wholesale loss of ($183,000) that will be applied to Bob's Buick GMC wholesale loss for the month of December 2017."

247.     Gentile not only indulged himself at investors' expense, he also apparently gave free rein to abuses by others. In October 2017, a manager in GPB Capital's automotive business wrote to Gentile to stress the need to "clean up" GPB's culture. The manager emphasized that "[t]here can never be broker kickbacks, boats and ATV's taken in by individuals, and incentive moneys paid to individuals (i.e. VW emissions money)."

### 4.     Additional Misrepresentations Involving the Automotive Dealership Operating Companies

#### a.     The Strict Requirements Surrounding the Automobile Dealership Approval Process Are Concealed

248.    The investment thesis for the GPB Investments centralized around the acquisition and ownership of automotive dealerships. However, purchasing an automotive dealership requires a rigorous approval process subject to strict requirements and due diligence by automobile manufacturers.

249.    Every automotive dealership applicant must enter into a franchise agreement with the automobile manufacturer, which specifies the location within a designated market area in which the dealership may sell vehicles and related products and perform approved services.

250.    Manufacturers, however, are reluctant to trust their brand name to unknown investors. Therefore, automobile manufacturers require that franchise applicants have sufficient experience and working capital to operate the dealership before it will approve a franchise application. Manufacturers also require that the dealership owners have a specified dealer principal and an executive or general manager approved by the manufacturer as having the requisite experience and expertise in the automobile dealership industry. A manufacturer is unlikely to approve a franchise owner unless an applicant has developed a sufficient track record in the automobile dealership industry.

251.    Dealerships sold from one owner to another also must go through the same rigorous manufacturer approval process. In the context of a dealership sale, the first step in the approval process requires the seller to deliver a copy of the proposed purchase agreement to the manufacturer. Once the proposed purchase agreement is provided to the manufacturer, the buyer must submit a completed application and any requested diligence directly to the manufacturer. The manufacturer will not approve the sale of the dealership until it is satisfied that it has all requested information and that the information provided satisfies its criteria for franchise ownership. At the end of the manufacturer approval process, the manufacturer provides

notification of the approval or denial of the application directly to both the dealer/seller and its proposed purchaser. This dealership approval process typically takes six months or longer.

252.     The Fund Defendants and the Selling Defendants did not disclose to investors the cumbersome process or lengthy timetable required to obtain manufacturer approvals. Further, the GPB Investments and the General Partner claimed in the PPMs that they had the requisite experience and relationships necessary to actually obtain manufacturer approval even though they knew that the General Partner and the GPB Investments did not have sufficient expertise in the automotive sector to receive manufacturer approval.

### b.     GPB Defendants Seek to Improperly Circumvent Manufacturer Approval Using a Convertible Loan Scheme

253.     The manufacturer approval process also presented a timing problem for the Fund Defendants, as the Fund Defendants promised investors that it would receive distributions from operations within three months of purchasing Units, but they could only obtain control of a dealership's cash flows once the dealership purchase was complete. The approval process, however, would take more time than the 3-month distribution schedule (promised to investors) would allow.

254.     The GPB and Selling Defendants knew about this problem and failed to disclose it when it made its offerings to investors in the GPB Investments.  Rather than disclosing this material risk, these Defendants developed the Convertible Loan Scheme to end-run the manufacturer approval process and allow the General Partner and the Holdings I, Holdings II and Automotive Funds to get access to the dealerships cash flows prior to obtaining actual ownership of the dealerships – which in many instances never happened.

255.     Under the Convertible Loan Scheme, the General Partner or an entity it controlled would enter into a purchase agreement with the dealership owner, whereby the GPB Investments

would pay the seller the purchase price in the form of a forgivable "loan" with a very low interest rate. In exchange, the Funds would obtain control of the dealership and its cash flows, but it would not receive an equity interest. Instead, upon manufacturer approval of the sale of the dealership, the Funds had the right to convert the "loan" into equity in the dealership and the seller's debt on paper would be released. The Funds' management teams would also be paid a management fee and other royalties in exchange for operating the dealership while the manufacturer approval process was still pending.

256. For example, in September 2013, the General Partner loaned $2 million to Defendant Lash—a member of the General Partner's management team—to enable Automotive to purchase 50% of the outstanding stock of Country Motors H, Inc. (doing business as Bob's Buick/GMC of Milford) (the "Milford Dealership"), a dealership owned by Lash. In July 2014, the General Partner loaned an additional $2,088,144 to Lash to similarly enable Automotive to purchase the remaining 50% of the Milford Dealership's outstanding stock. The purchases were made using the Convertible Loan Scheme and the purchase price was deceptively listed as a receivable on Automotive's financial statements.

257. As early as 2015, the GPB and Selling Defendants provided marketing materials to investors that identified the Milford Dealership as an asset that Automotive had acquired even though it had not yet obtained manufacturer approval.

258. In 2014, the General Partner began doing business with Patrick Dibre ("Dibre"), who owned several car dealerships in New York. Dibre claims he agreed to sell six dealerships to GPB Capital for $80 million. On information and belief, the General Partner began to fund the purchase price using the Convertible Loan Scheme to be paid over time. Between 2013 and 2015,

the General Partner advanced $42 million to Dibre for the purchase of certain of his Nissan and Volkswagen dealerships.

259.    As part of the transaction between the General Partner and Dibre, the General Partner received the net cash flows from the dealerships even though it did not yet own any of the dealerships. The General Partner withdrew amounts in excess of the cash flow generated by the dealerships and paid it as a special distribution based on the alleged performance of the dealerships, which was represented to investors as being higher than its actual performance. The General Partner ultimately was unable to complete the transaction to acquire several dealerships from Dibre because it lacked the funds to do so.

260.    On information and belief, the dealerships, typically did not generate the necessary cash flow to make the promised distributions to investors. On several occasions in 2016, the General Partner transferred funds from the GPB Holdings I fund to the Automotive fund to bolster financials and meet the returns promised to Limited Partners. The General Partner falsified financial reports to make the dealerships look more profitable than they were.  Automotive and the General Partner took similar actions in other transactions related to Automotive, Holdings I, and Holdings II.

261.    Effectively, the "Convertible Loan" was a sham that allowed the General Partner to bypass normal manufacturer approval requirements, surreptitiously gain access to dealerships net cash flows, and falsely represent to investors that the GPB Investments had acquired car dealerships. Indeed, in some instances, like Dibre's Nissan dealership, the General Partner and the GPB Investments never actually received manufacturer approval for the dealerships in which it had employed the Convertible Loan Scheme, falsely representing ownership to investors and falsely reporting and using cash flows that did not actually belong to the GPB Investments.

### c. Materially False Statements and Omissions Concerning the Risks Associated with Automobile Dealerships

262.    From 2013 through 2018 for Automotive and from 2015 through 2018 for Holdings II, the Fund Defendants and the Selling Defendants marketed the GPB Investments using false and misleading representations and omissions made in the PPMs presented to potential investors prior to purchasing Units.

263.    In the PPMs, the General Partner touted its ability to purchase and transform auto dealerships into stable, long-term investments. The General Partner stated that it expected to achieve its investment goal through aggressive monitoring and diligence of dealership management that would "isolate underperformance immediately and create an open dialogue on the matter to be sure all involved clearly understand what must be done under such circumstances."

264.    The GPB Investments' strategy was to acquire "income-producing, middle-market private companies with high barriers to entry, high sustainable current cash flow, recession resilient, and proven management teams." The PPMs told investors that the General Partner's target dealerships fit these criteria because—among other reasons, including the industry's resilience to recession—they have defined barriers to entry. In particular, the 2015 PPMs state that dealerships subject to manufacturer approval requirements provided a competitive advantage "that makes it difficult for new entrants."

265.    The General Partner also stated that its equity fund model provided an advantage that could enhance results because it could:

- Aggregate and consolidate Dealerships for reasons of cost-control, efficiency and scaling;
- Implement standard accounting practices across our entire Dealership portfolio;
- Consolidate Dealerships' back-office operations;

- Conduct portfolio-wide board meetings in which all Dealership GMs will be brought together for purposes of strategic coordination, as well as sharing of successful operational strategies;
- Improve the parts and services operations of each Dealership with a focus on bringing margins up to GPB standards and thus increase profit potential; and
- Implement a strong Internet sales operation.

266. The Fund Defendants also acknowledged in their PPMs the foundational requirement of getting manufacturer approval for dealership franchises. The manufacturers' requirement for having a specified dealer principal was one reason for the "fragmented" market that the GPB Investments presented as an opportunity to investors in their PPMs. The Fund Defendants and the Selling Defendants knew that the "fragmented" market reflected high barriers to entry in the dealership market as an equity fund. However, the Fund Defendants and Selling Defendants told potential investors that the car dealership market was a strong opportunity for an equity fund to invest in automobile dealerships when they knew the opposite was true. The General Partner further told investors that it had "overcome this barrier by seeking to partner with automotive industry specialists within their network of long-standing relationships, giving GPB a distinct advantage."

267. In fact, the General Partner "partnered" with Defendant Lash and Dibre—two dealership owners and co-directors of auto-retail for the General Partner—who knew that the GPB Investments were at a distinct **disadvantage** from other market participants because **manufacturers were unlikely to approve an equity fund as owner of an automobile dealership absent a well-established reputation for operating funds**. In fact, the franchising manufacturers refused to approve the General Partner as owner for several of Dibre's dealerships. For example, Nissan expressly declined to permit Dibre from selling his dealerships to the General Partner, characterizing the General Partner as an "unknown equity fund."

63

268.    Based on the experience of Defendant Lash and Dibre, the GPB and Selling Defendants knew that the equity fund model was viewed in the industry as a far riskier model than traditional ownership by a member of the community. The Fund Defendants and the Selling Defendants, therefore, knew that it was all but certain that manufacturers would not grant a franchise or approve an unknown equity fund as an owner on the timetables set forth in their PPM distribution projections. GPB Capital had pressured DiBre to enter what he dubbed "illegal stock sales" of numerous dealerships "in as much as none of the sales had received manufacturer approval."

269.    The GPB and Selling Defendants knew that the PPMs misrepresented the nature of the investment as a legitimate, long-term investment that could feasibly acquire dealership assets. They also provided PPMs with false statements about their intent to acquire automobile dealerships in the long-term to investors in order to conceal the overly risky nature of the investment and that their true motive was siphoning off fees and expenses from capital investments and the dealerships themselves.

270.    To give its investment plan credibility, the General Partner referred investors to news stories in its marketing materials, which reported that George Soros and Warren Buffett were embarking on similar ventures using equity funds to acquire automotive dealerships. By juxtaposing these news stories with its investment proposal, the General Partner intended to create the belief that it shared the credentials of the likes of Soros and Buffett. But according to Lash and Dibre, the General Partner knew that it could not garner the level of credibility needed to convince a manufacturer to approve it as a dealership owner, let alone garner the level of credibility that the likes of Soros and Buffett could.

### d.    GPB and Selling Defendants Bilk Investors Through the Use of Management Fees and Expenses

271.    Moreover, in exchange for its so-called "management" of the Funds and the "day to day operations" of the operating companies, the General Partner paid itself a "managerial assistance fee" consisting of 1.75- 2% per annum on the capital contributions made by the Funds' investors. The General Partner's principals also used the relationships that they made with dealerships to extract management fees for themselves directly from the dealerships. Meanwhile, because the General Partner did not meet the necessary dealership approval requirements to do so, the General Partner did not have control over nor could they manage the day-to-day operations of dealerships. Therefore, they took management fees to which they were not legally entitled.

272.    Under the guise of legitimate fees and expenses, from 2015 through 2017, GPB and Selling Defendants siphoned off a significant percentage of investor capital funds, reportedly paying themselves and affiliates $87.0 million in sales commissions, $20,415,000 in managerial fees, $5,000,000 in acquisition fees, and other unexplained fees, expenses, and interest. In addition, Defendants rewarded themselves with luxury cars, excessive compensation, sweetheart loans, overpayments on related party dealership assets, and waivers of related party financial guarantees—all to the detriment of the investors.

273.    Specifically, in 2015, 2016 and 2017, the General Partner extracted "managerial assistance fees" and/or "management fees" in the amounts of ███████████████████ ████████ from Automobile investors, respectively, and "managerial assistance," "management," and "organizational" fees of ████████████████████ from Holdings II investors, respectively.

274.    Moreover, the amounts and types of expenses were inconsistently reported from one statement to the next, which made them difficult for potential investors to review and compare. From 2015 through most of 2017, the total amount of expenses reported by Automotive and

Holding II, much of which appeared to filter down to Defendants or their affiliates, totaled

████████, and consisted of the following:

|  | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|
| **Holdings II** | ████ | ████ | ████ | ████ |
| **Automotive** |  |  |  |  |

275.     Significantly, GPB and Selling Defendants failed to disclose to investors that the vast majority of the fees, expenses, compensation and benefits on sales, acquisitions, management, and operations were being paid to related parties. Worse yet, none of these payments were reviewed, much less unanimously approved, by an independent committee.

276.     Instead, GPB and Selling Defendants lied to investors by falsely assuring them that all related party payments and transactions would be reviewed by an independent committee called the "Advisory Committee." Investors were misled into believing that the Advisory Committee was to be comprised of three independent members for the purpose of overseeing and reviewing all related party arrangements. Little did investors know that the Advisory Committee did not even exist until January 2019, well after the Funds had hemorrhaged millions of dollars in undisclosed related-party payments.

277.     Not only was this failure to assemble an Advisory Committee contrary to Defendants' disclosures in PPMs to investors, but it was also a material breach of the Limited Partnership Agreements which provide that "[t]he Partnership may not enter into a Related Party Transaction without the approval of all of the members of the Advisory Committee."

278.     Moreover, despite Plaintiff Naylor and DeLuca's multiple requests for minutes of the Advisory Committee and Audit Committee meetings, Defendants have neither produced such minutes nor confirmed that any such meeting minutes exist. Therefore, upon information and

belief, Plaintiffs allege that, GPB Capital also did not have a functioning Audit Committee or Acquisition Committee, further misleading Plaintiffs and the Class concerning the legitimacy of their investments in the GPB Investments.

### e. Lawsuits Emerge Involving GPB's Automobile Dealerships

279. On July 10, 2017, the General Partner—on behalf of Automotive, Holdings I, and Holdings II—filed a lawsuit against Patrick Dibre in the Supreme Court of New York in Nassau County alleging breach of his contractual obligations to the General Partner and its Funds.[4]

280. Among many allegations, GPB Capital alleged that Dibre had implemented improper and manipulative tactics that inflated the historic earnings of the dealerships he sold to GPB Capital. In response, Dibre asserted detailed counterclaims alleging that the General Partner was operating a Ponzi scheme and defrauding the Limited Partners invested in the funds that the General Partner managed (the "Dibre Counterclaims").[5]

281. Dibre alleged that, after GPB Capital took control over Dibre's dealerships (but without having actual ownership), it began implementing policies that negatively impacted the dealerships' financial performance but personally benefitted GPB Capital or its managers, and that GPB Capital began manipulating the financial statements of the dealerships and the GPB Investments to hide their activities. For example, while GPB Capital was only entitled to receive the net cash flows from dealerships under the Convertible Loan Scheme, it overfunded itself from the dealerships by drawing out more than the net cash flows from dealerships in order to entice new investors, and then used that overfunded cash to distribute to investors as a "special distribution," while touting the exceptional performance of the dealerships. At the end of the year,

---

[4] *GPB Capital Holdings, LLC et al. v. Dibre*, Index No. 606417/2017 (N.Y. Sup. Nassau July 20, 2017).

[5] *Id.* at Docket No. 51.

GPB Capital would "invest" the amount of the overfunded money into the dealership for "capital improvements" to cover the deficiency.

282. Defendants Gentile and Schneider recorded the purchase price of dealerships they purchased at several million dollars more than the actual purchase price, including closing expenses and working capital investment, and then directed those additional monies back to themselves, or entities in which they held an interest, as acquisition fees.

283. Gentile and Schneider also created an entity called LSG, to which they directed in excess of $4 million from reinsurance funds and manufacturer rebates that should have been paid to the dealerships, and, ultimately, to Limited Partners. GPB Capital also manipulated financials by taking factory incentives that were earned, but not yet received, and distributed those funds to investors.

284. Despite reporting to investors that the GPB Investments were over-performing, every quarter, none of the GPB Investments produced enough cash from operations to support the distributions being paid to investors, and the cash shortfall was made up for by using cash from investors' new deposits or by borrowing money from other GPB Capital-owned funds. For example, in 2016, Dibre alleged that on several occasions GPB Capital transferred funds from GPB Holdings I to Automotive and *vice versa* in order to bolster returns if one fund was lagging behind. Gentile would also have potential sellers of dealerships increase the purchase price by a certain dollar amount needed to pay back investors, and then take the additional funds as a rebate at closing of the dealership.

285. In 2015, GPB Capital obtained personal guarantees, backdated to 2014, in the amounts of $810,462 and $325,739 so that financial records did not reveal the actual losses. The fraudulent personal guarantees were then repaid by funds from other GPB Capital-owned funds to

show a profit rather than a loss. Likewise, Gentile and Schneider arranged to transfer $1,050,000 from entities they controlled to Automotive in order to show a profit rather than a loss.

286.     GPB Capital also manipulated financials by inflating the value of dealerships to further cover for actual losses. For example, GPB Capital reported that the Nissan of Richmond dealership, which it claimed in its financials to have purchased for $12 million, was valued at $20 million, reflecting an $8 million gain. At the time, however, the Fund Defendants had not yet purchased the dealership, but rather were only in a contract to buy that dealership in the future, and, in fact, the dealership was never actually purchased.

287.     GPB Capital, Gentile, and Schneider also sought to personally benefit from the reinsurance business at Dibre's dealerships. For example, warranty products are typically offered to customers through dealerships, whereby the warranty products are reinsured by the owners to an outside reinsurance company and administered by a third-party administrator. The third-party administrator charges a fee to administer the warranty and the balance of the price paid for the reinsurance product is deposited with the reinsurance company.

288.     Dibre engaged in the reinsurance business prior to doing business with the Fund Defendants. Upon entering into the business relationship with the Fund Defendants, Dibre alleged that Gentile and Schneider wanted to become involved in the reinsurance business but did not want to disclose to investors that they were personally benefitting from it, which would represent a conflict of interest requiring disclosure. Therefore, GBP Capital entered into an arrangement with Dibre whereby new warranties sold by the dealerships were funded into Dibre's reinsurance company, but the funds released after the expiration of the warranty were to be paid for the benefit of GPB Capital.

289.    At times, in order to assist with cash flow, Dibre agreed to advance GPB Capital a portion of the warranty funds that had not yet been paid.  Occasionally, Gentile and Schneider would request Dibre to make warranty fund payments to LSG, a Gentile/Schneider-related company.

290.    In July 2019, David Rosenberg ("Rosenberg") filed a breach of contract lawsuit in Massachusetts state court against GPB Prime Holdings, LLC and Automile Parent Holdings, LLC, entities both controlled by the General Partner (the "Rosenberg Complaint").

291.    Prior to 2017, Rosenberg owned and operated Prime Motor Group ("Prime"), which was at that time one of the largest automotive dealership groups in New England. In 2017, GPB Capital purchased a controlling interest in Prime and asked Rosenberg to oversee all of their automotive dealerships.  The combined portfolio of dealerships began doing business as the Prime Automotive Group ("PAG"), and Rosenberg became CEO of PAG.  PAG was one of GPB Capital's largest investments.

292.    The Rosenberg Complaint alleged that the defendants breached its contract to pay Rosenberg $5.9 million pursuant to the terms of their purchase agreement.  Rosenberg, however, also claimed that the General Partner-owned entities breached their contract in retaliation against Rosenberg after he made efforts to address fraudulent and wrongful conduct by the General Partner and its affiliates.

293.    Specifically, as CEO of PAG, Rosenberg became aware of information and documents evidencing serious financial misconduct by the General Partner with respect to GPB Capital's management of the dealership portfolios it operated, including the GPB Investments, before it acquired an interest in Prime, beginning at least as far back as 2014.

294.     According to Rosenberg, the financial misconduct that he observed included, *inter alia*, (i) the fabrication of revenue through the use of fictitious contracts; (ii) self-dealing transactions on the part of GPB Capital principals, including Defendant Gentile; and (iii) undisclosed related-party transactions that benefitted Defendant Lash. Rosenberg alleged that this financial misconduct took place in order to make it appear to investors that profits from the automotive investments were higher than they actually were, to conceal the fact that investors were receiving distributions directly from investor contributions instead of operating profits, and to misappropriate investor funds for the Fund Defendants' own personal use and/or benefit.

295.     For example, Rosenberg alleged to have seen two contracts titled "Performance Guaranty," which showed that Lash had personally guaranteed the 2014 performance of two Volkswagen dealerships acquired by GPB Capital and that he had personally agreed to pay any deficiency if the dealerships' net profits were below $450,000 and $150,000, respectively.  On March 18, 2015, GPB Capital issued letters addressed to Lash indicating a deficiency and seeking payments totaling $1,136,201. The 2014 year-end financial statements for GPB Holdings I, issued on April 30, 2015, reported that, for the year ending December 31, 2014, approximately $1,100,000 was paid into the dealerships based on the Performance Guaranties with Lash and similar agreements with a different dealer-operator. The Performance Guaranties with Lash, however, were actually a sham, as Lash never actually guaranteed the performance of the dealerships and GPB Capital never expected him to pay the deficiency amounts.  Indeed, most of the purported debt was waived as part of a settlement agreement between GPB Capital and Lash nearly 4 years later.

296.     Rosenberg also saw documents showing that, in April 2016, GPB Capital had used a similar strategy to fabricate over $1 million of net profit for 2015 in order to boost the profits

that GPB Capital could report. Rosenberg claims to have seen documents showing that, as GPB Capital was preparing documents for the 2015 year-end audit, it was, in fact, over $1 million short in revenue. To conceal the shortfall and manufacture profits to cover it, Gentile and other GPB Capital executives fabricated another Performance Guaranty in April 2016, whereby Lash "guaranteed" a certain amount of profit from a certain dealership for 2015, but backdated the agreement to January 1, 2015 to make it appear that it had been in place for the entirety of 2015. Rosenberg alleged that there was no evidence that Lash had paid the guarantee or that he had any intent or ability to pay the guarantee. Lash also told a member of Rosenberg's executive team that the contract was "fictitious" and "was never supposed to be paid back."

297.    In April 2016, GPB Capital had one of its subsidiaries wire $700,000 into an account associated with Lash. The same day that money was deposited, the same Lash account deposited $1,050,000 into an account for one of the GPB Investments. According to the Rosenberg Complaint, the purpose of the money transfer was to provide Lash with most of the funds to pay the fictitious Performance Guaranty.

298.    Rosenberg also witnessed documents evidencing improper "round tripping" by GPB Capital in an effort to inflate revenues. In 2016, the head of a dealership group owned by GPB Holdings I sent a payment of $3.2 million to certain other GPB Investments, but on the very same day, those same GPB Investments sent $2.1 million to the head of that same dealership as "working capital." According to Rosenberg, the purpose of that transaction was to conceal the fact that the dealership group was not truly generating $3.2 million in operating revenue for distribution.

299.    Rosenberg also claims that Defendants Gentile and Lash had funneled nearly $2 million in revenue to entities controlled by them under the guise of, *inter alia*, "management fees."

For example, in 2015, $201,706 was transferred to an entity called Emdykycol, Inc., which is alleged to be owned by Defendants Gentile and Lash, and $201,706 was transferred to Jarhirijo, Inc., an entity owned by Gentile. The Rosenberg Complaint further alleged that dealership funds were siphoned off to LSG Auto Wholesale, an entity named for Defendants Lash, Schneider, and Gentile, and that those payments served no legitimate business purpose, nor were they disclosed to investors.

300. The Rosenberg Complaint further detailed allegations of GPB Capital providing dealership-owned vehicles to third parties, including professional athletes and an investor in the GPB Investments, which served no legitimate business purpose, were not properly accounted for, and attributed costs directly to the dealerships that owned the vehicles. The Rosenberg Complaint further detailed GPB Capital's illegitimate purchase of a Ferrari for $355,000 through one of the GPB Investments' dealerships in December 2014 and alleged that the vehicle was transferred to another GPB Investment dealership and later sold for a loss of $183,000 three years later with only 1,700 miles on the vehicle.

301. Rosenberg also revealed a number of benefits specifically enjoyed by Defendant Lash at the expense of investors, including Plaintiffs. For example, in one instance Lash drew, on a dealership's behalf, an advance of $750,000 that he labelled as a "retention bonus," which was then distributed to himself and several others. In another instance, following the close of a new dealership purchase, Lash and others working on the dealership portfolio in question received approximately $100,000 worth of sporting vehicles and equipment in an alleged kickback arrangement. In addition, Lash and others tied to certain GPB Investment dealerships orchestrated a kickback of $100 per vehicle for every Canadian used car purchase, which Rosenberg alleged to have resulted in thousands of dollars being diverted from investor distributions.

302.    Rosenberg also detailed a number of misrepresentations made by GPB Capital to investors and the efforts made by the Fund Defendants to cover up the financial improprieties.  For example, in September 2018, following Crowe's resignation as auditor (discussed below), GPB Capital and Ascendant representatives falsely reported the circumstances of Crowe's withdrawal, as well as falsely stated that another firm, Stoneturn Group LLC, had completed a full forensic audit of GPB Capital and gave it a clean bill of health. Rosenberg claimed to have demanded that the misstatements be corrected, but no correction had been made.

303.    Rosenberg also revealed that GPB Capital consistently inflated the value of the dealerships in the GPB Funds' quarterly valuations and financial reports by carrying the dealerships at their purchase prices, which, in later years, did not accurately reflect their values. Rosenberg claimed to have consistently reported the information to GPB Capital about the dealerships' true valuation, but GPB Capital refused to adjust the valuations. According to Rosenberg, it was not until June 21, 2019 that GPB Capital was informed by Fidelity Investments that it would no longer carry its investments on its platform, and GPB Capital announced that it was dramatically cutting the valuation of the automotive dealership investments.

304.    In May 2019, Rosenberg was questioned by GPB Capital's auditors, and Rosenberg provided information about the General Partner's financial misconduct.  Rosenberg then received a threatening letter from GPB Capital's outside counsel in an effort to silence him, and GPB Capital began efforts to fire Rosenberg as CEO of PAG.

305.    According to the Rosenberg Complaint, Rosenberg provided GPB Capital with information about the financial misconduct on June 5, 2019 and requested that they take steps to preserve the value of the dealerships, which GPB Capital refused to do.

306.     None of these transactions and improper activities were disclosed to investors, including Plaintiffs, prior to making their investments in the GPB Investments.

**D.     The Funds Close to New Investment**

307.     By August 2017, Kgil circulated a report to senior management, including both Gentile and Schneider, pointing out that each Fund was well below full coverage. In fact, Kgil estimated that over the twelve-month period ending in June 2017 only Holdings II had reported positive net investment income.

308.     She reported that the other three flagship Funds were losing money on their investments – the implication being that those Funds were paying distributions entirely out of investor capital. Kgil included a chart that showed the trailing-twelve-month ("TTM") coverage ratios for Holdings I, Holdings II and Automotive, all of which were far below 100% and steadily getting worse.

309.     In November 2017, Kgil warned Gentile, Schneider and other senior management that the cumulative coverage deficit across the GPB Funds – *i.e.*, the amount of investor capital that had already been used to pay distributions – exceeded $70 million.

310.     By the end of the first quarter 2018, the cumulative coverage deficit for the GPB Funds had grown to nearly $100 million. As GPB Capital's Director of Fund Accounting summarized in a series of charts that he circulated to Gentile and other senior management, every one of the GPB Funds had been using significant and steadily increasing amounts of investor capital to pay distributions (as indicated by the lines tracking each fund's inception-to-date or "ITD" coverage deficit): Holdings I had a deficit of $25 million; Holdings II's deficit was more than $21 million; Waste Management had a nearly $5 million deficit; and Automotive's deficit was closing in on $50 million.

### E.    The Auditor Defendants Provided Substantial Assistance in the GPB Fraud

311.    The GPB and Selling Defendants oft touted that GPB had engaged a stable of independent auditors to audit the Funds' financial statements, value the Funds' operating companies, and marketed this heavily to investors to give the Funds' the appearance of legitimacy.

312.    These Auditor Defendants included (varying from year-to-year): RSM for Holdings II; Crowe for Holdings I and Subsidiaries and Automotive; CohnReznick for Waste Management; Margolin for Automotive, Holdings, Holdings Qualified, and NYC Development; EisnerAmper for Automotive, Holdings, Holdings II, and Holdings Qualified. RSM, Crowe, CohnReznick, Margolin, and EisnerAmper (the "Auditor Defendants") allowed their names and reputations to be used to sell GPB's Funds. Without the participation of Auditor Defendants listed in the PPMs and other sales and marketing material, GPB would not have been able to sell Units in its Funds to Plaintiffs and the other Class Members, particularly given that GPB lacked any substantial track record.

313.    Without the Auditor Defendants, GPB's scheme could not have succeeded or continued. Overstating the financial results of GPB and its Funds gave them the appearance of profitability, financial success, and viability while hiding its Ponzi-like scheme. The Auditor Defendants' participation in the scheme was vital to its perpetuation. By auditing financial statements, issuing clean audit opinions and reporting that they were working on audits for a number of years, and by allowing their names to be used in PPMs and in other investor sales and marketing materials, Auditor Defendants conveyed to investors, including the Class members herein, that their investments were legitimate and that the Funds had met or were meeting their financial reporting obligations.

314.    GPB Capital's knowingly false and misleading statements and omissions were perpetuated by the Auditor Defendants' decisions to ignore GPB Capital's financial data, abysmal

accounting systems, and poor (and in some cases non-existent) record keeping. These issues go well beyond the types of red flags that should cause auditors to take a closer look, or refuse to issue clean audit opinions. Without the Auditor Defendants, GPB Capital and its principals would not have been able to keep the scheme afloat, and thus not able to extract proceeds from Plaintiff and other investors. None of the activities of GPB Capital, Ascendant, Axiom, GPB Funds, and GPB's owners and principals would have been possible without the substantial assistance of Auditor Defendants.

315.     Auditor Defendants knew or were reckless in not knowing that the statements by the GPB entities were false and misleading. More specifically, inter alia, Auditor Defendants knew that it was not possible for GPB's funds to pay out a consistent 8%-12% return given the fact that the Funds were operating at a loss; they knew that Ascendant and Axiom were improperly siphoning off fees; and they knew of the extensive and irreconcilable conflicts of interests that were endemic to the operation and management of GPB's Funds.

316.     Auditor Defendants knew of the conduct by GPB Capital, Ascendant, Axiom, GPB Funds, and GPB's owners and principals, yet distributed documents that perpetuated their false statements, allowed their names to be used to promote the GPB's scheme, and failed to alert the public to those breaches.

317.     Absent this collective papering-over of the facts that revealed the true nature of the GPB business model, GPB Capital, Ascendant, Axiom, GPB Funds, and GPB's owners and principals would not have been able to carry out their fraudulent scheme. As such, the Auditors provided substantial assistance to the GPB entities in their fraudulent conduct.

318.     Each Auditor Defendant owed a duty to Plaintiffs and the other limited partner Class Members to audit GPB's funds' financial statements pursuant to GAAP. Each knew the

name and address of each limited partner of GPB Funds (i.e., Plaintiffs and the other Class Members herein) and consented that their audit and audit opinion be provided to such limited partners. Instead of fulfilling their duties to Class Members, the Auditors prepared clean audit opinions for financials which were materially incorrect, and which were later withdrawn. Auditor Defendants failed to comply with applicable accounting standards and were negligent in preparing their audit opinions.

319.    Auditor Defendants recklessly prepared false and/or misleading audits, while lending their name to the GPB Defendants for use in marketing the offerings to investors. RSM's participation in the fraud was vital to its success. Without its participation, GPB could not have successfully deceived investors and raised $1.8 billion in funding.

### 1.    Auditor Margolin, Winer & Evens Is Liable to GPB Investors

320.    Margolin, Winer & Evens LLP ("Margolin"), is a limited liability partnership with its principal place of business located at 1500 RXR Plaza, Uniondale, New York 11556.  Margolin has been providing accounting, auditing, tax planning, and advisory services since 1946.

321.    Margolin first entered into an engagement letter with Holdings I and Subsidiaries in or around May 2013 for provision of accounting services to GPB.

322.    Margolin served as an independent auditor for Holdings I for fiscal years 2014 and 2015, but was subsequently replaced by Crowe on or around December 12, 2016.

323.    On May 5, 2016, Margolin issued an audit opinion stating that "In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Holdings I as of December 31, 2015, and the results of their operations and their cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America."  This statement was false.  As the foregoing facts

demonstrate, Margolin did not actually believe that Holdings I's financial statements presented a fair picture of GPB's financial position.

324.   Through its audit opinion, Margolin fraudulently induced Plaintiffs and other investors to invest in the Funds based on false or misleading statements in the PPMs, audit opinions, and related documents it issued.

█████   As detailed below, for years, Margolin consistently assured investors that GPB accounts and records were GAAP compliant, when in reality, Margolin was well aware of the mountain of financial reporting deficiencies.  Margolin was motivated by profits to conspire in GPB's fraud. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

### a.   Margolin's General Knowledge of Fraud at GPB

326.   As early as February 11, 2014, Margolin had actual knowledge of GPB deficiencies and hence, the fraudulent scheme orchestrated and carried out by the Fund Defendants. ██

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████ (Bates_115919332_1.)  This is a clear red flag which should have caused Margolin to be wary of rendering its audit opinions, yet it did so despite these concerns.

327.    Margolin auditors were quick to sense a pattern of fraud.  Internally, they referred to GPB's business practices as "illegitimate," "unorthodox," and even "trash."  Nonetheless, they declined to voice their concerns about GBP's financial discrepancies, and thereby directly perpetuated the fraud.

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

        ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

        ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

**b.     Margolin's Knowledge of GPB's Sham Performance Guarantees**

332.     Margolin's cohort of auditors that worked on GPB financials had actual knowledge of GPB's sham guarantees as early as January 4, 2016, but despite such knowledge, Margolin

merely skirted the issue instead of exercising due diligence.  In so doing, Margolin was complicit

in, and directly contributed to, the perpetuation of GPB's bogus performance guarantees.

████    For instance, ███████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

### c.   Margolin's Shoddy Audit Practices

340.   For several years, Margolin was acutely aware that GPB financials did not comport with GAAP requirements, yet did nothing more than express passive curiosity about such financial irregularities.

██.   For instance, on January 21, 2016, Margolin's Gage wrote: ████████████

████████████████████████████████████████████

██████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

354.     Margolin signed its audit opinions in any event, continuously turning a blind eye to the fraud, thereby allowing the harm to investors to compound.

####     d.     Margolin's Knowledge of GPB's Related Party Transactions

████     Margolin knew about GPB's various transactions with related parties, that were either improper or insufficiently disclosed, yet consciously chose to conceal and/or ignore such knowledge.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

357. ████████████████████████████████████████

████████████████████████████████████████████ Thus, by this point, Margolin was well aware and/or consciously avoided knowing that GPB was engaged in shady related party transactions.

### e. Margolin's Knowledge of Investor Reliance

[REDACTED]

**f.      Margolin's Substantial Assistance with the GPB Fraud**

361.    Margolin substantially assisted the Fund Defendants by: (1) actively helping them conceal the fraud; and (2) failing to act when required to do so by: (a) resigning; or (b) staying silent despite glaring red flags, thus enabling the fraud to proceed.

[REDACTED].    Margolin expressly admitted to aiding GPB in its fraudulent scheme on several occasions, but helped conceal the fraud by continuing to sign its name on financial statements, thereby legitimizing GPB business operations.    [REDACTED]

[REDACTED]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

364.     It is of no import whether Margolin's inaction, deceptive accounting practices, and active concealment of the fraud is attributed to the direct pressure it received from GPB,[6] or its own conscious failure to uphold its auditing duties despite consistent red flags; regardless, the outcome is the same: Margolin directly participated in and substantially assisted GPB in furthering its fraudulent scheme, and such assistance proximately caused Plaintiffs financial harm.

365.     As a direct and foreseeable result of Margolin's fraudulent inducement and the aiding and abetting of that fraud, Plaintiffs and other Limited Partners have suffered substantial damages.

**2.   <u>Auditor Crowe Is Liable to GPB Investors</u>**

---

████████████████████████████████████████████████████

366.    Crowe LLP ("Crowe"), is a limited liability partnership with its principal place of business located at 225 West Wacker Drive, Suite 2600, Chicago, Illinois 60606.

367.    Crowe is a public accounting, consulting, and technology firm with offices worldwide. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

368.    Margolin's tenure with GPB was terminated in 2016, at which point Crowe assumed the role as GPB's primary auditor.

369.    On May 1, 2017, Crowe issued an audit opinion stating that "In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GPB Holdings, LP [Holdings I] and Subsidiaries as of December 31, 2016, and the results of their operations and their cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America."  This statement was false.  As the foregoing facts demonstrate, Crowe did not actually believe that GPB Holdings' financial statements presented a fair picture of GPB's financial position.

370.    As early as May 2016, Crowe had actual knowledge and/or consciously avoided knowing about the fraudulent scheme carried out by the Fund Defendants.

371.    In or around the summer of 2018, Crowe ceased its work auditing certain of GPB's companies and informed GPB Capital that it would be unable to provide a clean audit opinion for 2017, and further, that it was withdrawing its previous clean opinions for 2015 and 2016.  Crowe stated that such financial statements should not be relied upon.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**a. Crowe's Knowledge of GPB's Sham Performance Guarantees**

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

**b. Crowe's Negligent Audits**

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

███████████████████████████████████████

████████████████████████████████████████████

**c.  Crowe's Knowledge of Investor Reliance**

385.    Throughout its entire relationship as GPB's auditor, Crowe was well aware that GPB investors would rely on its audit work, yet stood idly on the sidelines.  As a licensed auditor, Crowe knew and/or consciously avoided knowing that the Fund Defendants' financials and accounts were seriously flawed, and that eventually, investors would be harmed by such inaccuracies.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

395.    Despite blatant signs of pervasive fraud at GPB, Crowe consciously ignored and/or covered up the red flags and instead allowed GPB to use its name to legitimize various statements, reports, and other documents laden with accounting discrepancies. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Crowe also signed its name on audit opinions for GPB for fiscal years 2016 and 2017. In its 2016 Audit Opinion, Crowe assured investors, "In our opinion, the consolidated financial statements

referred to above *present fairly*, in *all material respects*, the financial position of GPB Holdings, LP and Subsidiaries as of December 31, 2016, and the results of their operations and their cash flows for the year then ended *in accordance with accounting principles generally accepted* in the United States of America." ((GPB Holdings 2016 Audit Package) (emphases added).) Thus, Crowe knowingly induced and participated in the Fund Defendants' fraudulent scheme by convincing investors that GPB was financially sound.

### d. Crowe's Substantial Assistance

396.     Crowe substantially assisted the Fund Defendants by: (1) actively helping them conceal the fraud; and (2) failing to act when required to do so, thus enabling the fraud to proceed. Underneath its façade as an "independent auditor," Crowe was directly embroiled in GPB's fraudulent scheme. Namely, Crowe induced and participated in the fraud by exceeding the scope of its routine business services (i.e., auditing), by tending to a miscellany of non-audit items such as: GPB business deals; hiring practices; valuation work; and even prospective growth opportunities. As a result, Crowe's substantial assistance in the fraud was a proximate cause of the harm incurred by Plaintiffs.

■■     For example, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

███     Crowe also substantially assisted GPB with valuation work.     ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

401.     Crowe also effectively served as a consultant for GPB with respect to its hiring practices. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

402.     Nevertheless, GPB's decision to call on Crowe for non-audit assistance and advice was really just a ruse employed by GPB to make Crowe feel significant and incentivize it to conceal the fraud. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

403.    As a direct and foreseeable result of Crowe's fraudulent inducement and the aiding and abetting of that fraud, Plaintiffs and other Limited Partners have suffered substantial damages.

### 3.  Auditor RSM Is Culpable to Investors for Its Part in the GPB Scheme

404.    RSM US LLP, formerly known as McGladrey LLP ("RSM"), is a limited liability partnership with its principal place of business in Chicago, Illinois, and with offices in New York. RSM markets itself as the leading U.S. provider of audit, tax and consulting services focused on the middle market.

405.    GPB retained RSM's audit services for the Holdings II limited partnership from May 2015 through April 22, 2019. During this time frame, RSM completed the audits of Holdings II's financial statements for the 2015 and 2016 calendar years. While RSM worked on the 2017 audit, it was relieved prior to completing this audit. To date, Holdings II's 2017 audits forward remain outstanding.

### a.  RSM's Faulty Audit, Its Knowledge of GPB's Scheme and Investor Reliance

406.    RSM's role as auditor was instrumental to the legitimization of Holdings II.

407.    Holdings II's various sales and marketing presentations and offering documents given to investors, broker-dealers, and registered investment advisers ("RIAs") all touted RSM's role as Holdings II's auditor.

408.    Investors were reassured that Holdings II's books of account and records were "prepared on the basis of generally accepted accounting principles in the U.S. ("GAAP"), [and] w[ould] be audited annually," when these audits fell well below industry standards.

409.    GPB's PPM and its other sales and marketing documents all described RSM's experience and role as Holdings II's auditor. ████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ This same representation was made in all offering materials, including Holdings II's Second Amended and Restated Confidential Private Placement Memorandum ($500,000,000 of Class A Limited Partnership Units) and its Third Amended & Restated Confidential Private Placement Memorandum ($500,000,000 of Class B Limited Partnership Units), both dated December 2016. This same representation was made throughout the relevant period in GPB's SEC filings, including its Forms ADV, *e.g*., EA-GPB-DELUCA-0000024.

410.     Investors were also misled into believing that GPB Funds had robust valuation policies that involved a three tier, independent review. GPB's Valuation Committee was responsible for the determination of portfolio company valuations, and claimed that these valuations were conducted in accordance with U.S. GAAP Accounting Standard Codification 820, Fair Value Measurements ("ASC 820"), when this was far from reality. ██████████████

████████████████████████████████████████████████

██████████████████████████

████     Yet, GPB touted RSM's role in performing asset valuations in 2016 through the second quarter of 2017 while simultaneously serving as Holdings II's "independent" public auditor. With respect to RSM's role in the valuation of Holdings II's Portfolio Companies, GPB stated: █████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

        █████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████.

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████

413.    Throughout the relevant time frame, RSM claimed to be conducting its audits and valuations of Holdings II in accordance with GAAP, and certified that Holdings II's 2015 and 2016 financial statements fairly, in all material respects, represented the assets, liabilities and member's capital.

414.    Documents produced in 2021, however, showed that RSM abdicated its duties as an independent, public auditor and allowed a series of significant deficiencies to proliferate over a period of time during which GPB was able to scam investors into investing over $1 billion.

415.    RSM ignored unreported related-party transactions, phony personal performance guarantees and other odd accounting transactions, accepted unsupported management assertions about the value of the assets, and other irregularities in GPB's books and records.

416.    For example, GPB told investors that "[w]e typically require each Portfolio Company's management team to invest alongside GPB, either in the form of first-risk capital or by providing personal guarantees. This is done to provide downside protection."  In reality, however, these were nothing more than backdated paper transactions used to cover up the depleting and increasingly unprofitable operations of the Portfolio Companies. From 2014 to 2018, the accumulated phony payments *exceeded $100 million*.

████    In addition, money was being moved around between entities without explanation.

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

    ████ RSM also knew that certain portfolio companies were underperforming but continued to accept management's explanations and representations of a positive outlook, supported by nothing more than unsupported opinions and beliefs. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████.

    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

GPB Holdings II, LP and Subsidiaries
November 18, 2016
Page 2

**Significant Deficiency: Financial and Accounting Reporting Process**
Timely and accurate financial reporting is an important cornerstone of an organization's control environment. RSM noted that management's preparation and review of financial statements and related supporting schedules in the areas of investments, revenue and accounts payable were not performed timely and consistently. We recommend that management implement a plan of upgrading the process, procedures, systems and capabilities of the financial accounting and reporting department, including the allocation of resources needed to manage the financial activities of the organization. This plan should encompass the following:

- Improve existing process for the preparation and review of quarterly financial reports and schedules so that actions can be taken or decisions can be made in a timely manner;
- implement project planning as part of year end reporting and auditing process to ensure deadlines are met and information is reviewed timely by management
- streamline process around flow of information from investment professionals to the accounting team to assist with timely access and assessment of transactions
- adequately staff the accounting/financial reporting team to meet the growing demands of the larger capital base of the Company and continue to maintain complete and accurate books and records to prepare financial statements on a timely basis.

This communication is intended solely for the information and use of management, the General Partner and others within the organization, and is not intended to be, and should not be, used by anyone other than these specified parties.

*RSM US LLP*

New York, New York

We consider the following deficiencies in the Partnership's internal control to be significant deficiencies:

**Significant Deficiency: Related Party Transactions**
During the audit RSM noted an occurrence where funds was erroneously wired from the Partnership's account for an investment transaction executed by an affiliated fund. We recommend that the Partnership should maintain its own cash account segregated from those of its affiliated funds, and that executable items that pertain to related party transactions, like wires and journal entries, should be reviewed and approved on a consistent basis by an individual independent of the preparer ahead of processing.

THE POWER OF BEING UNDERSTOOD
AUDIT | TAX | CONSULTING

RSM US LLP is the U.S. member firm of RSM International, a global network of independent audit, tax, and consulting firms. Visit rsmus.com/aboutus for more information regarding RSM US LLP and RSM International.

422.     Documents obtained in 2021 also revealed that RSM knew of the significant problems with the valuation of the underlying portfolio company assets. Senior RSM audit partner John McParland advised Holdings II management that: ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Yet, GPB continued to tout the conservative three-tier approach to securing accurate valuations and highlighting the involvement of top-tier firm RSM.

423.     Despite being inundated with a significant and number of profound red flags, RSM and the other Auditor Defendants allowed their names and reputations to be used to sell interests in GPB Funds. With RSM's assistance and involvement, Holdings II was able to entice enough investors to raise over $645 million through false and misleading financial statements and overinflated portfolio company asset valuations, while RSM stood by silent.

424.     RSM and the other Auditor Defendants knew that the GPB Funds were underperforming, and yet Gentile and Schneider continued authorizing repeated distribution payments, including additional special distributions, to give investors the false impression that the Funds were flush with extra cash. Selling Defendants then touted the payments of special distributions in marketing email blasts to potential and existing investors, luring them into making initial or additional investments, respectively.

425.     RSM and the other Auditor Defendants knew or were reckless in not knowing that insiders were looting the Funds for their personal benefit. For example, Gentile ensured that several of the early fund acquisitions were companies in which he had an ownership interest. Gentile used the GPB Funds to benefit himself and his family through, among other things,

expense payments for luxury items and family salaries, and offloading financial obligations on to the GPB Funds. All told, Gentile reaped benefits of over $27 million.

426.    In addition, GPB was handsomely rewarding broker dealers in the form of outsized commission for the sale of interests in the Funds. GPB raised $1.8 billion in private sales through 63 broker-dealers who in turn received $167 million in commissions, at a rate of 9.3%.  Insiders were also pocketing their own exorbitant up-front management fees and commissions. Meanwhile, GPB was promising investors distributions of 8%-12% on an annualized rate from net operating profits that were "fully earned" or "fully covered" by cash flow from the Portfolio Companies. Investors were also told that the funds might pay special additional distributions where GPB Capital determined it was appropriate, based on the Funds' ability to pay them. Variations on these fundamental representations appeared in offering and marketing documents, responses to due diligence questionnaires, and correspondence with potential investors and salespeople.

427.    Indeed, GPB advised investors that they "should expect to receive their first distribution approximately 105 days after their admittance into the Fund. This deferred timing is in place to provide an adequate window for GPB to align capital inflow with timely deployment and assist us in ensuring all distributions are covered by operating cash flows."

428.    RSM and the other Auditor Defendants knew or were reckless in not knowing that the promised investor distributions were not feasible given the state of the assets themselves, the upfront sales commissions, related party transactions, and Insider's misuse of funds for personal benefit.

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████ Instead of providing serious independent financial oversight, RSM partners were collecting hundreds of thousands of dollars in fees and inviting GPB Insiders to lavish dinners and events, including a Yankee event at Ruth Chris Steakhouse in NYC.

430.    In August 2018, GPB announced that the previously issued RSM-audited financial statements for Holdings II for the 2015 and 2016 calendar years would need to be restated and could no longer be relied upon, acknowledging that they were materially misstated. The misstatements in the RSM-audited financials were so materially incorrect that GPB has yet to issue these restatements.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ GPB also announced its plan to release the outstanding 2016, 2017 and 2018 audits on September 30, 2019, but the accounting records were so poor, that EisnerAmper has yet to complete these audits.

432.    In the June 21, 2019 Investor Update, GPB also acknowledged that the overvaluation of the portfolio companies and disclosed that the Fund value were 25% and 73% lower than the previous reported values. Specifically, GPB reported that Holdings II's value had fallen 25.4%, Automotive's by 39%, and GPB's five remaining Funds had declined between 25% and 73% in value.  The values continue to decline.

433.    RSM was in a position to know that (1) GPB overpaid for the portfolio companies; (2) the portfolio companies were not as profitable as that represented, (3) the value of GPB's portfolio companies were inflated; (4) related party transactions and high upfront sales and management commissions were depleting investor funds; (4) investor distributions were being

made with investor capital; (5) net profits of the portfolio companies were not covering ordinary or special distributions announced by GPB Capital; and (6) phony transactions involving personal guarantees were used to falsely prop up the value of the assets and conceal the income shortfall; and (7) the promised distribution yields marketed to investors could not feasibly have been paid from net operating profits.

### 4.   <u>Auditor EisnerAmper Is Culpable to Investors for Its Part in the GPB Scheme</u>

434.    EisnerAmper LLP ("EisnerAmper") is a limited liability partnership with its principal place of business in New York, New York.

435.    In 2018, EisnerAmper LLP, ("EisnerAmper"), was brought in following Crowe's resignation as the cracks began to appear in GPB's façade. EisnerAmper reassured investors such as Plaintiffs and class members that GPB was a viable, going concern. Upon information and belief, EisnerAmper was made aware of the foregoing issues prior to its engagement as GPB's replacement auditor, and in any event was made aware of them no later than May 2019.

436.    EisnerAmper served as the outside auditor for certain of GPB's funds, including at least GPB Automotive, for fiscal years 2016 through 2019, GPB Holdings for fiscal years 2017 through 2019, and GPB Holdings Qualified for fiscal years 2017 through 2019.

437.    GPB first entered into an engagement letter with EisnerAmper on or around November 2, 2018.

438.    By December 7, 2018, GPB had provided EisnerAmper with "boatloads of info" and forwarded all materials prepared for Crowe to it. In addition, by that date, EisnerAmper had spent time with Crowe to review their work papers and was having weekly update meetings with them to effectuate the handoff of audit duties from Crowe to EisnerAmper.

439. Upon information and belief, in or around late 2018, EisnerAmper reviewed GPB Capital's financials and therefore was aware or should have been aware of GPB's significant issues, including the fact that the Funds were issuing distributions despite operating at a loss; that the Funds' financials were misstated; and that the funds were due to but had not been registered with the SEC, prior to accepting the engagement.

440. On May 14, 2019, David Rosenberg, CEO of Prime Motor Group, sent an email to, among others, Brian Downey, the GPB engagement partner at EisnerAmper, detailing various improper conduct on the part of GPB, of certain dealerships owned by GPC funds, and of certain of GPB's officers, operating partners, and dealership employees, including but not limited to that GPB, Gentile, Schneider and others were fabricating revenue and/or engaged in other self-dealing transactions.

441. Thus, as of at least May 2019, EisnerAmper had been notified of GPB Capital's improprieties and had the financial and other information necessary to validate Rosenberg's allegations for itself. EisnerAmper did not take appropriate steps to follow up or otherwise act upon this information. Eventually, GPB Capital removed Rosenberg from his position in order to silence him.

442. EisnerAmper was touted by GPB principals as a guarantee of the legitimacy of GPB's funds and validity of their financials. EisnerAmper knew and implicitly approved of its association with GPB's funds being communicated directly to investors for the purpose of causing those investors to retain their investment positions with GPB's funds.

443. Investment advisor newsletters and investor updates touted GPB's relationship with EisnerAmper:

444. "We continue to await the completion of the audits through 2018 which EisnerAmper is targeting for 9/30 completion. Once complete, the company will have more flexibility in terms of dividend payments, information dissemination to investors, corporate borrowings, and deal structuring." Traphagen Financial Group, Q2 2019 Market Synopsis.

445. "Audits and Fair Market Values: We remain focused on completing our audited financial statements and filing our Form 10s with the SEC. Additionally, we expect to release Fair Market Values ("FMVs") for each Partnership and, for the first time, for each Limited Partner, in the next two weeks." GPB Letter to Partners, dated October 29, 2019.

446. "GPB Management has also shared further details of this event with you, and on October 30, state it does not currently believe the developments related to Mr. Cohn will further delay the delivery of the audited financials beyond the December 31, 2019 deadline." Madison Avenue Securities, Letter to Investor, dated November 15, 2019.

447. Despite EisnerAmper's knowledge of GPB Capital's significant issues, and despite knowing that its continued association with GPB Capital was being used by GPB Capital, its principals, and related entities to convince Plaintiff and Class Members to invest and/or maintain their investments, EisnerAmper continued to serve as auditor.

448. EisnerAmper knew of the conduct by GPB Capital and Gentile, knew of the duties owed to Plaintiff and Class Members, and took active steps to cover up its knowledge. Specifically, EisnerAmper failed to alert relevant parties, and knowingly allowed their continued status as auditor to be utilized in public statements by GPB Capital and its principals to dissuade Plaintiffs and Class Members from investigating GPB Capital's activities and encourage continued or maintained investment with it.

### 5. **CohnReznick Is Culpable to Investors for Its Part in the GPB Scheme**

449.     CohnReznick LLP ("CohnReznick") is a limited liability partnership with its principal place of business in New York, New York.

450.     Defendant CohnReznick was the outside auditor for certain of GPB's funds, including at least GPB Waste Management, for fiscal years 2016, 2017 and 2018. CohnReznick audited and issued an audit opinion for the financial statements of Waste Management for fiscal year 2016.

451.     Upon information and belief, in or around 2019, CohnReznick reviewed GPB Capital's financials and therefore was aware or should have been aware of GPB's significant issues, including the fact that Waste Management's financials were misstated, as well as the existence of conflicted related-party transactions.

452.     CohnReznick's involvement was touted by GPB principals as a guarantee of the legitimacy of Waste Management and validity of its financials. CohnReznick knew and implicitly approved of its association with Waste Management being communicated directly to investors for the purpose of causing those investors to retain their investment positions with the fund.

453.     Despite CohnReznick's knowledge of GPB Capital's significant issues, and despite knowing that its continued association with GPB Capital was being used by GPB Capital, its principals, and Waste Management to convince Plaintiff and Class Members to invest and/or maintain their investments, CohnReznick continued to serve as auditor.

454.     CohnReznick knew of the conduct by GPB Capital and Gentile, knew of the duties owed to Plaintiff and Class Members, and took active steps to cover up its knowledge. Specifically, CohnReznick failed to alert relevant parties, and knowingly allowed their continued status as auditor to be utilized in public statements by GPB Capital and its principals to dissuade Plaintiffs

and Class Members from investigating GPB Capital's activities and encourage continued or maintained investment with Waste Management.

455. As a proximate result of the Auditor Defendants' knowing and substantial assistance, the GPB Defendants were able to produce audited financial reports that contained misleading and falsified information thereby causing Plaintiffs to sustain substantial losses.

### F. GPB Defendants' House of Cards Begins to Crumble

#### 1. The General Partner's Then-CFO Macrina Kgil Resigns

456. In 2018, the General Partner's CFO, Macrina Kgil, resigned due to concerns about fraud related to the funds the General Partner managed, including the GPB Investments. Notably, Kgil deleted all references to GPB Capital on her LinkedIn profile.

457. On July 16, 2018, the General Partner sent a letter to the investors stating that, effective May 1, 2018, Kyle Brengel was appointed as Interim Chief Financial Officer of GPB Capital. The letter further disclosed a potential conflict of interest, given Brengel was a Managing Partner of Gentile Pismeny & Brengel LLP ("GPB Accountant"), GPB Capital's accountant. Defendant Gentile spent 25 years as a partner of and an accountant with GPB Accountant.

458. According to LinkedIn, GPB Capital has stopped searching for a CFO and currently lists no CFO on its general website.

#### 2. The General Partner's Auditor Resigns and the GPB Investments' Financials Need to Be Restated

459. Both Automotive and Holdings II claimed to investors that their "financial statements ha[d] been prepared in accordance with accounting principles generally accepted in the United State of America ("GAAP") consistent with the presentation and disclosure requirements of Financial Accounting Standards board ("FASB") Accounting Standards Codification (ASC)

113

946, 'Financial Services – Investment Companies.'" This representation was made in the PPMs and various marketing materials and brochures from the inception of each entity.

460.     For Automotive, Margolin, Winer, & Evens LLP ("Margolin") conducted the 2014 and 2015 audits but was replaced by Crowe in 2016, who conducted the 2016 audit.  On May 1, 2017, Crowe provided Automotive with a clean audit opinion for the 2016 calendar year and noted no exceptions.

461.     Section 12(g) of the Exchange Act requires an issuer with total assets of more than $10 million and a class of securities held of record by either 2,000 persons, or 500 persons who are not accredited investors, to register that class of securities with the SEC. GPB Capital met these thresholds for both Automotive and Holdings II, its two largest funds, by May 18, 2017.

██      As a result, by May 18, 2017, each of the Funds needed to file registration forms and audited financials with the SEC, even though the funds were private and not listed or traded on an exchange. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

  ██████████████████████████████████████

███████████████████████████████████████████

[REDACTED]

468.     On March 20, 2019, the General Partner sent a letter to investors stating that their new tax preparation firm would not have Schedule K-1 tax documents prepared prior to the April 15, 2019 tax filing deadline and that Limited Partners should consult their own tax professionals for guidance.

469.     On April 4, 2019, the General Partner sent a letter to investors stating that there were delays in completing the audits for Automotive and Holdings II due to internal deficiencies and that it intended on completing the 2017 audits by June 30, 2019 and the 2018 audits by September 30, 2019.

470.     On June 21, 2019, the General Partner sent a letter to investors stating that the delivery of outstanding audits for 2016, 2017, and 2018 would all be released on September 30, 2019.

471.     In September 2019, the General Partner informed investors that, due to investigations by the SEC and Federal Bureau of Investigation ("FBI"), it would no longer be able to meet the September 30 deadline and, instead, expected to complete the audits by the end of the year.

472.     The investors are still waiting for the 2015 and 2016 financial restatements and await the the 2017, 2018, 2019, and 2020 audited financial statements.

### 3. GPB Capital and the Funds Become the Target of Government Investigations

473.    As their scheme began to unravel, Automotive failed to file a registration statement and audited financial statements with the SEC by April 30, 2018, as required. By August 2018, GPB Capital announced that it was suspending Automotive's offering, as well as investor redemptions.

474.    In September 2018, the Commonwealth of Massachusetts secretary announced that it had opened an investigation into the Selling Defendants and other broker-dealer firms that sold Units in the funds controlled by the General Partner, including the Funds.

475.    The SEC and the Financial Industry Regulatory Authority ("FINRA") also reportedly made inquiries of broker-dealer firms that sold private placement securities in partnerships controlled by the General Partner.

476.    On March 4, 2019, the General Partner sent a letter to the investors stating:

> On February 28, 2019 representatives of both the FBI and the New York City Business Integrity Commission ("BIC") arrived at GPB offices to collect materials pursuant to a search warrant obtained by the U.S. Attorney's Office – Eastern District of New York ("U.S. Attorney"). As previously indicated we believe this visit was a continuation of previous ongoing inquiries and GPB has and will continue to cooperate with any inquiries.

477.    In that same letter, the General Partner further confessed that:

> During the summer of 2018, GPB received a subpoena from the US Attorney's Office – Eastern District of New York requesting documents concerning GPB's Waste Management fund in connection with an investigation done with the BIC. Since that time GPB has received additional requests for information from the BIC and U.S. Attorney.

[. . . ]

> In September 2018 GPB received a subpoena requesting information from the Securities and Exchange Commission ("SEC").

> Additionally, in October 2018 GPB received subpoenas from the New Jersey Bureau of Securities for information . . . .

117

[. . .]

> Much of the requested information does concern issues raised by former operating partner, Patrick Dibre, in his response to our complaint filed against him in the Nassau County Supreme Court.

478.    Specifically, according to reports of an executive insider's account, the focus of the SEC's questions "is the accuracy of disclosures made to investors, the performance of various funds and the distribution of capital to investors."

479.    On July 15, 2019, GPB Capital sent a letter to investors indicating that the governmental investigations are still ongoing.

### 4.    GPB Defendants Admit to Paying Distributions Using Investor Capital Contributions Instead of Operating Income, as Previously Represented, and Then Promptly Cease Making Investor Distributions

480.    After raising more than $622 million through the fraudulent scheme discussed herein, the 2018 Automotive PPM admits the Ponzi Scheme that it had been perpetrating on investors for years. Indeed, after proffering to investors that it would make distributions to investors based solely on operational profits in an effort to lure them into an investment with the Funds, in July 2018, the General Partner abruptly changed course, now claiming that "[p]eriodic distributions are currently and may in the future be paid out of available working capital, **which include investor contributions**." (emphasis added). The Funds also began the short descent to revocation of investors' distributions altogether.

481.    In April 2018, GPB Capital reduced the rate of its distributions to investors from 8% per annum to 4% per annum.

482.    On December 20, 2018, the General Partner announced that the Funds would be transitioning to a quarterly distribution plan and told investors that distributions were not guaranteed.

483.     On April 4, 2019, the General Partner sent letters to investors stating that first quarter 2019 distributions, if any, would be declared at the end of April 2019, with distributions to be paid on May 15, 2019. The letter further stated that it believed that most of the Funds would not be issuing first quarter 2019 distributions.

484.     On April 30, 2019, the General Partner sent letters to investors stating that the GPB Investments would not be issuing a distribution to investors for the first quarter of 2019.

485.     As of June 21, 2019, Automotive is no longer making distributions to its investors at all, and the value of the Units for Automotive and Holdings II have dropped by 39% and 25.4%, respectively.

### 5.     The General Partner's Chief Compliance Office Is Indicted for Obstruction of Justice

486.     While employed as a Securities Compliance Examiner and Industry Specialist in the SEC's Enforcement Division, the General Partner's Managing Director and Chief Compliance Officer, Michael S. Cohen, accessed and disclosed confidential information to the General Partner – the target of the SEC's investigation – to land a job with the General Partner.

487.     On October 23, 2019, a superseding indictment was unsealed revealing that on October 17, 2019, Mr. Cohn was charged with obstruction of justice, unauthorized computer access, and unauthorized disclosure of confidential information.

488.     In approximately October 2018, prior to leaving the SEC, Mr. Cohn accessed highly sensitive information on SEC servers relating to an Enforcement Division investigation into the General Partner, which included "confidential information, privileged attorney-client work product and contacts with law enforcement and other regulatory agencies." According to the U.S. Attorney's Office for the Eastern District of New York's press release, "[d]uring discussions with [the General Partner's] personnel about obtaining a job there, Cohn advised them that he had inside

information about the SEC's investigation, and on several occasions he disclosed information to members of [the General Partner's] senior management about that investigation."

### 6. Defendants Gentile, Schneider and Lash Are Indicted for Securities Fraud

489. On February 4, 2021, an indictment against Defendants Gentile, Schneider, and Lash was unsealed, revealing that they were charged with conspiracy to commit securities fraud; conspiracy to commit wire fraud; securities fraud; and two counts of wire fraud.

490. Between approximately August 2015 and December 2018, Defendants Gentile, Schneider, and Lash conspired to employ a scheme to defraud investors by making false statements of material fact and/or omitting to state material facts in connection with the purchase and sale of investments in Holdings I, Automotive, and Holdings II, in violation of Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5.

491. Between approximately August 2015 and December 2018, Defendants Gentile, Schneider, and Lash, conspired to devise a scheme to defraud investors and prospective investors in Holdings I, Automotive, and Holdings II by materially false and fraudulent pretenses to transmit wire communication, in violation of Title 18, United States Code, Section 1343.

492. Between approximately August 2015 and December 2018, Defendants Gentile, Schneider, and Lash defrauded investors and prospective investors in Holdings I, Automotive and Holdings II by: (a) employing one or more devices, schemes and artifices to defraud; (b) making false statements of material fact or omitting to disclose material facts; and (c) engaging in acts that operated as a fraud and deceit upon investors, in violation of Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5

493.     On or around April 22 2016, Defendants Gentile and Lash transmitted a wire transfer in the amount of approximately $509,643 from the Signature Bank GPB Realty Account to the Chase GPB Realty Account in violation of Title 18, United States Code, Sections 1343, and 3551.

494.     On or around April 28, 2016, Defendants Gentile and Lash transmitted a wire transfer in the amount of more than $1 million from the LASH Chase Account to the Automotive Chase Account in violation of Title 18, United States Code, Sections 1343 and 3551.

## V.     CLASS ALLEGATIONS

495.     Plaintiffs assert this action under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and seeks to represent the following class of persons: all Limited Partners in the GPB Investments who, between January 1, 2013 and December 31, 2018, executed the subscription documents included with the PPMs for Automotive, Holdings I, Holdings II and Waste Management ("the Class").  The following persons are excluded from the Class:  GPB and Selling Defendants and any entity in which any of these Defendants has a controlling interest, and the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries, and/or assigns of any such entity.

496.     The Class meets the prerequisites for certification under Rules 23(a) and 23(b)(3):

497.     **Numerosity:** During the Class period, tens of thousands of investors executed subscription documents included with PPMs for Automotive, Holdings I, Holdings II and Waste Management.

498.     **Common Questions of Law and Fact:**

(a)        Did the GPB and/or the Selling Defendants know that the PPMs contained material misrepresentations or omissions of fact?

(b)      Did the GPB and/or the Selling Defendants intend to defraud Limited Partners?

(c)      Did the GPB and/or the Selling Defendants owe investors fiduciary duties and did they breach those duties by providing the PPMs and selling Units in investments that were fraudulently induced, and, in the case of the Selling Defendants, without performing proper due diligence?

(d)      Did the General Partner breach the LPA when it failed to provide accurate and truthful, annual financial reports as required?

(e)      Did the General Partner breach the LPA when it failed to form and authorize an Advisory Committee to review related party transactions as required?

(f)      Did the GPB and/or Selling Defendants fraudulently induce investors to purchase interests in the Funds by claiming falsely that made distributions to investors would be made out of the operating income of the portfolio companies when in fact at least part of the distributions were paid with investor capital?

(g)      Alternatively, did the Selling Defendants aid and bet the GPB Defendants' fraud when they, with willful blindness or reckless indifference to this fraud, provided PPMs to investors and sold Units in the Funds knowing that the operating companies' operating income could not cover the regular monthly or special distributions made to investors throughout the relevant time frame?

(h)      Did the Auditor Defendants aid and abet the GPB Defendants' fraud when they, with willful blindness or reckless indifference to this fraud, reviewed and/or audited the Funds' financial statements and in so doing both helped to actively conceal the fraud and/or ignore blatant red flags?

(i)     Were GPB and Selling Defendants unjustly enriched by receiving fees that they did not earn and/or were not entitled to?

499.   **Typicality:** Plaintiffs are members of the Class, and their claims are based on the same or similar facts affecting all Class members, including but not limited to misrepresentations in, and omissions from, the PPMs on which investors indicated reliance in their subscription documents.  Plaintiffs' legal theories are co-extensive with the other investors they seek to represent.  Plaintiffs' losses arose from the events, patterns of practice, and courses of conduct alleged herein, which uniformly affected all members of the Class.

500.   **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of the Class because Plaintiffs are sincere in their interest to pursue this action, and they are represented by competent counsel.

501.   **Predominance:** Common issues predominate over any individual ones.  Plaintiffs rely on common class proof in the form of the LPAs, PPMs, and the subscription documents to prove their claims, which were substantially similar across all investments, and Defendants' conduct is uniform to all Class members.

502.   **Superiority:** A class action is superior to individual actions for the fair and efficient adjudication of a controversy involving tens of thousands of investors.

**VI.    COUNTS**

### COUNT I:

### FRAUD IN THE INDUCEMENT AGAINST
### GPB DEFENDANTS AND THE SELLING DEFENDANTS

503.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

504. As set forth herein, the GPB and Selling Defendants made knowingly false representations and omissions regarding the nature, operations and financial condition of the Funds in the PPMs, financial statements, sales brochures, and other marketing materials.

505. The GPB and Selling Defendants promised a secure acquisition strategy with long-term value backed by expertise, when in reality the GPB and Selling Defendants were: (i) using investor capital to pay distributions, not operating income as promised; and (ii) embezzling and misappropriating tens of millions of dollars of investment capital in related-party dealings, instead of deploying investor capital towards income generating assets and ventures.

506. The GPB and Selling Defendants also disseminated materially false and misleading financial statements with materially inflated income created by fictitious performance guarantee payments and inter-fund loans, making the Funds appear more profitable than they were.

507. The GPB and Selling Defendants made these false and misleading misrepresentations and omissions knowingly, recklessly, and without regard to their truth or falsity, and with the intent to induce Plaintiffs and the Class to rely upon them and invest their money in the Funds.

508. Plaintiffs justifiably relied on these false representations and omissions by investing their money in this fraudulent investment scheme perpetrated by the GPB and Selling Defendants.

509. As a direct and proximate result of their reliance on the false representations and omissions of the GPB and Selling Defendants, Plaintiffs and the other Class Members suffered damages, including the loss of their investments and the improper and unearned fees paid to the GPB and Selling Defendants.

## COUNT II:

### AIDING AND ABETTING FRAUD
### IN THE INDUCEMENT AGAINST THE SELLING DEFENDANTS

510. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

511. This Count is alleged against the Selling Defendants in the alternative.

512. As alleged above, the GPB Defendants fraudulently induced Plaintiffs and other investors into investing in the Funds through the use of false or misleading statements in the PPMs, financial statements, sales brochures, and other marketing documents.

513. The Selling Defendants aided and abetted this fraud by disseminating the false and misleading material to investors with knowledge or constructive knowledge that: (i) significant and increasing portions of the monthly and special distributions were secretly being paid from the investors' own capital contributions rather than from operating profits, as promised; and (ii) GPB Defendants were embezzling and misappropriating tens of millions of dollars of investment capital in related-party dealings, instead of deploying investor capital towards income generating assets and ventures.

514. The Selling Defendants substantially assisted the GPB Defendants when they advised actual and prospective investors of "special" distributions that they knew could not be covered by the operating income of the Funds.

515. The Selling Defendants substantially assisted the GPB Defendants by giving credibility to the Funds when they were marketed to other brokers and other investors under their name and promoting their reputation.

516.     As a direct and foreseeable result of the Selling Defendants' assistance to and aiding and abetting of GPB Defendants' fraud, Plaintiffs and other Class Members have suffered substantial damages.

## COUNT III:

### AIDING AND ABETTING FRAUD IN THE INDUCEMENT AGAINST THE AUDITOR DEFENDANTS

517.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

518.     As set forth in this Complaint, the GPB Defendants knowingly made false representations and omissions regarding the nature, operations and financial condition of the Funds in the Funds' PPMs, financial statements, sales brochures, and other marketing materials. The GPB Defendants fraudulently induced Plaintiffs and other investors to invest in the Funds through the use of these false or misleading statements.

519.     The Auditor Defendants knew that these false and misleading statements and omissions were material to investors, but nonetheless, turned a blind eye to GPB Capital's financial data; as a result, such false and misleading statements and omissions were transmitted to investors via the Fund Administrator.

520.     The Auditors knew that the statements by the GPB entities were false and misleading. More specifically, they knew the GPB Defendants were touting false distribution projections in their PPMs; making misleading portrayals of their financial status in the financial statements and investor updates; and that the financial statements were not in compliance with GAAP and FASB.

521. Absent their collective papering-over of the facts that revealed the true nature of the GPB model, GPB Defendants would not have been able to carry out their fraudulent scheme. As such, the Auditors provided substantial assistance to the GPB Defendants' fraudulent conduct.

522. The Auditor Defendants acted with intent to commit fraud, or in the alternative with willful blindness or recklessness in allowing the GPB Defendants to offer the Units to investors, and as a result, are charged with knowledge or constructive knowledge that the GPB Defendants were making the material false representation and omissions alleged herein.

523. The Auditor Defendants substantially assisted the GPB Defendants by giving credibility to the Funds when they were marketed to other brokers and other investors under their name and promoting their reputation.

524. The Auditor Defendants substantially assisted the GPB Defendants by issuing clean audit opinions to financials that accompanied the PPMs, while knowing the financials were false and unreliable.

525. The Auditor Defendants substantially assisted the GPB Defendants because they knew that ordinary and "special" distributions could not be covered by the operating income of the Funds yet stood by while the GPB Defendants misled investors into believing that such distributions were being covered by the Funds' operating income.

526. As a direct and foreseeable result of the Auditor Defendants' assistance to and aiding and abetting of GPB Defendants' fraud, Plaintiffs and other Class Members have suffered substantial damages.

## COUNT IV:

## FRAUD AGAINST GPB DEFENDANTS

527.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

528.    As set forth above, the GPB Defendants made false representations of material fact in the PPMs as well as other documents and materials provided to investors about its financial condition and its operations.

529.    Namely, the GPB Defendants failed to disclose that the value of the Funds' portfolio assets were grossly overstated on account of (i) unchecked exaggerations by management about its future growth prospects; (ii) fraudulent accounting practices (*i.e.*, inter-Fund transactions and phony guarantee income); (iii) lack of internal controls and weaknesses in the accounting systems; (iv) lack of any independent oversight of Gentile, Schneider and Lash; (v) concealment of operational problems with automobile manufacturers and dealership partners; (vi) overall inexperience of GPB Capital as an investment adviser; (vii) an obscene amount of undisclosed related party dealings, embezzlement and misappropriation of funds.

530.    Plaintiffs justifiably relied upon these false representations and material omissions made by the GPB Defendants when deciding whether to invest their money in the Funds.

531.    As a result of their reliance on these false representations and material omissions of fact, Plaintiffs have suffered substantial damages, including the loss of their investments, meanwhile the GPB Defendants have derived substantial and unearned profits. The GPB Defendants misconduct was a direct and proximate cause of Plaintiffs' and other Class Members' losses.

## COUNT V:

## AIDING AND ABETTING ACCOUNTING FRAUD
## AGAINST THE AUDITOR DEFENDANTS

1.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

532.    As alleged above, the GPB Defendants fraudulently induced Plaintiffs and other Class Members into investing in the Funds based on false or misleading statements in the PPMs and related marketing and sales documents.

533.    The Auditor Defendants knew or consciously avoided knowing about the fraud conducted by the GPB Defendants. Specifically, the Auditor Defendants reviewed and/or audited certain of the GPB Defendants' financial statements, valuations, books, and records and thus were privy to the ongoing fraudulent scheme. The Auditor Defendants either resigned despite glaring red flags or failed to alert relevant parties as to the fraud and instead signed off on the financial statements and reports. As such, the Auditor Defendants are charged with constructive knowledge that:

(a)    The GPB Defendants falsely represented to investors in connection with the purchase of Units in the Funds that: (i) they would be paid distributions from actual cash flows and profits arising from the operating companies rather than from capital funds invested by investors; (ii) the financial statements of the Funds were audited pursuant to GAAP and FASB standards and accurately represented the income of the operating companies; (iii) the operating companies were valued properly pursuant to GAAP; and (v) payments to related-party entities, to the extent disclosed, were proper and legitimate; and

(b)    The GPB Defendants failed to disclose the following material information, which among other statements, they knew would render the statements in the PPMs and financial statements false and/or misleading: (i) GPB Defendants were unable to cover the regular monthly and special distributions made to investors with the income of the operating companies; (ii) the fees deducted from investors capital investment were being paid to affiliates of and/or related parties to the GPB Defendants with whom they collaborated to defraud investors; and (iii) income reported in the financial statements included income from phony personal guarantees and inter-Fund transfers.

534. The Auditor Defendants substantially assisted the Fund Defendants by: (i) actively helping them conceal the fraud by repeatedly signing their names on GPB financial statements, thereby affirmatively misrepresenting GPB's financial status quo, and legitimizing GPB's shady business operations; and (ii) by resigning or staying silent despite the glaring red flags of fraud. For example, on November 9, 2018, Crowe suspended work relating to the Partnership audit and resigned as the auditor for the Partnership due to "perceived risks that Crowe determined fell outside of their internal risk tolerance parameters." Further, on or around November 22, 2019, EisnerAmper suspended its work on financial audits for the partnership in the wake of the criminal indictment against former GPB Chief Compliance Officer, Michael Cohn. The Auditor Defendants' actions were one of the proximate causes of the fraud alleged herein.

535. As a direct and foreseeable result of the Auditor Defendants' aiding and abetting of the Fund Defendants' fraud, Plaintiffs and other Class Members have suffered substantial damages.

## COUNT VI:

### FRAUDULENT MISREPRESENTATION
### AGAINST MARGOLIN, CROWE, AND RSM

536. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

537. As set forth herein, Margolin, Crowe, and RSM knowingly made false representations and omissions regarding the accuracy of GPB's financial status, when they issued clean audit opinions year after year, noting no deficiencies. For instance, Margolin. represented in its audit opinion on May 5, 2016 that: "In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of GPB Automotive Portfolio, LP as

of December 31, 2015, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America." Specifically, Margolin issued clean audits for years 2015 and 2016; Crowe for 2016 and 2017; and RSM for 2015 and 2016.

538.    As set forth above, these statements were patently false because neither Margolin, Crowe, nor RSM actually held the opinion that GPB's financial statements presented fairly the financial position of Automotive.  In particular, numerous employees at Margolin, Crowe, and RSM who were responsible for conducting GPB's audit knew that GPB's financial statements were deficient in many respects and failed to present an accurate picture of GPB's financial status. For instance, Margolin, Crowe, and RSM employees knew that: (i) the GPB Investments invested their monies into an automobile dealership acquisition strategy that could not be feasibly achieved; (ii) they would be paid distributions from capital funds invested by subsequent investors rather than from cash flows and profits arising from the acquisitions of dealerships; (iii) the equity fund model provided no market advantages in the automobile dealership industry; (iv) their financial statements substantially deviated from GAAP and FASB accounting standards. Knowledge that GPB's finances were not compliant with accounting standards is evidenced by the fact that Margolin, Crowe, and RSM auditors regularly questioned GPB about suspicious accounting practices, yet failed to do more. For instance, and as set forth above, an RSM auditor inquired into a suspicious cash transfer amounting to more than $6.1 million, and on another occasion, RSM even detailed the numerous deficiencies in GPB's financial and accounting process, yet in either case, RSM declined to take any real action. Similarly, Crowe auditors consistently nudged GPB regarding outstanding items for the audits as well as outright inconsistent financials in their books and records, yet failed to report such in its audits.

539.     Margolin, Crowe, and RSM failed to disclose the following material information, which they knew would render their statement about GPB's financial statements false and/or misleading, including that: (i) the Fund Defendants used the Convertible Loan Scheme to circumvent manufacture approval requirements; (ii) did not obtain manufacturer approval for dealerships they purported to have acquired; and (iii) the fees subtracted from the Limited Partners' capital investment were paid to affiliates to and/or related parties of the Fund Defendants with whom they conspired to defraud investors.  Despite the grave financial implications that Margolin, Crowe, and RSM knew the aforementioned posed, the auditors still chose to omit such information in their audits.

540.     Margolin, Crowe, and RSM knew the statements made in their audit opinions were false at the time they were made.

541.     These false statement were made for the purpose of inducing Plaintiffs, Class Members, and other potential investors to rely on those representations and invest in the GPB Funds.

542.     Plaintiffs and Class Members justifiably relied on those representations by Margolin, Crowe, and RSM in determining whether to invest and maintain their positions in the GPB Funds.

543.     Plaintiffs and Class Members were injured as a result of these false and misleading statements or omissions, as evidenced by the fact that their investments in the GPB Funds have lost most or all of their value.

544.     Plaintiffs and the Class, therefore, seek damages in an amount to be determined at trial.

## COUNT VII:

## BREACH OF CONTRACT AGAINST
## THE GENERAL PARTNER

545.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully

stated herein.

546.     This Count is against the General Partner.  Under the LPA, the General Partner had

the following duties:

> (a) Within 120 days after the end of each Fiscal Year, the General Partner will
> cause to be prepared and furnished to the Limited Partners a financial report
> for such Fiscal Year that includes the audited Financial Statements for such
> Fiscal Year and any other information that the General Partner deems
> necessary or appropriate.
>
> (b) Within 120 days after the end of each Fiscal Year, the General Partner will
> cause to be prepared and furnished to the Limited Partners all necessary tax
> reporting information.
>
> (c) Within 45 days after the end of each Fiscal Quarter, the General Partner
> shall cause to be prepared and furnished to the Limited Partners an unaudited
> summary investment report for such Fiscal Quarter; provided that in the event
> any Units are registered under the 1934 Act, the General Partner may deem
> reports filed by the Partnership thereunder to satisfy the foregoing.

547.     The General Partner breached these duties when it failed to timely produce the

financial reports and when it produced inaccurate financial statements from 2013 to 2017.

548.     The LPAs further required the General Partner to compose a three member

independent committee identified as the Advisory Committee.  Specifically, the LPAs provided

that:

> The Partnership[s] may not enter into a Related Party Transaction without the
> approval of all of the members of the Advisory Committee. In approving any
> Related Party Transaction, the General Partner must provide the Advisory
> Committee with an independent valuation of the proposed acquisition and the
> Advisory Committee must determine that the Related Party Transaction is in
> the best interest if the Partnership.

549.    The General Partner breached these duties when it failed to appoint an Advisory Committee until January 2019.

550.    Plaintiffs and the Class were harmed as a result of these material contractual breaches.

## VII.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** on behalf of themselves individually and similarly situated Limited Partners, Plaintiffs requests the following:

(a)    Certification of this action as a class action proper and maintainable pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and declaration of the proposed named Plaintiffs as proper Class representatives;

(b)    Preliminary and permanent equitable relief, including the imposition of a constructive trust to preserve the assets wrongfully taken from Plaintiffs;

(c)    Compensatory, consequential, and general damages in an amount to be determined at trial;

(d)    Disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts and practices;

(e)    Punitive damages for each claim based on the outrageous nature of Defendants' willful and wanton disregard of Plaintiffs' rights;

(f)    Costs, pre-judgment and post-judgment interest at the highest rate allowable by state law, and reasonable attorneys' fees and reimbursement of expenses; and

(g)    Other such relief as this Court may deem just and proper.


Dated: September 30, 2021                     **GRANT & EISENHOFER P.A.**

                                                                    By:  */s/ Daniel L. Berger*

Daniel L. Berger
Caitlin M. Moyna
485 Lexington Ave. 29th Fl.
New York, New York 10017
Tel: (646) 722-8501
dberger@gelaw.com
*Attorneys for Plaintiffs Barbara Deluca,
Drew R. Naylor, and Peggy Rollo and the
Putative Class*

**OF COUNSEL**

Catherine Pratsinakis *(Admitted PHV)*
Jessica L. Titler-Lingle *(Admitted PHV)*
DILWORTH PAXSON LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Tel: (215) 575-7013
cpratsinakis@dilwothlaw.com
*Attorneys for Plaintiffs Barbara Deluca,
Drew R. Naylor, and Peggy Rollo and the
Putative Class*

Michael J. Barry (*pro hac to be filed*)
Kimberly A. Evans (*pro hac to be filed*)
Laina M. Herbert (*Admitted PHV*)
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com
kevans@gelaw.com
lherbert@gelaw.com

*Attorneys for Plaintiffs Barbara Deluca,
Drew R. Naylor, and Peggy Rollo and the
Putative Class*